## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

ROBERT DALE HARRIS,

               Plaintiff,

vs.                       Case No.  **2:18-CV-00017-JES-MRM**

KEVIN RAMBOSK, in his Official Capacity
as Sheriff of Collier County, Florida, KASEY
P. WINGO, individually, MICHAEL D.
CHAPMAN, individually, BRIAN R.
WIEDEL, individually, SCOTT PEPIN,
individually, and ROSS ANTHONY,
individually,

               Defendants.

## AMENDED COMPLAINT and DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, ROBERT DALE HARRIS, by and through his attorney,

Dawn L. Drellos-Thompson of Compass Law Firm, P.A., files this Amended Complaint

and Demand for Jury Trial, and sues Defendants KEVIN RAMBOSK, KASEY P.

WINGO, MICHAEL D. CHAPMAN, BRIAN R. WIEDEL, ROSS ANTHONY, and

SCOTT PEPIN for damages, jointly and severally, and alleges on knowledge as to their

own actions, and otherwise upon information and belief, as follows:

## JURISDICTION

1.      This Court has jurisdiction over this action pursuant to Title 42 U.S.C.

Section 1983 and Title 28 U.S.C. Section 1343, seeking damages including costs of

litigation, and reasonable attorney fees, against Defendants SHERIFF KEVIN

RAMBOSK (RAMBOSK) in his official capacity as Sheriff of Collier County, Florida;

and, the following Defendants in their *individual* capacities: KASEY P. WINGO

(WINGO), MICHAEL D. CHAPMAN (CHAPMAN), BRIAN R. WIEDEL (WIEDEL),

ROSS ANTHONY (ANTHONY) and SCOTT PEPIN (PEPIN), for committing acts,

under the color of law, which deprived Plaintiff of his rights secured by the Fourth and

Fourteenth Amendments to the Constitution and law of the United States.  This Court has

original jurisdiction pursuant to Title 28 U.S.C. Section 1331 and 1367.

2.      Plaintiff Robert Dale Harris (HARRIS) also seeks the Supplemental

Jurisdiction of this Court, pursuant to 28 U.S.C. 1367, against Defendants WINGO,

CHAPMAN, WIEDEL, ANTHONY, and PEPIN for intentional acts committed under the

common law of the State of Florida, in that such claims derive from a common nucleus of

operative facts and are so related to the claims in this action within the Court's

jurisdiction, that they form part of the same case or controversy.

3.      Defendants WINGO, CHAPMAN, WIEDEL, ANTHONY, and PEPIN, at

all times material hereto, were employed by the Office of Sheriff of Collier County and

were acting individually, as well as under color of authority of the laws of the State of

Florida.  Defendant RAMBOSK, was, at all times material hereto, employed by the

Office of Sheriff of Collier County and was acting in his official capacity as Sheriff under color of authority of the laws of the State of Florida.

4.      Defendants RAMBOSK, WINGO, CHAPMAN, WIEDEL, ANTHONY, and PEPIN, at all times material to this action, were engaged in activities best described as "operational" level decision-making within the Collier County, Florida, Sheriff's Department. In as much as these activities do not fall into the category which involves broad policy making or planning and hence do not involve discretionary governmental functions, the Defendants named in this paragraph are not immune from tort liability under the provisions of Section 768.28, *Florida Statues*, and the Constitution of the State of Florida.

## VENUE

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that all of the events and actions giving rise to the claims contained herein occurred in this district.

6.      All conditions precedent required by Florida law for the filing of this Complaint, including notification of certain Defendants pursuant to Section 768.28, *Florida Statute*, of any state law claims, have been met.

## PARTIES

7.      Plaintiff, Robert Dale Harris (HARRIS), is an individual who formerly resided at 6** Pine Vale Drive, Naples, Florida (Collier County) from March 2011 until January 26, 2017. HARRIS is currently living at 7** S. Sandusky Road, Sandusky, Michigan 48471.

8.     Upon information and belief, Defendant Kevin RAMBOSK is the Sheriff of Collier County and was, at all times, the Sheriff of Collier County during the events giving rise to the claims contained herein.

9.     Upon information and belief, Defendant Kasey P. WINGO is currently a Sergeant with the CCSD (CCSD) and was, at all times, employed by the CCSD during the events and actions giving rise to the claims contained herein.

10.     Upon information and belief, Defendant Michael D. CHAPMAN is currently a Deputy with the CCSD and was, at all times, employed by the CCSD the events and actions giving rise to the claims contained herein.

11.     Upon information and belief, Defendant Brian R. WIEDEL is currently a Deputy with the CCSD and was, at all times, employed by the CCSD during the events and actions giving rise to the claims contained herein.

12.     Upon information and belief, Defendant Scott PEPIN is currently a Deputy with the CCSD and was, at all times, employed by the CCSD during the events and actions giving rise to the claims contained herein.

13.     Upon information and belief, Defendant Ross ANTHONY is currently a Deputy with the CCSD and was, at all times, employed by the CCSD during the events and actions giving rise to the claims contained herein.

### GENERAL ALLEGATIONS

14.     On at least three separate occasions between September 2013 and December 2013, CHAPMAN, in his capacity as a deputy sheriff, escorted Collier County Code Enforcement Agents to a home located at 6** Pine Vale Drive, Naples, Florida.

15.     During this time, HARRIS was residing at the Pine Vale Drive home,
which was owned by his maternal grandmother.  However, HARRIS did not have a legal
or financial responsibility for the home or its upkeep.

16.     During CHAPMAN'S escorts with Code Enforcement, CHAPMAN was
verbally abusive toward and argumentative with HARRIS.

17.     On March 9, 2014, between the hours of 3:30 a.m. and 4:30 a.m.,
HARRIS was at the McDonald's located at 8875 Davis Blvd., Naples, which is about .02
miles from his residence.  This McDonald's is open 24 hours a day and seven days a
week.

18.     On March 9, HARRIS was a lawful customer of this McDonald's during
its regular business hours and was seated at an outside table with friends when
CHAPMAN arrived in his patrol vehicle.

19.     Upon arriving at the McDonald's, CHAPMAN was summoned over to
assist another McDonald's customer who had locked his keys inside his vehicle.

20.     After CHAPMAN finished assisting the other customer, upon seeing
HARRIS and without lawful cause to do so, came over to HARRIS'S table and
threatened to trespass HARRIS from this McDonald's and any other business
establishment in Naples, whenever he would see him.

21.     CHAPMAN remembered HARRIS from his previous meetings with him
at the Pine Vale Drive residence, and had no problem identifying HARRIS when he saw
him again on March 9th at McDonald's.

22.     Immediately after CHAPMAN left McDonald's, at approximately 4:22 a.m., HARRIS called the CCSD to report CHAPMAN'S threat to unlawfully trespass him.  Shift Sgt. Amengual was dispatched to McDonald's to take HARRIS'S complaint, which was recorded on his patrol car's dash cam.

23.     Prior to arriving, Amengual had contacted CHAPMAN and WINGO about HARRIS'S complaint.  WINGO arrived at McDonald's simultaneously with Amengual. Amengual's dash cam recorded WINGO walking in front of Amengual's patrol car toward HARRIS, while HARRIS was making his complaint about CHAPMAN to Amengual.

24.     After speaking with HARRIS, both Amengual and WINGO returned to their vehicles leaving HARRIS at the McDonalds.  Neither Amengual nor WINGO issued a written report concerning HARRIS'S March 9 complaint about CHAPMAN or took any further action.

25.     In an email to Peggy Brooks dated, May 7, 2014, an employee of CCSD's Professional Responsibility Bureau (PRB), Amengual verified that WINGO was present during HARRIS'S complaint about CHAPMAN on March 9, as his witness.

26.     On April 4, 2014, at approximately 9:00 a.m., HARRIS, arrived at the iStorage facility (unit 223) located at 3836 Tollgate Blvd., Naples, Florida, which is about .05 miles from where he resided on Pine Vale Drive.

27.     HARRIS was working for his friend Randy at a lawfully rented unit, repairing Randy's Harley-Davidson motorcycle.  Randy's nickname was Rockn' Roll Randy, but his given name was Randy Leon Sulwikowski.  Randy has since passed away.

28.   The iStorage units are enclosed by a high, wrought-iron fence, with access for unit renters from 6:00 a.m. to 9:00 p.m.   These times are prominently posted in large letters on the front access gate, next to another sign for its business hours, and stating that security cameras were in use.   A keypad and code entry system controls access for renters when the gate is closed.

29.   HARRIS left Randy's iStorage unit throughout the day and evening to purchase motorcycle parts from Walmart, which is located at 9885 Collier Blvd., Naples, and refreshments from the Shell Station located at 3825 Tollgate Blvd., Naples.

30.   The Shell Station is located across the street and southwest from the iStorage facility.   The iStorage's front gate is clearly visible from the Station's parking lot adjacent to Tollgate Blvd.

31.   On April 4, 2014, HARRIS passed the Shell Station on his way to Walmart when he noticed two sheriff's patrol vehicles parked next to each other.   Since CHAPMAN'S threat to unlawfully trespass HARRIS on March 9, and CCSD's failure to fully investigate the threat, HARRIS took special notice of these patrol vehicles for fear of being unlawfully trespassed.

32.   After his trip to Walmart, HARRIS returned to the storage unit through the front gate and then, about an hour later, went to the Shell Station to purchase refreshments when he again noticed a sheriff's patrol vehicle parked in the Station's parking lot.   HARRIS made his purchase and headed directly back to the iStorage facility using the front gate.

33.     On April 4, at 8:10 p.m., round the same time that HARRIS was going in and out of the iStorage unit, CHAPMAN investigated a suspicious vehicle located at the Comfort Inn and Suites at 3860 Tollgate Blvd., Naples, which is directly north of the iStorage.

34.     On April 4, at 8:45 p.m., CHAPMAN was dispatched to a traffic stop located at Catalina Drive and Devon Circle in Naples where he issued a written traffic warning.  After issuing the warning and without being dispatched, CHAPMAN returned to the Tollgate Blvd. area, which was approximately 15 minutes away.

35.     After returning to Tollgate Blvd., CHAPMAN parked his patrol vehicle near the Cracker Barrel restaurant located at 3845 Tollgate Blvd., which is directly west from the iStorage.  CHAPMAN parked his vehicle facing Tollhouse Drive (to the south) so he could maintain surveillance of the iStorage's front gate, which appears to be the only appropriate way in and out of the facility, and the same gate that HARRIS was entering and exiting throughout the day and into the evening.

36.     On April 4, at 8:47 p.m., WINGO conducted a welfare check at the Super 8 Hotel located at 3880 Tollgate Blvd., Naples, which is directly north of the iStorage.

37.     During the time that WINGO and CHAPMAN were patrolling the Tollgate Blvd. area, HARRIS was working out of Randy's opened unit, using a generator and a light, which was visible from Tollgate Blvd.

38.     On April 4, at approximately 9:30, while parked near the Cracker Barrel restaurant, Chapman saw HARRIS walking toward the iStorage front gate.

39.     When CHAPMAN saw that HARRIS was beginning to leave the iStorage facility, he followed HARRIS from behind in his patrol vehicle as HARRIS made his way toward the front gate.

40.     Just as HARRIS exited iStorage's front gate, CHAPMAN pulled up and called out to HARRIS by his first name, "Robert," before he even asking HARRIS for his name or identification.

41.     WINGO arrived in his patrol vehicle simultaneously with CHAPMAN just as HARRIS was exiting the iStorage's front gate.

42.     Neither CHAPMAN nor WINGO had on body cameras, and WINGO'S patrol vehicle did not utilize a dash-cam.  CHAPMAN, on the other hand, intentionally parked his patrol vehicle in such away that its in-car dash cam did not visually record his and WINGO'S interaction with HARRIS.

43.     When CHAPMAN and WINGO arrived at the iStorage gate, HARRIS was not climbing over the iStorage fence; he was not dodging the iStorage security cameras; he was not running through the gate; and, he was not trying to conceal his identity.

44.     When HARRIS saw CHAPMAN and WINGO at the iStorage gate, he did not attempt to run from them, he did not try to avoid them, and he did not attempt to pedal away but, instead, met the officers at the gate.

45.     When CHAPMAN first arrived, he called out to HARRIS by his first name, "Robert," asking him if he was working at the storage facility, to which HARRIS immediately replied that he was working there for Randy.

9

46.     CHAPMAN then asked HARRIS if anyone could verify that he was working there to which HARRIS again replied, "Randy." CHAPMAN recognized that the person to whom HARRIS was referring to goes by the nickname, "Rock'n Roll Randy."

47.     After HARRIS asks CHAPMAN why he is being stopped, CHAPMAN misleads HARRIS by telling him that someone had called in a loitering and prowling complaint, and not that CHAPMAN himself had self-initiated the investigation.

48.     CHAPMAN'S need to conceal the identity of who initiated the prowling and loitering complaint against HARRIS is evidence that CHAPMAN lacks probable cause for stopping HARRIS, especially in light of CHAPMAN'S previous threats to unlawfully trespass HARRIS and because he has been keeping HARRIS under surveillance throughout the evening.

49.     Complying with CHAPMAN's request to verify his reason for being at the iStorage, HARRIS can be heard on CHAPMAN'S dash-cam audio calling Randy from his cellphone and asking him to come to the front gate "to talk with the officers." Randy can also be heard over the audio replying, "[o]n my way," which both WINGO and CHAPMAN can hear as well.

50.     During HARRIS'S cellphone call to Randy, HARRIS hears CHAPMAN utter to WINGO, "Corporal," and then sees him motion to WINGO. This utterance is picked up by CHAPMAN'S audio.

51.     As Harris is waiting for Randy to come to the gate, HARRIS is straddling the horizontal crossbar of his men's bike with both feet touching the ground on each side,

which makes it impossible for him to move off the bike quickly or take a threatening stance against either deputy.  Moreover, HARRIS is not attempting to pedal away.

52.    Furthermore, neither deputy can be heard on CHAPMAN'S audio expressing concern that HARRIS is threatening their physical well-being or safety. Regardless of a lack of threat, and just as Randy is opening the gate to speak with WINGO and CHAPMAN, they seize HARRIS from his bike and begin beating him.

53.    In addition, while WINGO and CHAPMAN are beating HARRIS, Randy can be seen on the video pacing back and forth behind the gate; however, neither deputy calls out to Randy asking for his name or for him to step out from behind the gate.

54.    Even though Randy is still behind the gate when HARRIS is stopped, Randy is not arrested for loitering and prowling or is he issued a trespass warning.

55.    During HARRIS'S beating, he sees WINGO bring out a knife to cut off his backpack while CHAPMAN continues his assault and battery and, although HARRIS is subdued and lying on the ground, other arriving deputies join in on the assault and battery against HARRIS.

56.    While HARRIS is handcuffed on the ground going in and out of consciousness from the excessive beating and tasing, Defendant PEPIN strikes HARRIS on his left shoulder back area several times with his "asp," which is a telescopic baton that leaves approximately seven red, black and blue marks on HARRIS'S back in the shape of his baton.

57.    While HARRIS is incapacitated on the ground, a deputy is overheard mocking him for making his March 9 complaint about CHAPMAN and Amengual, who

is now present on the scene, but does nothing to stop his deputies from beating and tasing HARRIS or question the reason for the stop based on his prior knowledge of HARRIS'S interaction with CHAPMAN.

58.      Before HARRIS is taken away by ambulance, an unidentified officer lifts HARRIS'S head up to take a picture of his face. HARRIS hears the officer say, "Wait, hold on, I have got to take a picture as my trophy. Yea, that picture looks good because of all of the snot coming out of his nose," which Amengual also allows to happen.

59.      HARRIS is arrested on six (6) counts: three (3) counts of which are a third-degree felony for battery on an officer, with each count punishable by up to five (5) years in prison or a total of up to fifteen (15) years.

60.      HARRIS is also charged with one (1) count of a second-degree felony for assault on an officer, which is punishable by up to 15 years in prison.

61.      HARRIS is also charged with one (1) count, first-degree misdemeanor for resisting/obstructing an officer without violence, which is punishable by up to one year in jail and a second-degree misdemeanor for loitering and prowling, which is punishable by up to 60 days in jail. In all total, HARRIS is facing up to 30 years in prison plus jail time.

62.      On April 17, 2014, The State Attorney's Office files a *Not Filing Charge* document on all counts and HARRIS is subsequently released from custody: however, HARRIS spends 14 days in jail because he is unable to make bond.

63.      The CCSD never seeks a copy of the iStorage's April 4, 2014 security camera video to corroborate CHAPMAN and WINGO'S statements.

64.     On May 29, 2014, less than two months after HARRIS is released from jail for his April 4 arrest, ANTHONY issues HARRIS two trespass warnings: one for the Shell Station located at 3825 Tollgate Boulevard, Naples and one for the Waffle House located at 3824 Tollhouse Drive, Naples.  On the Waffle House trespass warning, ANTHONY writes "Bothering customers at Circle K," even though ANTHONY issues the warning at the Waffle House.

65.     ANTHONY self-initiated the Waffle House trespass warning after he followed HARRIS into the Waffle House ordering that HARRIS step outside but refusing to tell HARRIS why.  Neither CCSD nor ANTHONY had been called to the Waffle House by either an employee or manager to trespass HARRIS.

66.     HARRIS repeatedly asks ANTHONY why he is being stopped, but ANTHONY refuses to give him a reason.  During this time, and in front of a Waffle House employee, ANTHONY threatens to pepper-spray HARRIS if he does not step outside, despite the fact that HARRIS is not causing a disturbance and ANTHONY has not given HARRIS a reason for why he is being stopped.

67.     HARRIS complies with ANTHONY'S order to go outside and, once outside, ANTHONY handcuffs HARRIS who is then surrounded by several other deputies while ANTHONY goes back into the Waffle House to tell the employee that he is going to issue HARRIS a trespass warning – a restaurant that HARRIS has frequented since 2011 without a problem.

68.     ANTHONY then, without being dispatched, goes over to the Shell Station next to the Waffle House and tells an employee there, by the name of Ibrahim, that he intends to issue HARRIS a trespass warning.

69.     Ibrahim, who later hired HARRIS to stock shelves at the Shell Station, after the trespass warning, told HARRIS that he did not voluntarily authorize ANTHONY to trespass HARRIS, but felt that he had no choice, and did so "to keep the peace" with CCSD.

70.     The Shell Station's trespass warning also included the Circle K in that it states that HARRIS was "bothering customers at Circle K," a gas station located at 8600 Radio Lane, Naples, which is about .03 blocks from HARRIS'S residence, and one that he also frequents as a customer.  Prior to these trespass warnings, HARRIS frequented all of these business establishments on a regular basis since 2011.

71.     On June 6, 2014, about two months after HARRIS'S April 4 arrest and his release from jail, WINGO conducted a Florida Department of Law Enforcement (FDLE) Transaction Archive Report (TAR) on HARRIS, for unknown reasons.

72.     On June 10, 2014, HARRIS is issued a third trespass warning by CCSD's Deputy Sean Ellis for the Dunkin' Donuts located at 8885 Davis Blvd., Naples, where HARRIS was also a frequent customer.

73.     On June 10, HARRIS had just purchased two donuts when he went over to the McDonald's next door to buy coffee and sit outside.  Shortly thereafter, HARRIS found himself surrounded by four CCSD's deputies.  According to Deputy Ellis's trespass warning, WINGO was also present.

74.     HARRIS witnessed PEPIN and Deputy Ellis walk over to the Dunkin'
Donuts and, through the large glass windows, saw them speaking to Sara, the cashier
from whom he had just purchased the two donuts from. The Dunkin's Donuts is about
.03 miles from HARRIS'S home. Later, HARRIS would become an employee of this
Dunkin' Donuts. It is believed that Sara was dating PEPIN'S son at the time of this
trespass.

75.     PEPIN was also one of the responding deputies to HARRIS'S April 4,
2014 arrest where he used his baton on HARRIS'S back, striking him at least seven
times.

76.     On June 10, 2014, Natalie Monplaisir of the CCSD also conducted a
FDLE-TAR on Harris.

77.     On June 27, 2014, HARRIS, along with members of the ACLU-Collier
Chapter, met with Commander Michael Williams of the CCSD to discuss HARRIS'S
April 4, 2014 arrest and the subsequent trespass warnings by CCSD deputies. It was at
this meeting that Commander Williams referred to HARRIS as a "sovereign citizen,"
even though HARRIS has no history of: drug use, threats against law enforcement;
memberships with sovereign citizen groups; or violence against others.

78.     HARRIS, as a citizen of Collier County and recognizing the authority of
Commander Williams, sought his help in stopping the constant harassment and violation
of his constitutional rights by CCSD's deputies.

79.     On July 11, 2014, Anna Marie DeRosa of the CCSD also conducted a
FDLE-TAR on HARRIS.

80.     On August 30, 2014, Daniel Kennedy of the CCSD also conducted a FDLE-TAR on HARRIS.

81.     On August 30, 2014, Courtney Ewart of the CCSD also conducted a FDLE-TAR on HARRIS.

82.     On August 30, 2014, Frank Pisano of the CCSD also conducted a FDLE-TAR on HARRIS.  Deputy Pisano would also be one of the arresting officers for HARRIS'S December 16, 2016 arrest, almost two years later.

83.     On November 4, 2014, Robert Bremer of the CCSD also conducted a FDLE-TAR on HARRIS.

84.     On December 22, 2014, Adam Kallenberg of the CCSD also conducted a FDLE-TAR on HARRIS.  A little less than two years later, on October 18, 2016, Kallenberg would initiate a traffic stop against HARRIS, that HARRIS captured on his in-car camera.  Kallenberg would then submit a report to the CCSO CIB stating that HARRIS has been "known to identify himself as a sovereign citizen …," even though no discussion about HARRIS being a sovereign citizen occurred between HARRIS and KALLENBERG.

85.     On December 29, 2014, Shawn Bogart of the CCSD also conducted a FDLE-TAR on HARRIS.

86.     On December 29, 2014, HARRIS stopped at the Circle K located on Golden Gate and Collier Blvd., to buy some refreshments when he found himself suddenly surrounded by three Collier County Deputies: Cady, Marchesiello, and Dehann who began interrogating him while HARRIS was on his cellphone talking to his lawyer.

The deputies were not responding to a call at the Circle but had initiated the stop on their own. After speaking with HARRIS'S lawyer, the deputies stopped their interrogation of HARRIS and left the scene.

87.     On January 5, 2015, Kristin Adams of the CCSD also conducted a FDLE-TAR on HARRIS.

88.     On March 11, 2015, Vanessa Rodriquez of the CCSD conducted a FDLE-TAR on HARRIS.

89.     On March 11, 2015, Brian Kilcoyne of the CCSD also conducted a FDLE-TAR on HARRIS.

90.     On March 21, 2015, Kevin Alexander of the CCSD also conducted a FDLE-TAR on HARRIS.

91.     On March 25, 2015, Brian Kilcoyne of the CCSD also conducted a FDLE-TAR on HARRIS.

92.     On March 26, 2015, Robert Bremer of the CCSD also conducted a FDLE-TAR on HARRIS.

93.     On March 26, 2015, Amy Caprari of the CCSD also conducted a FDLE-TAR on HARRIS.

94.     On March 26, 2015, Christopher Goggin of the of the CCSD also conducted a FDLE-TAR on HARRIS.

95.     On March 26, 2015, Robert Bremer of the CCSD also conducted a FDLE-TAR on HARRIS.

96.     On March 26, 2015, a call from Sew Shore located at 3845 Beck Blvd., Naples, Florida, believed to be placed by its owner Steven Sherman, was made to CCSD regarding HARRIS and a friend who entered Sew Shore. Sew Shore provides uniforms and equipment to law enforcement personnel, specifically the CCSD. It is also located near HARRIS'S April 4, 2014 arrest.

97.     The owner, Steven Sherman, is a former law enforcement officer, who requested that HARRIS be trespassed. An Intelligence Report about this incident was filed with CCSD-CIB; however, some of the substantive information contained within the Report is either fabricated or embellished, but it is used as part of CCSD's justification for continuing its surveillance of HARRIS.

98.     On April 9, 2015, Karen Eggleston of the CCSD also conducted a FDLE-TAR on HARRIS.

99.     On May 4, 2015, Renee Mang of the CCSD also conducted a FDLE-TAR on HARRIS.

100.     On May 6, 2015, Robert Bremer of the CCSD also conducted a FDLE-TAR on HARRIS.

101.     On June 12, 2015, Dale Dear of the CCSD also conducted a FDLE-TAR on HARRIS.

102.     On June 12, 2015, David Christiansen of the CCSD also conducted a FDLE-TAR on HARRIS.

103.     On June 15, 2015, Dale Dear of the CCSD also conducted a FDLE-TAR on HARRIS.

104.    On June 15, 2015, Frank Pisano (one of HARRIS'S arresting officers on December 16, 2016) of the CCSD also conducted a FDLE-TAR on HARRIS.

105.    On June 18, 2015, Stephen German of the CCSD also conducted a FDLE-TAR on HARRIS.

106.    On August 5, 2015, Dale Dear of the CCSD also conducted a FDLE-TAR on HARRIS.

107.    On August 12, 2015, Adam Kallenberg of the CCSD also conducts his second a FDLE-TAR on HARRIS.

108.    On August 12, 2015, Brian Kilcoyne of the CCSD also conducted a FDLE-TAR on HARRIS.

109.    On August 12, 2015, Michael Portnov of the CCSD conducted a FDLE-TAR on HARRIS.

110.    On August 12, 2015, Michael CHAPMAN (who arrested HARRIS on April 4, 2014, but charges were never filed by the State) also conducted a FDLE-TAR on HARRIS.

111.    On August 13, 2015, Sean Combs of the CCSD also conducted a FDLE-TAR on HARRIS.

112.    On August 19, 2015, Neil Gershman of the CCSD also conducted a FDLE-TAR on HARRIS.

113.    On August 29, 2015, Matthew Kinney of the CCSD also conducted a FDLE-TAR on HARRIS.

114.    On August 29, 2015, Courtney Ewart of the CCSD also conducted a FDLE-TAR on HARRIS.

115.    On September 4, 2015, Robert Russell of the CCSD also conducted a FDLE-TAR on HARRIS.

116.    On September 5, 2015, Lisa Martin of the CCSD also conducted a FDLE-TAR on HARRIS.

117.    On September 5, 2015, Dennis Grossklas of the CCSD also conducted a FDLE-TAR on HARRIS.

118.    On September 5, 2015, Sandra Long of the CCSD conducted a FDLE-TAR on HARRIS.

119.    On September 7, 2015, Michael Portnov of the CCSD also conducted a FDLE-TAR on HARRIS.

120.    On September 22, 2015, Erenia Borowski of the CCSD also conducted a FDLE-TAR on HARRIS.

121.    On October 4, 2015, Rashad Smith of the CCSD also conducted a FDLE-TAR on HARRIS.

122.    On October 12, 2015, David Schaare of the CCSD also conducted a FDLE-TAR on HARRIS.

123.    On October 18, 2015, Steven Maholtz of the CCSD also conducted a FDLE-TAR on HARRIS.

124.    On October 19, 2015, Donna Hanson of the CCSD also conducted a FDLE-TAR on HARRIS.

125.   On October 20, 2015, Marie Burns of the CCSD also conducted a FDLE-TAR on HARRIS.

126.   On October 24, 2015, Staci Bellantoni of the CCSD also conducted a FDLE-TAR on HARRIS.

127.   On October 24, 2015, ANTHONY also conducted a FDLE-TAR on HARRIS.

128.   On November 3, 2015, Brian Kilcoyne of the CCSD conducted a FDLE-TAR on HARRIS.

129.   On November 3, 2015, Cecilia Orr of the CCSD also conducted a FDLE-TAR on HARRIS.

130.   On November 4, 2015, Michael Puka of the CCSD also conducted a FDLE-TAR on HARRIS.

131.   On November 27, 2015, Chris Lukasz of the CCSD also conducted a FDLE-TAR on HARRIS.

132.   On November 29, 2015, Chris Lukasz of the CCSD also conducted a FDLE-TAR on HARRIS.

133.   On November 29, 2015, Amy Cleveland of the CCSD also conducted a FDLE-TAR on HARRIS.

134.   On December 10, 2015, ANTHONY conducted a FDLE-TAR on HARRIS.

135.   On March 1, 2016, Janeen Peden of the CCSD also conducted a FDLE-TAR on HARRIS.

136.    On August 31, 2016, Thomas Horsman of the CCSD also conducted a FDLE-TAR on HARRIS.

137.    On September 28, 2016, HARRIS initiated a Notice of Intent to File, which was served pursuant to Florida statute on the CCSD and the Florida Department of Financial Services.

138.    On October 4, 2016, WIEDEL conducted a FDLE-TAR on HARRIS. WIEDEL was also one of HARRIS'S arresting officers on December 16, 2016, and helped initiate criminal charges against HARRIS, which the State failed to file.

139.    On October 4, 2016, Simone Hatch of the CCSD also conducted a FDLE-TAR on HARRIS.

140.    On October 6, 2016, Stephanie Thompson of the CCSD also conducted a FDLE-TAR on HARRIS.

141.    On October 4, 2016, WIEDEL conducted a FDLE-TAR on HARRIS.

142.    On October 16, 2016, Julie Wilson of the CCSD also conducted a FDLE-TAR on HARRIS.

143.    On October 18, 2016, Julie Wilson of the CCSD also conducted a FDLE-TAR on HARRIS.

144.    On October 19, 2016, Adam Kallenberg of the CCSD also conducted his third FDLE-TAR on HARRIS.

145.    On October 27, 2016, Amy Butrico of the CCSD also conducted a FDLE-TAR on HARRIS.

146.    On October 27, Chris Marotta of the CCSD also conducted a FDLE-TAR on HARRIS.

147.    On November 20, 2016, at about 10:00 p.m. HARRIS was walking his brother's service dog to the Palm Springs Park, which is located only a few blocks from his residence.  When HARRIS arrived at the Park, he saw several CCSD deputies in tactical gear and clothing standing at the end of the cul du sac to the Park.  It was common for HARRIS to walk the dog during this time near the Park.  As HARRIS passed the deputies, Deputy Smith called out to HARRIS and asked him if he could help him and HARRIS responded that he was just walking his dog and that he lived in the neighborhood, to which Deputy Smith replied, "yea, I know."

148.    On December 12, 2016, Angela Speak of the CCSD also conducted a FDLE-TAR on HARRIS.

149.    On December 14, 2016, Casey WINGO (who arrested HARRIS with Deputy CHAPMAN on April 4, 2014 and on December 16, 2016) of the CCSD also conducted a FDLE-TAR on HARRIS.

150.    On December 14, 2016, Gregory Gosselin of the CCSD conducted a FDLE-TAR on HARRIS.  Deputy Gosselin was one of HARRIS'S arresting officers on December 16, 2016.

151.    On December 16, 2016, Monica Guttenfelder of the CCSD also conducted a FDLE-TAR on HARRIS.

152.    On December 16, 2016, Miriam Loyola of the CCSD also conducted a FDLE-TAR on HARRIS.

153.    On December 16, 2016, Casey WINGO of the CCSD also conducted a FDLE-TAR on HARRIS.

154.    On December 16, 2016, Tiffany Castle of the CCSD also conducted a FDLE-TAR on HARRIS.

155.    On December 16, 2016, Jonathan Warford of the CCSD conducted a FDLE-TAR on HARRIS.

156.    On December 16, 2016, Michael Williams of the CCSD, whose help HARRIS had sought back in June 2014, also conducted a FDLE-TAR on HARRIS.

157.    On December 16, 2016, Roger Mottley of the CCSD also conducted a FDLE-TAR on HARRIS.

158.    On December 16, 2016, Liliana Aguilar of the CCSD also conducted a FDLE-TAR on HARRIS.

159.    On December 16, 2016, Jill Windland of the CCSD also conducted a FDLE-TAR on HARRIS.

160.    All totaled, approximately 59 CCSD deputies and personnel conducted about 76 searches on HARRIS beginning on June 6, 2014 (two months after his April 4, 2014 arrest) and until December 17, 2016, the day after his second arrest.  Some of these searches were conducted by Officers WINGO, CHAPMAN, WIEDEL, PEPIN, ANTHONY.

161.    On December 16, 2016, at approximately 10:00 a.m., HARRIS was driving home from his third-shift Dunkin' Donuts job, when he turned onto Palm Springs

Blvd., and suddenly noticed an SUV with its emergency lights on speed out from behind some bushes on the opposite side of the road.

162.    HARRIS immediately pulled over but kept his in-car camera running on axillary power and pointed the camera toward the driver's side window so that it would record the actions of the law enforcement officer who stopped him: HARRIS did this out of fear based on CHAPMAN'S March 9 threat, his April 4 beating and arrest, and his belief that deputies were following him.

163.    WINGO was the driver of the unmarked CCSD vehicle and, as part of his practice and habit, was not wearing a body camera and nor did his vehicle employ a dash cam.  The only audio and visual recording of this stop is from HARRIS'S in-car camera. WINGO was also wearing a military-like tactical vest and gear.

164.    WINGO'S December 16 Supplemental Narrative Report (SNR) stated that he, "... identified myself, the reason for the stop, and requested [HARRIS'S] driver's license, registration, and proof of insurance."

165.    Based on HARRIS'S in-car video and audio, WINGO never identified himself to HARRIS or the reason for the stop.

166.    WINGO never determined whether the vehicle belonged to HARRIS or investigated whether the vehicle's tag was proper.

167.    WINGO'S SNR also states that "I informed Robert that he could not call his lawyer at this time and asked him to step out of the vehicle ...."

168.    WINGO'S SNR also states that "Robert leaned back in the vehicle pulling me into the vehicle with him."

169.     Based on HARRIS'S in-car video and audio, WINGO never advised HARRIS to step out of this vehicle before he, without probable cause, forcibly entered HARRIS'S vehicle and began tasing and beating him.

170.     Based on HARRIS'S in-car video and audio, HARRIS never pulled WINGO into his vehicle; however, WINGO, without probable cause and without issuing an order for HARRIS to step out of the vehicle, forced his way into HARRIS'S vehicle, got on top of HARRIS, and began beating and threatening him with lethal force.

171.     According to WIEDEL'S December 16, Incident Report, WINGO "identified himself as law enforcement," and that he "advised HARRIS for the reason of the stop ...." However, WIEDEL'S narrative is also contrary to what was recorded on HARRIS'S in-car camera for WINGO never identifies himself as law enforcement and nor does he inform HARRIS as to the reason for the stop.

172.     Also, according to WIEDEL'S report, "[o]n 12/14/16 and again on 12/15/16 a drive by of 6** Palm Vale Drive was conducted ...." However, WIEDEL'S report fails to provide a reason as to why the CCSD was conducting surveillance of HARRIS'S residence regarding a misdemeanor traffic stop.

173.     WIEDEL'S narrative also states that WINGO requested HARRIS to "step out of the vehicle." However, HARRIS'S recording shows that WINGO made no such request and that within seconds of approaching HARRIS'S vehicle, WINGO is seen, without warning or probable cause, aggressively attempting to open HARRIS'S door.

174.    WINGO exhibited extreme anger and aggression toward HARRIS while attempting to open HARRIS'S car door, even though HARRIS had not made any oral threats or threatening moves that would have placed WINGO in fear for his safety.

175.    WINGO'S behavior is so out of control that he yells at HARRIS, "Do not – get out of the f****** car," as he is attempting to gain entry into HARRIS'S car, but stating in his report that HARRIS failed to exit his vehicle upon his orders.

176.    During the beating, HARRIS realizes that it is WINGO and calls out asking if the officer is, in fact, WINGO, but WINGO does not respond.

177.    While on top of HARRIS and beating him, WINGO unjustifiably threatens HARRIS with lethal force by shouting, "I'm gonna f****** shoot you if you don't' get out of the car," despite HARRIS'S willingness to comply with WINGO'S order to get out of the car, he cannot because WINGO is on top of him. HARRIS can be heard on the audio begging WINGO to stop, but WINGO keeps on hitting and dry tasing HARRIS.

178.    WINGO later tells HARRIS that "I'm gonna f****** hurt you so bad in a second," to which HARRIS replies, "Please stop." Shortly thereafter, other deputies arrive and drag HARRIS out of the car from the passenger side, pepper spraying him in his eyes, nose, and mouth.

179.    Not once during his beating by WINGO, does HARRIS threaten WINGO and state that he is a "sovereign citizen." HARRIS calls WINGO "sir" and repeatedly asks WINGO what he is doing and tells WINGO his willingness to get out of the car if WINGO would get off of him.

180.    After arresting HARRIS, CCSD investigating deputies searched HARRIS'S vehicle but do not find any drugs or literature related to sovereign citizen activities in HARRIS'S car.

181.    About a week before HARRIS'S December 16, arrest, HARRIS, with the help of a benevolent friend, purchased a 1997 White Ford Escort from Thomas Brimmekamp so HARRIS could keep his Dunkin' Donuts job after his car broke down, which he lost anyway after his December 16, 2016 arrest.

182.    Neither WINGO nor WIEDEL'S reports state the reason why WINGO and "his team" were conducting surveillance of HARRIS'S residence on or prior to December 14, 2016, but it appears to be caused by the CCSD's obsessive and unsubstantiated belief that HARRIS is involved in sovereign citizen activities or drug running.

183.    On December 16, after HARRIS was released from the hospital, he is transported to the Collier County Jail where an unidentified deputy tells the deputies escorting HARRIS into booking that he needs "to take [HARRIS'S] picture for the other officers," and takes a picture of HARRIS'S beaten face with a cellphone camera.

184.    HARRIS is charged with a second-degree felony for assault of an officer, which carries a penalty of up to 15 years in prison.

185.    HARRIS is also charged with two counts of a third-degree felony for battery on an officer with violence and resisting an officer with violence, which carries up to five years in prison for each count.

186.   HARRIS is also charged with one count, first-degree misdemeanor for resisting arrest without violence, which carries a penalty of up to a year in jail.  All total, HARRIS is facing 25 years in prison plus jail time – predicated on a misdemeanor traffic stop.

187.   On January 17, 2017, The State Attorney's Office files a *Not Filing Charge* on all counts for the December 16, 2014 arrest, and HARRIS is released from custody, but not before spending over a month in jail because he could not afford to post a $55,500 bond.  The State also refuses to pursue charges on the unassigned tag allegation.

188.   On January 24, 2017, HARRIS'S initiates a second Notice of Intent to File for the December 16, 2016 arrest pursuant to Florida statute on the CCSD and the Florida Department of Financial Services.

189.   After HARRIS is released from jail, however, because he is in fear for his life and well-being, he moves to undisclosed location.

### COUNT I
**Violation of Civil Rights of ROBERT DALE HARRIS Pursuant
to 42 U.S.C. §1983 Against Sheriff KEVIN RAMBOSK
for the April 4, 2014 Arrest**

190.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

191.   Defendant RAMBOSK, as Sheriff of the Collier County, Florida Sheriff's Office, and his predecessors in office, have, over time, established a policy and custom of failure to provide timely, appropriate, and adequate oversight of deputies in the execution

of their duties and have failed to investigate complaints regarding the execution of those duties.

192.    RAMBOSK has established a policy and custom of failure to train and administer adequate discipline to deputies despite a continued pattern of misconduct in the execution of law enforcement duties by deputies, and has established a policy and custom of failure to properly train deputies in the law regarding probable cause and the conduct of an investigation of the kind initiated for the incidents as alleged above.

193.    Such policies and customs constitute deliberate indifference to the risk that citizens of Collier County will be subjected to unlawful seizure during an investigatory stop, excessive force in making such unlawful seizure detention, and prosecution, and have contributed to an atmosphere of tolerance for misconduct, and such policies and customs are tantamount to deliberate indifference to HARRIS'S constitutional rights as secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

194.  In addition, these policies and customs fail to take into consideration the lives and wellbeing of Collier County deputies and other law enforcement personnel who needlessly race in their vehicles in response to calls for assistance from deputies who subject citizens to unlawful seizure during an investigatory stop, unnecessary excessive force, and false arrest.

195.    Furthermore, these policies and customs fail to take into consideration the lives and wellbeing of citizen bystanders who may be unintentionally hurt by deputies who needlessly race in their vehicles in response to calls for assistance from deputies who

subject citizens to unlawful seizure during an investigatory stop, unnecessary excessive force, and false arrest.

196. The unlawful seizure of HARRIS based on a conspiracy to fabricate an arrest by RAMBOSK'S deputies, without probable cause of HARRIS during an investigatory stop; the use of unreasonable and excessive force to effect that seizure; and detention and prosecution of HARRIS are directly attributable to RAMBOSK'S policies and customs that permeate his Department with regard to inadequate oversight, inadequate discipline of deputies despite a pattern of misconduct, and inadequate training of deputies in the execution of their law enforcement duties.

197. On March 9, 2014, HARRIS reported to CHAPMAN'S superior that CHAPMAN had threatened to unlawfully trespass him, without probable cause, from whatever business establishment he found HARRIS.

198. Neither Amengual nor WINGO, based on the policies and customs of the Department, endorsed by RAMBOSK, filed a report about CHAPMAN'S threats toward HARRIS or initiated a formal investigation to determine whether CHAPMAN was unlawfully using his position with the CCSD to harass and intimidate HARRIS, absent any criminal activity.

199. Neither Amengual nor WINGO, based on the policies and customs of the Department, endorsed by RAMBOSK, demonstrated a sense of concern, surprise, or urgency for the reported conduct of CHAPMAN toward HARRIS, which is a direct result of the policies and customs established by RAMBOSK.

200.   The lack of an investigation over HARRIS'S complaint demonstrates a systematic failure within the CCSD and the leadership of RAMBOSK to address citizens' concerns as they relate to their protected constitutional right to be free from unlawful search and seizures by deputies who are acting outside of the scope of their authority or immunity.  This systematic failure permeates through the ranks to those deputies who patrol the streets.

201.   That the deputies were accustomed to departmental tolerance of their use of such threats and unlawful excessive force and believed they would never be held accountable for their conduct, was demonstrated by their future conduct toward HARRIS.

202.   That RAMBOSK has failed to provide adequate training, policies, and oversight into how his deputies respond to individuals of lower socio-economic standing and cognitive deficiencies without resulting to incorrectly and overzealously mis-categorizing citizens as part of extremist groups when they complain about their treatment at the hands of CCSD deputies.

203.   RAMBOSK, as the head of the CCSD, is ultimately responsible for not only setting the law enforcement policies and customs of the Department and his deputies interactions with citizens, but departmental policy guided by the U.S. Constitution as it relates to investigations and arrests.

204.   RAMBOSK has cultivated and encouraged an environment within the CCSD whereby his deputies feel comfortable and entitled to unlawfully threaten and intimidate citizens of their choosing, with impunity, that led to the violation of

HARRIS'S constitutional rights against unlawful search and seizure, use of excessive use of force and malicious prosecution.

205.  WINGO and CHAPMAN'S plan to unlawfully detain, search, seize and use excessive force against HARRIS on April 4, 2014, was a direct proximate cause of the leadership and environment cultivated, created, and maintained under the direct supervision of RAMBOSK.

206.  As a direct and proximate result of such policies and customs, as alleged above, HARRIS has suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

207.  HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant Sheriff Kevin RAMBOSK, pursuant to the provisions of 42 U.S.C. Section 1983.

208.  **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant Sheriff KEVIN RAMBOSK, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT II
### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against KASEY P. WINGO for False Arrest and Excessive Force for the April 4, 2014 Arrest

209.  Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

210.   WINGO violated the clearly established and well settled federal constitutional rights of HARRIS, including but not limited to, his Fourth and Fourteenth Amendment rights of:

a. Freedom from unreasonable seizure of his person; and

b. Freedom from illegal detention and deprivation of his liberty without due process of law.

211.   The acts of WINGO, while acting under color of state law, deprived HARRIS of his right to be free from unlawful restraint and excessive force and otherwise deprived him of due process of law in violation of the Constitution of the United States.

212.   On April 4, 2014, while patrolling the Tollgate Blvd. area, WINGO and CHAPMAN conspired to set HARRIS up for an unlawful arrest after keeping HARRIS under surveillance while he worked in a unit at the iStorage.

213.   WINGO was present for HARRIS'S March 9, 2014 complaint about CHAPMAN'S threat to unlawfully trespass HARRIS from every business establishment in Naples.

214.   WINGO'S CAD and Deputy History Report place him near surrounding business establishments with full view of the iStorage facility where HARRIS was working and where he could keep HARRIS under surveillance on April 4, 2014.

215.   WINGO'S CAD and Deputy History Reports also shows his time near the iStorage as overlapping with that of CHAPMAN who is working in the same area during this time.

216.   WINGO arrived simultaneously with CHAPMAN just as HARRIS exited the iStorage even though there was no 911 call for loitering or prowling.

217.   Upon being stopped and questioned by WINGO and CHAPMAN, HARRIS tells the deputies that he has been working at the facility for Randy.  In front of WINGO and CHAPMAN, HARRIS places a cellphone call asking that Randy come to the gate to verify his reason for being there – this call and Randy's response can be heard on CHAPMAN'S dash-cam audio.

218.   As HARRIS is calling Randy to come to the gate, he hears CHAPMAN utter to WINGO, "Corporal," and then sees him motion to WINGO.  WINGO and CHAPMAN are facing the gate, and as they see Randy opening the gate to speak with them, WINGO and CHAPMAN seize HARRIS and begin beating and tasing him.

219.   As WINGO and CHAPMAN beat and tase HARRIS, Randy can be seen pacing back and forth behind the gate, but neither WINGO nor CHAPMAN call out to Randy asking him to identify himself or seemed concerned about his presence behind the gate.

220.   There is no visual or audio corroboration of CHAPMAN'S account that HARRIS "took an aggressive stance" by "balling his hands into fists while leaning towards" CHAPMAN as CHAPMAN alleges in his incident report.

221.   No one from the CCSD requested a copy of the iStorage security camera video as evidence to corroborate reports that HARRIS'S search and seizure was lawful or that the use of excessive force used against him was reasonable and necessary.

222.    Upon questioning by WINGO and CHAPMAN, HARRIS provided a credible and immediately verifiable reason for being at the iStorage, which WINGO and CHAPMAN disregarded for the sake of their conspiracy to arrest HARRIS.

223.    Throughout the evening, WINGO and CHAPMAN kept HARRIS under surveillance waiting for the right time to execute their plan to set HARRIS up for an arrest and the subsequent charges that followed.

224.    WINGO saw Randy opening the gate to meet them, but he and CHAPMAN could not allow Randy to interfere with their plan to arrest HARRIS.

225.    WINGO and CHAPMAN conspired to arrest HARRIS the night of April 4 as payback for his complaint to Amengual on March 9.  WINGO'S simultaneous arrival with CHAPMAN, and just as HARRIS is exiting the iStorage facility, is no coincidence but a planned opportunity to teach HARRIS a lesson.

226.    HARRIS walked freely in and out of the gate from 9:00 a.m. that morning until WINGO and CHAPMAN'S arrival.  HARRIS was not seen jumping over the fence, he was not running from the facility, he did not try to avoid security cameras, and he did not flee from the deputies as they pulled up.

227.    The unlawful seizure of HARRIS by WINGO, including the beating with batons, the use of tasers, use of pepper spray, and threatening to unleash a K-9 on HARRIS was not predicated on any facts regarding possible criminal activity, nor any threat to WINGO or another deputy.  HARRIS was seized against his will, subjected to unreasonable and excessive force out of all proportion, and not subject to a valid

investigation, which deprived HARRIS of his right to due process of law in violation of the Fourth and Fourteenth Amendment to the Constitution of the United States.

228.   HARRIS'S stop was unlawful and unreasonable because it was part of a conspiracy by WINGO and CHAPMAN to falsely arrest HARRIS to intimidate, harass, and teach HARRIS a lesson about reporting CHAPMAN'S misconduct to Amengual less than a month earlier.

229.   Randy, who was still inside the iStorage facility after HARRIS'S arrest, was not arrested or given a citation for trespassing.

230.   As a direct and proximate result of the unconstitutional conduct of WINGO, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

231.   HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant WINGO, pursuant to the provisions of 42 U.S.C. Section 1983.

232.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant KASEY P. WINGO together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT III

### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against KASEY P. WINGO for Malicious Prosecution for the April 4, 2014 Arrest

233.     Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

234.     The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by WINGO.

235.     WINGO violated the clearly established and well-settled federal constitutional rights of HARRIS, including, but not limited to, his Fourth Amendment right to be free from malicious prosecution when he was seized without probable cause.

236.     The acts of WINGO, while on the job and acting under color of state law, deprived HARRIS of his right to be free from unreasonable seizure and otherwise deprived him of due process of law in violation of the Constitution of the United States.

237.     WINGO, conspiring with CHAPMAN, seized HARRIS, beat him, pepper sprayed him, tasered him, and threatened him with bodily harm despite the fact that HARRIS was cooperating with WINGO by supplying a credible and verifiable reason for being at the iStorage facility.

238.     WINGO saw Randy approaching the gate; however, before Randy could verify HARRIS'S reason for being there, WINGO seized HARRIS and began beating and tasing him.

239.     There was no articulable fact that justified HARRIS'S continued detention by WINGO since both he and CHAPMAN had HARRIS under surveillance prior to the

iStorage closing and they self-initiated the stop. Furthermore, HARRIS was not seen jumping over the fence; HARRIS was not seen running from the facility; HARRIS did not try to avoid security cameras; and, HARRIS did not flee from the deputies as they pulled up in their patrol vehicles.

240.    WINGO intentionally prohibited Randy from verifying HARRIS'S reason for being on the premises, which would have ended WINGO'S investigatory stop, if it had been lawful.

241.    HARRIS was charged with six counts that, upon conviction, totaled about 30 years in prison despite having committed no crime.

242.    Because of WINGO's report, HARRIS is jailed for approximately 14 days and unable to make bond before he is released. WINGO'S conduct and report were a legal cause of the proceeding. The proceeding was terminated in favor of HARRIS when the State's Attorney issued a Not Filing Charge document on April 17, 2014, for all six counts.

243.    WINGO'S plan to arrest HARRIS by creating a fictitious prowling and loitering complaint as the basis for the unlawful search, seizure, and arrest was clearly done with malice and in disregard for HARRIS'S constitutional rights and, as a result, HARRIS has been damaged as a result of the proceedings.

244.    WINGO'S beating, pepper spraying, using the knife to cut off his backpack, and tasing of HARRIS constituted a malicious act, an additional unlawful seizure, and illegal deprivation of the liberty of HARRIS in violation of the Fourth Amendment.

245.    As a direct and proximate result of the unconstitutional conduct of WINGO, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

246.    HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant Kasey P. WINGO, pursuant to the provisions of 42 U.S.C. Section 1983.

247.    **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant KASEY P. WINGO, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT VI
### Malicious Prosecution Claim Against KASEY P. WINGO for the April 4, 2014 Arrest

248.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

249.    The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by WINGO.

250.    After being told by HARRIS that Randy could verify his reason for being at the iStorage facility, WINGO seized HARRIS from his bike, without provocation or probable cause, just as Randy was about to make contact with him and CHAPMAN.

251.    WINGO initiated police reports to charge HARRIS with up to six criminal counts that could have resulted in a total of up to 30 years in prison.

252.    Based on WINGO'S report, HARRIS was jailed for approximately 14 days, unable to afford bond. WINGO'S conduct and report were a legal cause of the proceeding – a proceeding that was terminated in favor of HARRIS when the State's Attorney issued a Not Filing Charge document on April 17, 2014, for all six counts.

253.    As a direct and proximate cause of HARRIS'S arrest without probable cause by WINGO, as alleged above, HARRIS has suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

254.    **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant KASEY P. WINGO, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT V
### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against MICHAEL D. CHAPMAN for False Arrest and Excessive Force for the April 4, 2014 Arrest

255.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

256.    CHAPMAN violated the clearly established and well settled federal constitutional right of HARRIS, including but not limited to, his Fourth and Fourteenth Amendment rights of:

a. Freedom from unreasonable seizure of his person; and

b. Freedom from illegal detention and deprivation of his liberty without due process of law.

257.    The acts of CHAPMAN while acting under color of state law, deprived HARRIS of his right to be free from unlawful restraint and excessive force and otherwise deprived him of due process of law in violation of the Constitution of the United States.

258.    CHAPMAN was on the job when he and WINGO conspired to set HARRIS up for an unlawful arrest after keeping HARRIS under surveillance at the iStorage on April 4, 2014.

259.    On March 9, 2014, HARRIS made an oral complaint to CHAPMAN'S supervisor after CHAPMAN threaten to unlawfully trespass HARRIS from every business establishment in Naples.

260.    CHAPMAN was aware that HARRIS had complained to his supervisor, Amengual, about his threats to unlawfully trespass HARRIS

261.    On April 4, HARRIS went to buy motorcycle parts at the Walmart and, later, refreshments at the Shell Station.  On both occasions, HARRIS saw Collier County deputy patrol vehicles parked at the Shell Station.

262.    On April 4, at 8:10 p.m., CHAPMAN investigated a suspicious vehicle located at the Comfort Inn and Suites, which is directly across the street from the iStorage.

263.    On April 4, at 8:45 p.m., CHAPMAN was dispatched to a traffic stop approximately 15 minutes away from the iStorage.  After the stop, however, CHAPMAN

returned to the iStorage and parked his patrol vehicle near the Cracker Barrel restaurant to continue his surveillance of HARRIS.

264.   As CHAPMAN is parked near the Cracker Barrel, he sees HARRIS opening the gate. CHAPMAN, parallel on Tollgate Blvd., follows HARRIS with his patrol vehicle and pulls up just as HARRIS is exiting.

265.   HARRIS is leaving from the front access gate in a leisurely manner in front of the iStorage security cameras in a well-lit area. HARRIS is not climbing over the fence, nor does he attempt to run when he sees CHAPMAN's patrol vehicle pull up to the gate, in fact, HARRIS continues through the open gate.

266.   CHAPMAN pulls his patrol vehicle in toward the front gate in such a way that his in-car camera is facing away from where he stops HARRIS so there is no video of HARRIS'S stop.

267.   CHAPMAN calls out to HARRIS by his first name, "Robert," before he asks for identification, and asks if he is working in the storage facility. HARRIS immediately replies that he is working there for Randy. CHAPMAN recognizes that HARRIS is referring to Rock'n Roll Randy who is also known to CHAPMAN.

268.   In front of CHAPMAN, HARRIS places a cellphone call to Randy asking that he come to the gate to verify to the deputies HARRIS'S reason for being there, to which Randy replies, "[o]n my way." This call can be heard on CHAPMAN's in-car audio.

269.    CHAPMAN sees Randy approaching the gate and utters to WINGO, "Corporal," and then signals to WINGO to seize HARRIS from his bike, before Randy can make contact with them to verify HARRIS'S explanation.

270.    Randy can be seen in the background pacing back and forth behind the gate, however, CHAPMAN does not call out to Randy to indemnify himself or seemed concerned about his presence behind the gate despite the fact that he has stopped HARRIS for an alleged loitering and prowling complaint.

271.    There is no audio or video corroboration of CHAPMAN's account that HARRIS was making a threatening move toward either deputy.

272.    CHAPMAN and WINGO conspired to set HARRIS up for a false arrest and, therefore, they could not afford to wait for Randy to confirm HARRIS'S reason for being at the iStorage facility.

273.    The unlawful search and seizure of HARRIS by CHAPMAN, including the beating with batons, the use of tasers, pepper spray, the use of the knife, and threatening to unleash a K-9 on HARRIS began just as Randy was approaching CHAPMAN to verify HARRIS'S reason for being at the facility.

274.    HARRIS'S seizure was not predicated on any facts regarding possible criminal activity, nor any threat to CHAPMAN or another deputy.  HARRIS was seized against his will, subjected to unreasonable and excessive force out of all proportion, and not subject to a valid investigation, which deprived HARRIS of his right to due process of law in violation of the Fourth and Fourteenth Amendment to the Constitution of the United States.

275.    HARRIS'S stop was unlawful and unreasonable from the beginning because it was part of a conspiracy between CHAPMAN and WINGO to intimidate, harass, and teach HARRIS a lesson about reporting CHAPMAN'S misconduct.

276.    As a direct and proximate result of the unconstitutional conduct of CHAPMAN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

277.    HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant CHAPMAN, pursuant to the provisions of 42 U.S.C. Section 1983.

278.    **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant MICHAEL D. CHAPMAN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

### COUNT VI
#### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against MICHAEL D. CHAPMAN for Malicious Prosecution for the April 4, 2014 Arrest

279.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

280.    The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by CHAPMAN.

.

281.    CHAPMAN violated the clearly established and well-settled federal constitutional rights of HARRIS, including, but not limited to, his Fourth Amendment right to be free from malicious prosecution when he was seized without probable cause.

282.    The acts of CHAPMAN, while on the job and acting under color of state law, deprived HARRIS of his right to be free from unreasonable search and seizure and otherwise deprived him of due process of law in violation of the Constitution of the United States.

283.    CHAPMAN'S conspiracy with WINGO resulted in HARRIS being seized, beaten, pepper sprayed, tased, and threatened with bodily harm despite the fact that HARRIS was cooperating with CHAPMAN by supplying a legal and immediately verifiable reason for being at the iStorage.

284.    CHAPMAN saw Randy opening the gate to speak with the deputies: however, before Randy could verify HARRIS'S reason for being there, CHAPMAN signaled to WINGO to seize HARRIS from his bike and begin an unlawful assault and battery upon HARRIS.

285.    There was no articulable fact that justified HARRIS'S continued detention by CHAPMAN: there was no report of a suspicious person loitering or prowling around the iStorage; HARRIS had a credible reason and an immediate witness to verify his being at the iStorage; HARRIS was not seen jumping over the fence or running from the iStorage; HARRIS did not try to avoid the iStorage security cameras; and HARRIS did not flee from the deputies as they pulled up in their patrol vehicles.

286.   CHAPMAN knowingly and intentionally obstructed Randy from verifying HARRIS'S reason for being on the premises that would have resulted in ending his investigatory stop, if it had been a lawful in the first place.

287.   While lying on the ground after being beaten, HARRIS suffers a further indignity when an officer grabs him by his hair to hold up his head, so he can take a picture of HARRIS'S beaten and peppered sprayed face "as my trophy..." and "... because of all of the snot coming out of his nose."

288.   Based upon CHAPMAN'S arrest reports, HARRIS is jailed for approximately 14 days because he is unable to afford the bond.  Subsequently, he is brought before a magistrate.  CHAPMAN'S conduct and report were a legal cause of the proceeding.

289.   The proceeding was terminated in favor of HARRIS when the State's Attorney issued a Not Filing Charge document on April 17, 2014, for all six counts, which would have totaled about 30 years in prison.  The State also filed a Not Filing Charge for the loitering and prowling charge.

290.   CHAPMAN conspired to arrest HARRIS earlier that evening by creating a fictitious prowling and loitering charge as the basis for the unlawful search, seizure, and arrest, which was clearly done with malice and in disregard for the constitutional rights of HARRIS, and HARRIS has been damaged as a result of the proceedings.

291.   The beating, pepper spraying, threatening HARRIS with a K-9, and tasing of HARRIS constituted a malicious act and an additional unlawful seizure and illegal deprivation of the liberty of HARRIS in violation of the Fourth Amendment.

292.   As a direct and proximate result of the unconstitutional conduct of CHAPMAN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

293.   HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant CHAPMAN, pursuant to the provisions of 42 U.S.C. Section 1983.

294.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant MICHAEL D. CHAPMAN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT VII
### Malicious Prosecution Against MICHAEL D. CHAPMAN for the April 4, 2014 Arrest

295.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

296.   The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by CHAPMAN.

297.   After being told by HARRIS that Randy could verify his reason for being at the iStorage, and without provocation or probable cause, CHAPMAN seized HARRIS from his bike and arrested him for crimes that could have been punishable by up to 30 years in prison.

298.   Based upon CHAPMAN'S report, HARRIS was jailed for approximately 14 days, unable to afford bond, and subsequently brought before a magistrate. CHAPMAN'S conduct and report were a legal cause of the proceeding.  The proceeding was terminated in favor of HARRIS when the State's Attorney issued a *Not Filing Charge* document on April 17, 2014, for all six counts.

299.   As a direct and proximate cause of HARRIS'S arrest without probable cause by CHAPMAN, as alleged above, HARRIS has suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

300.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant MICHAEL D. CHAPMAN, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT VIII

### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against SCOTT PEPIN for False Arrest and Excessive Force for the April 4, 2014 Arrest

301.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

302.   PEPIN violated the clearly established and well settled federal constitutional right of HARRIS, including but not limited to, his Fourth and Fourteenth Amendment rights of:

a.  Freedom from unreasonable seizure of his person; and

b. Freedom from illegal detention and deprivation of his liberty without due process of law.

303. PEPIN while acting under color of state law, deprived HARRIS of his right to be free from unlawful restraint and excessive force and otherwise deprived him of due process of law in violation of the Constitution of the United States.

304. PEPIN provided a Supplemental Narrative Report No. 1400009312 and Use of Force Report that were attached to the Offense Incident Report and Booking Sheet used to initiate criminal proceedings against HARRIS, PEPIN provided the following:

> "At this time administered approximately 3 strikes to Harris's upper left shoulder area with my agency issued baton, in attempt for him to give up his arm. Harris refused and continued to fight with deputies by kicking his legs and feet and trying to move his arms to defeat the deputies. I then again administered 4 more strikes to Harris's upper left back/shoulder area. Harris still would not comply and was actively fighting with Cpl. Guth and Cpl. Wingo."

305. As PEPIN is striking HARRIS, Amengual arrives on the scene and his in-car video camera records that one deputy has already immobilized HARRIS'S legs with his body weight and another deputy has HARRIS'S arms before PEPIN strikes HARRIS with his baton "4 more" times.

306. PEPIN uses his baton approximately seven times to strike HARRIS, and while deputies continue to have HARRIS subdued, PEPIN then stands up and administers his taser while standing over HARRIS'S head.

307. While PEPIN is tasing HARRIS, he bends down and pounds his steel (periscoping baton) asp near HARRIS'S head on the ground to get it to close.

308.    As a direct and proximate result of the unconstitutional conduct of PEPIN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

309.    HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant PEPIN, pursuant to the provisions of 42 U.S.C. Section 1983.

310.    **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant SCOTT PEPIN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT IX
### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against SCOTT PEPIN for Malicious Prosecution for the April 4, 2014 Arrest

311.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

312.    PEPIN provided a Supplemental Narrative Report No. 1400009312 criminal prosecution of HARRIS, in which he states the following:

> "At this time administered approximately 3 strikes to Harris's upper left shoulder area with my agency issued baton, in attempt for him to give up his arm. Harris refused and continued to fight with deputies by kicking his legs and feet and trying to move his arms to defeat the deputies. I then again administered 4 more strikes to Harris's upper left back/shoulder area. Harris still would not comply and was actively fighting with Cpl. Guth and Cpl. Wingo."

313. As PEPIN is striking HARRIS, Amengual arrives on the scene and his in-car video shows that one deputy has already immobilized HARRIS'S legs with his body weight and another deputy has HARRIS'S arms while PEPIN continues to strike HARRIS with his steel baton multiple times.

314. PEPIN'S Reports were used to support the charges against HARRIS that included two third-degree felony counts for battery on an officer; one second-degree felony count for assault of an officer; one third-degree felony count for resisting an officer; and one first-degree misdemeanor for resisting/obstructing.

315. PEPIN violated the clearly established and well-settled federal constitutional rights of HARRIS, including, but not limited to, his Fourth Amendment right to be free from malicious prosecution when he was seized without probable cause.

316. PEPIN while on the job and acting under color of state law, deprived HARRIS of his right to be free from unreasonable search and seizure and otherwise deprived him of due process of law in violation of the Constitution of the United States.

317. The proceeding was terminated in favor of HARRIS when the State's Attorney issued a Not Filing Charge document on April 17, 2014, for all six counts, which would have totaled about 30 years in prison.

318. The beating and tasing of HARRIS constituted a malicious act and an additional unlawful seizure and illegal deprivation of the liberty of HARRIS in violation of the Fourth Amendment.

319. As a direct and proximate result of the unconstitutional conduct of PEPIN, as alleged above, HARRIS suffered damages, including the costs associated with his loss

of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

320.  HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant PEPIN, pursuant to the provisions of 42 U.S.C. Section 1983.

321.  **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant SCOTT PEPIN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT X
### Malicious Prosecution Against SCOTT PEPIN for the April 4, 2014 Arrest

322.  Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

323.  The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by PEPIN.

324.  PEPIN provided a Supplemental Narrative Report No. 1400009312 criminal prosecution of HARRIS, in which he states the following:

> "At this time administered approximately 3 strikes to Harris's upper left shoulder area with my agency issued baton, in attempt for him to give up his arm. Harris refused and continued to fight with deputies by kicking his legs and feet and trying to move his arms to defeat the deputies. I then again administered 4 more strikes to Harris's upper left back/shoulder area. Harris still would not comply and was actively fighting with Cpl. Guth and Cpl. Wingo."

325. As PEPIN is striking HARRIS, Amengual arrives on the scene and his in-car video shows that one deputy has already immobilized HARRIS'S legs with his body weight and another deputy has HARRIS'S arms while PEPIN continues to strike HARRIS with his steel baton multiple times.

326.   Based upon PEPIN'S report, HARRIS was jailed for approximately 14 days, unable to afford bond, and subsequently brought before a magistrate.  PEPIN'S conduct and report were a legal cause of the proceeding.  The proceeding was terminated in favor of HARRIS when the State's Attorney issued a Not Filing Charge document on April 17, 2014, for all six counts.

327.   As a direct and proximate cause of HARRIS'S arrest without probable cause by PEPIN, as alleged above, HARRIS has suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

328.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant SCOTT PEPIN, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT XI
### Assault and Battery Claim Against KASEY P. WINGO, MICHAEL D. CHAPMAN, and SCOTT PEPIN for the April 4, 2014 Arrest

329.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

330.   WINGO, CHAPMAN and PEPIN acted maliciously and with intent to cause harm to HARRIS by brutally assaulting him, and they did cause him harm.

331.   The assault and battery of HARRIS first began when CHAPMAN signaled to WINGO to seize HARRIS from his bike, without justification or probable cause, and the force used was unreasonable under the circumstances and clearly excessive. The acts complained of were committed by WINGO and CHAPMAN in bad faith and with a willful and wanton disregard for the safety of HARRIS.

332.   HARRIS had committed no crime, was cooperating with the investigation, and could immediately produce a witness to verify his reason for being at the iStorage facility. HARRIS was not attempting to flee, did not have a weapon, and did not engage the officers in a threatening matter.

333.   Shortly thereafter, PEPIN joined WINGO and HARRIS and began his brutal assault and battery against HARRIS while HARRIS was subdued, lying on the ground, and going in and out of consciousness.

334.   As a direct and proximate result of the assault and battery committed by WINGO, CHAPMAN and PEPIN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

335.   **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against the Defendants KASEY P. WINGO, MICHAEL D. CHAPMAN,

SCOTT PEPIN together with pre-judgment interest, interest, costs of the action, and

TRIAL BY JURY.

**COUNT XII**

**Conspiracy to Violate the Civil Rights of ROBERT DALE HARRIS Pursuant
to 42 U.S.C. §1983 Against KASEY P. WINGO and MICHAEL D. CHAPMAN
for the April 4, 2014 Arrest**

336.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if

fully set forth herein and further alleges:

337.    The acts of WINGO and CHAPMAN while acting under color of state

law, deprived HARRIS of his right to be free from unlawful restraint and excessive force

and otherwise deprived him of due process of law in violation of the Constitution of the

United States.

338.    On March 9, 2014, HARRIS made an oral complaint against CHAPMAN

to his supervisor Amengual after CHAPMAN threatened to unlawfully trespass HARRIS

from every business establishment in Naples.  WINGO was present when HARRIS made

this complaint to Amengual.

339.    WINGO and CHAPMAN'S CAD and Deputy History Reports place them

at surrounding business establishments with full view of the iStorage facility where

HARRIS was working on April 4, 2014.

340.    CAD and Deputy History Reports also show WINGO and CHAPMAN'S

time near the iStorage facility as overlapping.  HARRIS sees sheriff's patrol vehicles

parked at the Shell Station when he went to Walmart for motorcycle parts and then when

he went to the Shell Station to buy refreshments.

341.   Based on their surveillance of HARRIS, WINGO and CHAPMAN arrive simultaneously as HARRIS is exiting the iStorage even though there was no report of a suspicious person or loitering or prowling report called into dispatch.

342.   WINGO and CHAPMAN saw Randy approaching the gate; however, WINGO and CHAPMAN did not want to give Randy an opportunity to corroborate HARRIS'S statements before seizing HARRIS from his bike.

343.   While Randy is pacing back and forth behind the gate during HARRIS'S beating, neither WINGO nor CHAPMAN call out to Randy and 1) ask him to indemnify himself; 2) seemed concerned about his presence; or 3) consider Randy as being a possible accomplice.

344.   HARRIS'S stop was unreasonable and unlawful because it was a conspiracy between WINGO and CHAPMAN to setup an innocent citizen for arrest to intimidate, harass, and teach HARRIS a lesson about reporting CHAPMAN'S misconduct.

345.   As a direct and proximate result of the unconstitutional conduct of WINGO and CHAPMAN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

346.   HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to

reimbursement therefore from Defendants KASEY P. WINGO and MICHAEL D.

CHAPMAN, pursuant to the provisions of 42 U.S.C. Section 1983.

347.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment

for damages against Defendants KASEY P. WINGO and MICHAEL D. CHAPMAN,

together with pre-judgment interest, interest, attorneys' fees, costs of the action, and

TRIAL BY JURY.

## COUNT XIII

### Violation of ROBERT DALE HARRIS'S First Amendment Rights
### Against KASEY P. WINGO and MICHAEL D. CHAPMAN
### for the April 4, 2014 Arrest

348.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if

fully set forth herein and further alleges:

349.   On March 9, HARRIS complained to CHAPMAN'S supervisor,

Amengual, that CHAPMAN was planning on using his position with the CCSD to

unlawfully detain and trespass HARRIS, without probable cause, from every business

establishment in Naples.

350.   Amengual brings along WINGO as his witness while he takes HARRIS'S

complaint. Amengual informs HARRIS that he has already spoken to CHAPMAN about

his complaint making CHAPMAN aware that HARRIS intends to file a formal complaint

against him.

351.   On April 4, both CHAPMAN and WINGO keep HARRIS under

surveillance at the iStorage until HARRIS exits the facility at approximately 9:30 p.m.

352.   HARRIS is working out of an opened unit using a generator and light, which illuminates the row where he is working from during the evening that can be seen from Tollgate Blvd.

353.   While CHAPMAN and WINGO were patrolling and responding to calls in the Tollgate area during the time that HARRIS was working for Randy, they have also been keeping HARRIS under surveillance.

354.   Just as HARRIS is exiting the iStorage gate, CHAPMAN and WINGO immediately and simultaneously pull up in separate patrol vehicles and begin interrogating HARRIS.  However, HARRIS is able to provide them with an immediate and lawful purpose for why he is at the iStorage.  Regardless, WINGO and CHAPMAN are not interested in verifying HARRIS'S explanation so CHAPMAN signals to WINGO to seize HARRIS.

355.   WINGO and CHAPMAN's intent the night of April 4 was to retaliate against HARRIS for exercising his First Amendment Right on March 9 of making a complaint to Sgt. Amengual about CHAPMAN's unlawful threats of trespass.

356.   HARRIS'S April 4 statements to WINGO and CHAPMAN that they are taking their wages under false pretenses and that he does not consent to the search and seizure by WINGO and CHAPMAN are based upon HARRIS limited understanding of these terms and his limited ability to express himself.  However, WINGO and CHAPMAN become angered by these comments and violate HARRIS'S right to free speech to question the premise of which the stop was made.

357.   HARRIS'S First Amendment rights were further violated when WINGO and CHAPMAN failed to allow HARRIS to bring forth a witness who could verify his explanation for being at the iStorage facility.

358.   Citizens have a First Amendment constitutional right to properly question or make citizen complaints to their supervisors about law enforcement officers who engage them during searches and seizures without fear of reprisal, threats, or attack.

359.   HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendants KASEY P. WINGO and MICHAEL D. CHAPMAN, pursuant to the provisions of 42 U.S.C. Section 1983.

360.   WHEREFORE, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendants KASEY P. WINGO and MICHAEL D. CHAPMAN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT XVI
### Violation of ROBERT DALE HARRIS'S First Amendment Rights Against ROSS ANTHONY and SCOTT PEPIN

361.   Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

362.   ANTHONY and PEPIN violated the clearly established and well settled federal constitutional right of HARRIS First Amendment rights by violating his Fourth and Fourteenth Amendment rights of:

a. Freedom from unreasonable seizure of his person; and

b. Freedom from illegal detention and deprivation of his liberty without due process of law.

363.    The acts of ANTHONY and PEPIN while acting under color of state law, deprived HARRIS of his right to be free from unlawful restraint and excessive force and otherwise deprived him of due process of law in violation of the Constitution of the United States, and were in retaliation when HARRIS exercised his First Amendment right to complain about his treatment at the hands of the CCSD.

364.    On March 9, HARRIS complained to CHAPMAN'S supervisor that CHAPMAN was planning on using his position with the CCSD to unlawfully detain and trespass HARRIS, without probable cause, from every business establishment in Naples.

365.    WINGO and CHAPMAN's intent the night of April 4 was to retaliate against HARRIS for exercising his First Amendment Right on March 9 when he complained to Amengual about CHAPMAN's unlawful threats of trespass.

366.    HARRIS'S First Amendment rights were further violated when WINGO and CHAPMAN failed to allow HARRIS to bring forth a witness who could verify his explanation for being at the iStorage facility and question the validity of his arrest.

367.    On May 29, 2014, ANTHONY, without lawful caused to do so, and premised on HARRIS'S March 9 citizen's complaint to Amengual and the failure of the State to prosecute HARRIS for his April 4 arrest, detained and issued HARRIS trespass warnings for three different business establishments: Dunkin' Donuts, Shell Station, and the Circle K in violation of his civil and constitutional rights.

368.   Later, an employee of the Shell Station told HARRIS after he hired him to perform stock work, that he felt that ANTHONY had coerced him into agreeing to trespass HARRIS and that he did so to keep the peace with the CCSD.

369.   On June 10, 2014, PEPIN, along with three other deputies, circled HARRIS at McDonald's and then walked over to the Dunkin' Donuts where they proceeded to have an employee of the Dunkin's Donuts agree to issue a trespass warning to HARRIS even though he had just purchased two donuts and had left without being asked.  PEPIN was one of the arresting officers on April 4, who violently struck HARRIS and tased him after he had been subdued.

370.   Citizens have a First Amendment constitutional right to properly question law enforcement who engage them during searches and seizures without fear of reprisal, threats, or attack.

371.   HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendants ROSS ANTHONY and SCOTT PEPIN, pursuant to the provisions of 42 U.S.C. Section 1983.

372.   WHEREFORE, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendants ROSS ANTHONY and SCOTT PEPIN, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT XV

### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against Sheriff KEVIN RAMBOSK for Unlawful Trespass Warnings and the December 16, 2016 Arrest

373.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

374.    Defendant RAMBOSK, as Sheriff of the Collier County, Florida Sheriff's Office, and his predecessors in office, have, over time, established a policy and custom of failure to provide timely, appropriate, and adequate oversight of deputies in the execution of their duties and have failed to investigate complaints regarding the execution of those duties.

375.    RAMBOSK has established a policy and custom of failure to train and administer adequate discipline to deputies despite a pattern of misconduct in the execution of law enforcement duties by deputies and has established a policy and custom of failure to properly train deputies in the law regarding probable cause and the conduct of an investigation of the kind initiated for this incident.

376.    Such policies and customs constitute deliberate indifference to the risk that citizens of Collier County will be subjected to unlawful seizure during an investigatory stop, excessive force in making such unlawful seizure detention, and prosecution, and have contributed to an atmosphere of tolerance for misconduct, and such policies and customs are tantamount to deliberate indifference to HARRIS'S constitutional rights as secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

377.   In addition, these policies and customs fail to take into consideration the lives and wellbeing of Collier County deputies and other law enforcement personnel who race in their vehicles in response to calls for assistance from deputies who subject citizens to unlawful seizure during an investigatory stop, excessive force in making such an unlawful search and seizure, use of excessive use of force and malicious prosecution.

378.   Furthermore, these policies and customs fail to take into consideration the lives and wellbeing of citizen bystanders who may be unintentionally hurt by deputies who race in their vehicles in response to calls for assistance from deputies who subject citizens to unlawful seizure during an investigatory stop, excessive force in making such an unlawful search and seizure, use of excessive use of force, and malicious prosecution.

379.   The unlawful seizure of HARRIS without probable cause during an investigatory stop; the use of unreasonable and excessive force to effect that seizure; and detention and prosecution of HARRIS were directly attributable to RAMBOSK'S policy and custom of inadequate oversight, inadequate discipline of deputies despite a pattern of misconduct and inadequate training of deputies in the execution of their law enforcement duties.

380.   RAMBOSK, as leader of the CCSD, is ultimately responsible for not only setting the tone of the Department, but departmental policy as it relates to investigations and arrests.  However, RAMBOSK has cultivated and encouraged an environment within the CCSD whereby his deputies feel comfortable and entitled to act with impunity by unlawfully threatening and intimidating citizens of their choosing, which led to the

violation of HARRIS'S constitutional rights against unlawful search and seizure, use of excessive use of force, and malicious prosecution.

381.   On May 29, 2014, HARRIS is issued two trespass warnings by ANTHONY that include a third business establishment in which HARRIS is a frequent customer.  The employee on duty at the time of the trespass told HARRIS about a year later when he hired him to stock shelves that he did not want to trespass HARRIS but felt that he had no choice because he wanted "to keep the peace" with CCSD.

382.   ANTHONY'S actions and the Shell Station's employee's belief that he could not oppose ANTHONY writing a trespass warning for HARRIS, exhibits a troubling practice, policy, custom and leadership problem within CCSD that not only are law-abiding citizens the target of unlawful and unconstitutional behavior by CCSD's law enforcement, but that lawful business owners are coerced into being accomplices or agents for this behavior for fear of retaliation against them by CCSD.

383.   On June 10, 2014, HARRIS is issued a third trespass warning by Deputy Ellis for the Dunkin' Donuts where he is also a frequent customer.  No trespass call had been made to CCSD and HARRIS was there during regular business hours as a customer. WINGO and PEPIN were present when this trespass warning was issued, and both participated in HARRIS'S April 4 arrest.

384.   A search of the FDLE-TAR database shows that approximately 59 CCSD deputies and personnel conducted about 76 searches on HARRIS beginning on June 6, 2014 (two months after his April 4, 2014 arrest) and until December 17, 2016, the day after his second arrest.

385.   The FDLE-TAR searches were conducted under the direction and with the implicit authority of RAMBOSK, demonstrating a troubling use of resources and manpower by CCSD to target citizens without evidence of criminal wrongdoing.

386.   That the deputies were accustomed to departmental tolerance of their use of such threats and unlawful excessive force and believed they would never be held accountable for their conduct, was demonstrated by their future conduct toward HARRIS.

387.   That RAMBOSK has failed to provide adequate training, policies, and oversight into how his deputies respond to individuals of lower socio-economic standing and cognitive deficiencies without resulting to incorrectly and overzealously mis-categorizing citizens as part of extremist groups when they complain about their treatment at the hands of CCSD deputies.

388.   RAMBOSK, as the head of the CCSD, is ultimately responsible for not only setting the law enforcement policies and customs of the Department and his deputies interactions with citizens, but departmental policy guided by the U.S. Constitution as it relates to investigations and arrests.

389.   RAMBOSK has cultivated and encouraged an environment within the CCSD whereby his deputies feel comfortable and entitled to unlawfully threaten and intimidate citizens of their choosing, with impunity, that led to the violation of HARRIS'S constitutional rights against unlawful search and seizure, use of excessive use of force and malicious prosecution.

390.   As a direct and proximate result of such policies and customs, as alleged above, HARRIS has suffered damages, including the costs associated with his loss of

income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

391.    HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendant Sheriff Kevin RAMBOSK, pursuant to the provisions of 42 U.S.C. Section 1983.

392.    **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against Defendant Sheriff KEVIN RAMBOSK, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT XVI
### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against KASEY P. WINGO for False Arrest and Excessive Force for the December 16, 2016 Arrest

393.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

394.    Several days after filing his Notice of Intent in September 2016, HARRIS notices that Collier County Deputies are following him.  Fearing for his safety and afraid of being falsely arrested again, HARRIS installed a camera in his vehicle.

395.    On December 16, 2016, while driving home from work, HARRIS notices an SUV suddenly speed out from behind some bushes with its emergency lights on. HARRIS immediately pulls over but records the stop to protect himself from false allegations and arrest.

396.    The driver of this unmarked Sheriff's Department vehicle was WINGO, who is alone without a partner. WINGO was not wearing a body camera and nor did his vehicle employ a dash cam. The only audio and visual recording of this stop is from HARRIS'S in-car camera. WINGO is wearing military-like tactical gear and clothing when he pulls HARRIS over for a traffic stop.

397.    WINGO pulled HARRIS over, but he never identified himself as law enforcement and nor does he inform HARRIS as to the reason for the stop, which is contrary to his December 16, 2016, SNR.

398.    WINGO and his "team" were conducting surveillance of the area surrounding HARRIS'S residence, and had received information about an unassigned tag, but fail to justify why a misdemeanor traffic stop involved the surveillance of HARRIS'S residence.

399.    WIEDEL reports that WINGO "requested" that HARRIS "step out of the vehicle." However, HARRIS'S recording shows that WINGO makes no such request and that within seconds of approaching HARRIS'S vehicle, WINGO is seen trying to open HARRIS'S door and yelling, "Do not – get out of the f****** car.

400.    HARRIS repeatedly asks who WINGO is and what is he doing. While WINGO is beating and attempting to tase HARRIS, HARRIS calls out to the officer asking him if he is, in fact, WINGO, but WINGO does not respond.

401.    While on top of HARRIS and punching him, WINGO unjustifiably threatens HARRIS with lethal force by stating that "I'm gonna f****** shoot you if you

don't' get out of the car," even though HARRIS begs WINGO to get off him and states his willingness to comply with WINGO'S order to get out of the car.

402.   HARRIS can be heard on the audio begging WINGO to stop, but WINGO keeps on beating and dry tasing HARRIS.  WINGO later tells HARRIS that "I'm gonna f****** hurt you so bad in a second," to which HARRIS replies, "Please stop."  Shortly thereafter, other deputies arrive and drag HARRIS out of the car from the passenger side. While lying on the ground, HARRIS is pepper-sprayed in his eyes, nose, and mouth.

403.   HARRIS is arrested and charged with three felonies against law enforcement: one count carries up to 15 years in prison; two counts carry up to five years in prison, each, which total about 25 years in prison.

404.   While in jail, HARRIS is denied water for extended periods of time and considers drinking the pooling water that is leaking on his cell's floor because of his thirst.

405.   While in jail, HARRIS is placed on suicide watch and is in fear from retaliation by jail personnel, particularly the deputies in the jail.

406.   HARRIS is also heavily shackled, and his arms are kept tightly around his sides that he can barely walk and steady himself.  The deputies refer to this as HARRIS'S "jewelry."

407.   HARRIS'S undergarments are taken from him and he is only allowed to wear an orange jail issued jumpsuit.  He is also not allowed to clean himself.

408.   On January 17, 2017, The State Attorney's Office filed a Not Filing Charge on all counts and HARRIS was released from custody after spending over a

month in jail because he could not afford to post the $55,500 bond. The State also did
not pursue charges related to the unassigned tag allegation.

409.    On January 24, 2017, Harris's Notice of Intent to File were served
pursuant to statute for the December 16, 2016 arrest.

410.    Shortly after his release from jail, HARRIS, in fear of his life and well-
being, leaves for an undisclosed location.

411.    As a direct and proximate result of the unconstitutional conduct of
WINGO, as alleged above, HARRIS suffered damages, including the costs associated
with his loss of income from his employment, humiliation, and mental anguish, and has
suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment
of life.

412.    HARRIS has been required to engage the services of the undersigned
counsel and to pay her a reasonable fee for her services, and he is entitled to
reimbursement therefore from Defendant WINGO, pursuant to the provisions of 42
U.S.C. Section 1983.

413.    **WHEREFORE**, Plaintiff, ROBERT DALE HARRIS, demands judgment
for damages against Defendant KASEY P. WINGO together with pre-judgment interest,
interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

## COUNT XVII

### Violation of Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against KASEY P. WINGO for Malicious Prosecution for the December 16, 2016 Arrest

414.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if fully set forth herein and further alleges:

415.    The criminal prosecution of HARRIS was the natural consequence of his arrest without probable cause by WINGO.

416.    WINGO violated the clearly established and well-settled federal constitutional rights of HARRIS, including, but not limited to, his Fourth Amendment right to be free from malicious prosecution when he was seized without probable cause.

417.    The acts of WINGO, while on the job and acting under color of state law, deprived HARRIS of his right to be free from unreasonable seizure and otherwise deprived him of due process of law in violation of the Constitution of the United States.

418.    HARRIS'S December 16. 2016, traffic stop by WINGO was predicated upon an unassigned tag.

419.    WINGO never advised HARRIS for the stop or identified himself as law enforcement.  WINGO was not wearing a patrol deputy's uniform but, rather, military-like tactical gear and clothing.

420.    WINGO never conducted a proper and professional investigation as to the unassigned tag, which violated HARRIS'S civil rights.

421. WINGO did not have probable cause or lawful authority to gain entry into HARRIS'S vehicle.

422. HARRIS never threatened WINGO either orally or physically that would have necessitated WINGO's entry into HARRIS'S vehicle or to threaten HARRIS with a taser.

423. HARRIS made no oral or physical threats to WINGO that would have justified WINGO'S threat to use lethal force against HARRIS by shooting him.

424. HARRIS was arrested and charged with three felonies, which totaled 25 years on prison.

425. On January 17, 2017, The State Attorney's Office filed a Not Filing Charge on all counts and HARRIS was released from custody after spending over a month in jail because he could not afford to post the $55,500 bond. The State also did not pursue charges for the unassigned tag allegation.

426. The beating, pepper spraying, and tasing of HARRIS constituted a malicious act and an additional unlawful seizure and illegal deprivation of the liberty of HARRIS in violation of the Fourth Amendment.

427. As a direct and proximate result of the unconstitutional conduct of WINGO, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

428.    HARRIS has been required to engage the services of the undersigned

counsel and to pay her a reasonable fee for her services, and he is entitled to

reimbursement therefore from Defendant WINGO, pursuant to the provisions of 42

U.S.C. Section 1983.

429.    **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment

for damages against Defendant KASEY P. WINGO, together with pre-judgment interest,

interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

**COUNT XVIII**
**Violation of Civil Rights of ROBERT DALE HARRIS Pursuant
to 42 U.S.C. §1983 Against BRIAN D. WIEDEL for Malicious
Prosecution for the December 16, 2016 Arrest**

430.    Plaintiff repeats and realleges paragraphs 14 through 189, above, as if

fully set forth herein and further alleges:

431.    Based on "intel" received by WINGO and his "team," WIEDEL drove by

HARRIS'S residence on December 14, and December 15, 2016, concerning an

unassigned tag. WIEDEL'S report, however, provided no other information that this

vehicle was being used for illegal purposes or was stolen.

432.    On December 16, 2016, while conducting surveillance on HARRIS,

WINGO drove by HARRIS'S residence and then parked his patrol SUV behind some

bushes on Palm Springs Blvd. lying in wait for HARRIS knowing the approximate time

that HARRIS would be arriving home from work.

433.    Based on WIEDEL'S report, he arrives on the scene after HARRIS is in

custody and does not have first-hand knowledge of WINGO stopping HARRIS or what

led up to HARRIS'S arrest despite writing a report claiming that WINGO conducted a proper stop.

434.    WIEDEL'S information about anything that transpired between WINGO and HARRIS before he arrived, could only have come from WINGO.

435.    WIEDEL was personally aware of the history between WINGO, the CCSD and its treatment of HARRIS.  Therefore, WIEDEL was a willing participant in helping to create WINGO'S version of events knowing that his report would result in substantial felony charges against HARRIS, and HARRIS'S depravation of his liberty.

436.    On January 17, 2017, The State Attorney's Office filed a Not Filing Charge on all counts and HARRIS was released from custody after spending over a month in jail because he could not afford to post the $55,500 bond.  The State also did not pursue charges for the unassigned tag allegation.

437.    The beating, pepper spraying, and tasing of HARRIS constituted a malicious act and an additional unlawful seizure and illegal deprivation of the liberty of HARRIS in violation of the Fourth Amendment.

438.    As a direct and proximate result of the unconstitutional conduct of WINGO, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

439.    HARRIS has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to

reimbursement therefore from Defendant WINGO, pursuant to the provisions of 42

U.S.C. Section 1983.

440.   **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment

for damages against Defendant BRIAN W. WIEDEL, together with pre-judgment

interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

**COUNT XIX**
**Assault and Battery Claim Against KASEY P. WINGO**
**for the December 16, 2016 Arrest**

441.   Plaintiff repeats and realleges paragraphs 14 through 189 above, as if fully

set forth herein and further alleges:

442.   WINGO acted maliciously and with intent to cause harm to HARRIS by

brutally assaulting him, and he did cause harm.

443.   The assault and battery occurred when WINGO seized HARRIS forcibly

and without probable cause, attempting to enter HARRIS'S vehicle, and the force used

by WINGO was unreasonable under the circumstances and clearly excessive.

444.   The acts complained of were committed by WINGO in bad faith and with

a willful and wanton disregard for the safety and rights of HARRIS.

445.   WINGO'S simmering hatred of HARRIS began when HARRIS lodged a

citizen's complaint against CHAPMAN in March 2014 followed by WINGO'S failed

conspiracy with CHAPMAN to have HARRIS convicted on multiple felony charges in

April 2014, which culminated in HARRIS'S felony arrest predicated on a misdemeanor

traffic stop.

446.    There was no justifiable reason for WINGO to open HARRIS'S vehicle's door, gain entry and then begin and tasing HARRIS, in addition to threatening him with lethal force and bodily harm.

447.    As a direct and proximate result of the assault and battery committed by WINGO and CHAPMAN, as alleged above, HARRIS suffered damages, including the costs associated with his loss of income from his employment, humiliation, and mental anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity for the enjoyment of life.

448.    **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment for damages against the Defendant KASEY P. WINGO, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT XX
### Conspiracy to Violate the Civil Rights of ROBERT DALE HARRIS Pursuant to 42 U.S.C. §1983 Against KASEY P. WINGO and BRIAN D. WIEDEL for the December 16, 2016 Arrest

449.    Plaintiff repeats and realleges paragraphs 14 through 189 above, as if fully set forth herein and further alleges:

450.    The acts of WINGO and WIEDEL, while acting under color of state law, deprived HARRIS of his right to be free from unlawful restraint and excessive force and otherwise deprived him of due process of law in violation of the Constitution of the United States.

451.    WINGO and WIEDEL, under the guise of exchanging "intel," based on embellished and unsubstantiated evidence, labeled HARRIS as a sovereign citizen

despite the fact that HARRIS had reached out to the CCSD on at least three separate

occasions to ask for help in how he was being treated by the CCSD: 1) Sgt. Bartolome on

March 9, 2014; 2) Commander Williams on June 26, 2014; and 3) Lt. Gibbons after his

Dec. 16, 2016 arrest.

452.    WINGO, who had no partner with him or recorded the stop, first surprises

HARRIS by speedy out from behind some bushes and then, seconds later, places

HARRIS in fear by aggressively trying to open his vehicle door, without probable cause,

and finally threatens HARRIS with lethal force culminating in serious felony charges

against HARRIS with substantial prison time, which could only have been accomplished

with the support of WIEDEL.

453.    WIEDEL was personally aware of the history between WINGO, the

CCSD and its treatment of HARRIS and should have been more suspect as to WINGO'S

version of events knowing that his report would result in substantial felony charges

against HARRIS, and HARRIS'S depravation of his liberty.

454.    As a direct and proximate result of the unconstitutional conduct of

WINGO and CHAPMAN, as alleged above, HARRIS suffered damages, including the

costs associated with his loss of income from his employment, humiliation, and mental

anguish, and has suffered loss of reputation, loss of future earnings and loss of capacity

for the enjoyment of life.

455.    **WHEREFORE,** Plaintiff, ROBERT DALE HARRIS, demands judgment

for damages against Defendants KASEY P. WINGO and BRIAN D. WIEDEL, together

with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY

JURY.

**WHEREFORE,** ROBERT DALE HARRIS requests judgment as follows:

A.    On Count I, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

B.    On Count II, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

C.    On Count III, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

D.    On Count IV, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

E.    On Count V, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

F.    On Count VI, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

G.    On Count VII, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

H.    On Count VIII awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

I.    On Count IX, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

J.    On Count X, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

K.    On Count XI, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

L.      On Count XII, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

M.      On Count XIII, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

N.      On Count XIV, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

O.      On Count XV, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

P.      On Count XVI, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

Q.      On Count XVII, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

R.      On Count XVIII, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

S.      On Count XIX, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

T.      On Count XX, awarding damages in favor of ROBERT DALE HARRIS, in an amount to be determined at trial, together with pre-judgment interest, interest, attorneys' fees, costs of the action, and TRIAL BY JURY.

U.      Granting ROBERT DALE HARRIS such other and further relief as the Court deems just and proper.

Dated: May 1, 2018
Bonita Springs, Florida

Respectfully submitted,

**Dawn L. Drellos-Thompson, Esq.**
Florida Bar No. 22503

**Compass Law Firm, P.A.**
27499 Riverview Center Blvd., Suite 210
Bonita Springs, Florida  34134
239-444-1727
dawn@compass.legal

Attorney for Plaintiff, Robert Dale Harris