UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERT DALE HARRIS,

      Plaintiff,

v.                                                    CASE NO. 2:18-cv-17-FtM-29MRM

KEVIN RAMBOSK, in his Official
Capacity as Sheriff of Collier County,
Florida, KASEY P. WINGO, individually,
MICHAEL D. CHAPMAN, individually,
BRIAN R. WIEDEL, individually, SCOTT
PEPIN, individually, and ROSS
ANTHONY, individually,

      Defendants.

_____/

**DEFENDANT KASEY P. WINGO'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant Kasey P. Wingo

("Deputy Wingo") moves for summary judgment, and in support thereof states:

**I. Introduction**

This is a civil rights action brought under 42 U.S.C. § 1983. Plaintiff Robert

Harris alleges that deputies with the Collier County Sheriff's Office engaged in a pattern

of conduct that "deprived [him] of . . . his rights." (Doc. 51 ¶ 1.) Deputy Wingo twice

arrested Harris while working as a patrol deputy. From these encounters, Harris brings

claims for false arrest, malicious prosecution, excessive force, assault and battery, First

Amendment retaliation, and conspiracy. (<u>Id.</u> at Counts II, III, VI, XI, XII, XIII, XVI,

XVII, XIX, and XX.)

The complaint alleges a one-sided, unflattering story of harassment and gratuitous force at the hands of Deputy Wingo.  (Id. at ¶¶ 55, 170.)  The facts adduced during discovery, however, reveal a much different narrative.  Far from the unsuspecting citizen who was abruptly accosted, Harris was ornery and uncooperative when lawfully approached by Deputy Wingo on both occasions.  This resistance led to an escalation in force that, although upsetting to Harris, was dictated by circumstances he created.  At bottom, the factual record confirms that Deputy Wingo acted in accordance with the Constitution and state law.  Summary judgment is thus appropriate.

## II. Undisputed Material Facts

The complaint is broad, spanning several years and seeking relief for numerous contacts with the Collier County Sheriff's Office.  (See Doc. 51.)  The claims against Deputy Wingo, however, arise from only two arrests.  (Id.)  The first occurred on April 4, 2014, outside a self-storage facility.  The second followed more than two years later on December 16, 2016, as part of a traffic stop.  Given these two incidents form the universe of relevant facts as to Deputy Wingo, the full saga of Harris's conflict with the Sheriff's Office is not discussed.[1]

### A.  iStorage Arrest

On April 4, 2014, Harris spent the day at an iStorage facility helping his friend repair a motorcycle.  (Ex. A, Harris Dep. 36:3-25.)  He was "in and out of the storage unit all day, getting refreshments [and] accessory parts."  (Id. at 19-21.)  Harris noticed two

---

[1] Many of the factual assertions below may ultimately be disputed at trial.  But for present purposes, Harris's testimony must be accepted as true where not contradicted by the objective evidence.  See Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007).

police cruisers while running these errands: first in a nearby gas station and then later in a hotel parking lot.  He did not, however, have any contact with the deputies or see who was in the cars.  (Id. at 40:2-42:17.)

Harris finished working on the motorcycle around 9:25 p.m. and left his friend. (Id. at 43:18.)  The iStorage facility had closed by that point and it was dark.  Harris, riding his bicycle and carrying a backpack, left through the front gate.  (Id. at 135:11-19, 141:5-6.)  At that moment, Collier County Deputy Michael Chapman was on patrol and he noticed Harris.  (Ex. B, Chapman Dep. 67:23-68:5.)  Deputy Chapman turned into the iStorage entrance to question Harris.  (Id. at 74:19-24 ("I'm investigating . . . somebody coming out of a closed business in what appears to be an unlawful hour with - - due to my training and experience, someone that may or may not have been breaking into something inside.").

Deputy Chapman exited his car and asked Harris for identification.  Harris initially refused, suggesting that Deputy Chapman should know him from a prior encounter.  (Ex. A, Harris Dep. 128:22-25.)  Harris also did not have his wallet with him. (Id. at 129:5-7.)  Despite Harris's assumption, Deputy Chapman did not initially identify him.  (Ex. B, Chapman Dep. 70:14-19.)  It was only after initial contact that Deputy Chapman recognized Harris's face, but he still did not know his name.  (Id. at 70:17-19.) Deputy Chapman then activated his body microphone and the remainder of their interaction was captured on tape.  (Id. at 70:12-13; Doc. 100, Ex. 2 Chapman Dash Cam Video.)

The audio captures Deputy Chapman explaining that he stopped Harris because he was coming out of a closed business, at night, and with a backpack.  Given the history of burglaries with these facilities, Deputy Chapman wanted to ensure Harris had a legitimate reason to be there.  (Chapman Dash Cam Video 1:14-45.)  Harris, by his own admission, was uncooperative.  (Ex. A, Harris Dep. 134:23-25.)  After initially explaining that he was in the storage facility working with a friend, (Chapman Dash Cam Video 1:04-25), Harris raises his voice and demands to see a supervisor, (Id. at 1:25-2:00.)  When his request was refused, Harris argues with Deputy Chapman about his rights.  (Id. at 2:00-18.)

During this exchange, Deputy Wingo arrives and questions if Harris has been identified.  (Id. at 2:15-18.)  Deputy Chapman responds that Harris's surname is unknown.  (Id. at 2:18-24.)  Deputy Wingo then asks for identification.  Harris does not comply.  He instead tells Deputy Wingo to "talk to 2008."  (Id. at 2:21-25.)  Harris accuses the deputies of harassment as Deputy Wingo continues to ask for identification.  Eventually, Harris states that he "has no ID."  (Id. at 2:25-40.)

The deputies thus switch gears, asking Harris for his surname and date of birth so they can run it through the computer for identification.  (Id. at 3:05-25, 4:13-15.)  Harris offers his name but does not confirm the spelling, telling Deputy Wingo "he does not consent."  (Id. at 3:48-4:00.)  Harris makes a phone call to his friend inside the iStorage, telling him to come to the gate to confirm his story.  (Id.)

Deputy Chapman advises Harris that he has a legal obligation to identify himself.  (Id. at 4:00-08.)  This was no help.  Harris again accuses the deputies of harassment and

asks if he has committed a crime.  (Id. at 4:15-25.)  Deputy Chapman explains that he is investigating a loitering and prowling and thus needs his identification – *i.e.*, name and date of birth.  (Id. at 4:25-35.)  Harris, believing he has the right to resist, rants that the deputies "are taking wages under false pretenses."  (Id. at 4:31-35; Ex. A, Harris Dep. 146:11-19.)

Having given Harris numerous chances to provide his name and date of birth without success, Deputy Chapman orders him off the bike.  (Chapman Dash Cam Video 4:35-41.)  Harris refuses, proclaiming "I don't consent."  (Id.)  The deputies, who up to that point had not touched Harris, (Ex. A, Harris Dep. 144:12-14), went "hands on" and took him to the ground, (Id. at 148:14-23; Ex. C, Wingo Dep. 106:21-107:23.)

Once on the ground, Chapman and Wingo sought to secure Harris's hands.  This was impossible, however, because Harris had balled himself up.  (Ex. A, Harris Dep. 151:1-3, 157:8-10, 163:1-9.)  The deputies repeatedly commanded Harris to roll over and present his hands.  (Chapman Dash Cam Video 4:45-5:00.)  Harris claims that the backpack prevented his compliance, but his statements and conducted showed otherwise. Instead, Harris continued to shout "I do not consent" and "I didn't do nothing."  (Id.)

Unable to secure Harris's hands, Deputy Chapman pulled his taser and warned Harris to "roll over or I'm going to tase you."  (Id. at 5:00-05; Ex. A, Harris Dep. 152:2-4.)  Harris did not reply and instead deflected the taser prongs.  (Ex. A, Harris Dep. 152:6-12.)  With the taser ineffective, Deputy Wingo and Deputy Chapman attempted to gain compliance through physical force.  (Id. at 153:20-21, 155:10-156:9.)  At the same

time Harris continued to resisting, claiming he was "trying to defend [him]self." (Id. at 154:2-3.)

The physical struggle between Harris and the deputies lasted over three minutes. During this time, Harris can be heard yelling "harassment," "stalking," and "I want your supervisor." (Chapman Dash Cam Video 5:20-8:23.)  Harris is repeatedly told to roll over and present his hands.  His reason for non-compliance changes from the deputies being top of him, to his backpack being in the way.  (Id. at 6:00-8:20.)  Exhausted by the struggle and gasping for air, Deputy Chapman warns Harris that he will deploy mace without compliance.  (Chapman Dash Cam Video 6:29-35, 8:20-21.)

Several minutes into the confrontation Deputy Scott Pepin arrives.  (Id. at 8:35-50.)  He approaches the group struggling on the ground and demands Harris's arm.  (Id. at 8:55-59.)  When Harris still does not comply, Deputy Pepin strikes him with a baton. (Ex. A, Harris Dep. 163:1-9, 167:4-22.)  After a second warning, Deputy Pepin also deploys his taser.  (Chapman Dash Cam Video 9:15-20.)

At this point, Deputy Amengual arrives and his patrol car captures the remaining events on video.  (Doc. 100, Ex. 3 Amengual Video.)  Harris can be seen on his stomach with deputies trying to handcuff his arms.  (Id. at 4:56 (depicting Harris's arms still apart.))  Deputy Pepin administers additional strikes with the baton and again uses the taser.  (Ex. A, Harris Dep. 179:11-25.)  Harris was closely questioned at deposition as to when he was finally handcuffed.  (Id. at 183:18-184:13.)  He testified consistent with the video that there was no use of force once his hands were secured.  (Id. at 184:13-185:1;

6

Amengual Video 5:16-7:00.)  EMS arrived several minutes later, and Harris was taken from the scene.

Harris was formally arrested on several charges, including resisting arrest.  The State Attorney's Office later dropped the case.  (Doc 51 ¶¶ 241-242.)

Based on these facts, Harris has brought the following claims against Deputy Wingo: False Arrest & Excessive Force under 42 U.S.C. § 1983 (Count II); Malicious Prosecution under 42 U.S.C. § 1983 (Count III); Malicious Prosecution under Florida law (Count VI); Assault and Battery (Count XI); Conspiracy under 42 U.S.C. § 1983 (Count XII); and First Amendment Retaliation under 42 U.S.C. § 1983 (Count XIII).

### B. 2016 Traffic Stop

The second episode with Deputy Wingo arises from a traffic stop.  On December 16, 2016, Deputy Wingo was conducting surveillance for Harris's brother – Bo Harris.  (Ex. C, Wingo Dep. 172:3-173:12.)  The Sheriff's Office had intel that Bo was using a white station wagon with improper tags to transport narcotics.  (Id. at 175:3-176:23.)  Deputy Wingo observed the station wagon from a gas station and initiated a stop for the improper license plate.  (Id. at 180:8-11, 181:22-183:16.)

Deputy Wingo approached the vehicle and discovered it was not Bo.  It was instead Harris, who Deputy Wingo did not recognize as their last encounter was two years prior.  (Id. at 180:8-181:3.)  Harris activated a GoPro mounted on the dash, which recorded the remainder of the stop.  (Doc. 100, Ex. 4 Harris Video.)

Upon reaching the driver-side door, Deputy Wingo greets Harris with "hello sir."  (Id. at 0:33-35.)  Harris cuts him off, stating "one second I am calling my attorney."  (Id.

at 0:35-39.)  Deputy Wingo pauses briefly and asks for a license and registration.  (<u>Id.</u> at 0:41-43.)   Harris does not comply, again telling Deputy Wingo he plans to call his attorney.  (<u>Id.</u> at 0:43-44.)  Concerned that Harris could be contacting anyone (such as his brother who is possibly involved with transporting narcotics) Deputy Wingo demands the license immediately.  He also opens the car door.  (<u>Id.</u> at 0:44-46.)

Harris reacts by grabbing the door and pulling it shut.  (<u>Id.</u> at 0:45-47.)  Faced with physical resistance, Deputy Wingo again opens the door and reaches to seize Harris.  He simultaneously tells Harris to get out of the car.  (<u>Id.</u> at 0:47-50.)  Harris does not comply.  He instead turns his knees to block Deputy Wingo.  (<u>Id.</u> at 0:50-55; Ex. A, Harris Dep. 507:7-18.)

Harris uses his legs to hold off Deputy Wingo for several seconds.  During this time, Deputy Wingo can be heard telling Harris (repeatedly) to get out of the car.  (Harris Video 0:51-56.)  With physical contact established and no compliance, Deputy Wingo pulls his taser.  (<u>Id.</u> at 0:56.)  Harris again resists, grabbing the taser and removing the firing cap:



(Ex. D, Kroll Report 17-19.)[2]  This rendered the taser useless except in drive-stun mode, which requires physical contact with the suspect.  (Id. at 26.)

After nearly thirty-seconds of struggling back and forth with the taser, Deputy Wingo grabs Harris by the wrist and attempts to pull him from the car.  (Harris Video 0:59-1:30; Ex. A, Harris Dep. 512:16-23.)   Harris uses this opportunity to try and "scrape" away the taser. (Ex. A, Harris Dep. 512:23-513:18.)  This physical struggle for the weapons continues for several minutes as Deputy Wingo yells at Harris to "get out of the car."  (Id. at 515:15-531:3; Harris Video 1:30-4:00.)[3]

Harris eventually pins Deputy Wingo against the car's ceiling, holding him there unable to move.  (Ex. A, Harris Dep. 532:1-17.)  At that point, a second deputy arrives and deploys pepper spray from the passenger window.  (Id. at 532:23-533:15.)  Only then did Harris release Deputy Wingo.  (Id. at 533:18-19.)

Harris claims that Deputy Wingo shot him with the taser when he first pulled the weapon.  (Ex. A, Harris Dep. 508:10-510:18.)  This is untrue, as the firing cap is visible from the video.  (Harris Video 0:57; Ex. D, Kroll Report 18, 26-27.)  Harris also testified that the "taser was continuously making contact with [him]" during the encounter.  (Ex. A, Harris Dep. 522:1-2.)  Again, not true.  Deputy Wingo's taser saves all data when in use.  The download history shows that Harris was subject to a brief shock lasting only seconds.  (Ex. D, Kroll Report 14, 26.)  The video confirms this as well – the arching

---

[2] Deputy Wingo's expert report is submitted on grounds that his testimony on these issues will ultimately be admissible at trial.  See Lee v. Offshore Logistical & Transp., L.L.C., 859 F.3d 353, 355 (5th Cir. 2017).

[3] Of note, the taser can be heard "arcing" as Deputy Wingo attempts to drive-stun Harris.  (Harris Video 0:59-4:00.)  This indicates the weapon was not delivering a charge.  In other words, Harris was not being shocked.  (Ex. D, Kroll Report 26.)

noise heard throughout the encounter will only happen when the taser is *not* in contact with a suspect.  (Id. at 26.)

Harris has brought the following claims against Deputy Wingo based on this incident: False Arrest & Excessive Force under 42 U.S.C. § 1983 (Count XVI); Malicious Prosecution under 42 U.S.C. § 1983 (Count XVII); Assault and Battery (Count XIX); and Conspiracy under 42 U.S.C. § 1983 (Count XX).

### III. Standard of Review

Summary judgment is proper where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Imaging Bus. Mach., LLC. v. BancTec, Inc., 459 F.3d 1186, 1189 (11th Cir. 2006).  "The inquiry performed is the threshold [question of] whether there is the need for a trial – in other words, [are] there . . . any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Id. at 249-50. And a dispute is genuine if the evidence could lead a reasonable jury to return a verdict for the nonmoving party.  Id.

A plaintiff is obligated at the summary judgment stage to produce evidence establishing the essential elements of the case he must prove at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the defendant in a . . . civil case moves for summary judgment . . . the judge must ask himself whether a fair-minded jury could

return a verdict for the plaintiff on the evidence presented." Burger King Corp. v. Weaver, 169 F.3d 1310, 1321 (11th Cir. 1999).

"It is true that on a motion for summary judgment all reasonable inferences must be made in favor of the non-moving party." Cuesta v. Sch. Bd. of Miami-Dade Cty., 285 F.3d 962, 970 (11th Cir. 2002) (citation omitted). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." Id. (citations omitted). Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Burger King, 169 F.3d at 1321.

Although summary judgment is not designed as a substitute for trial, this relief is appropriate where the record fails to show the necessary elements of a plaintiff's case. The law is clear that a defendant should not be put to the expense of a trial where the only possible result will be a directed verdict. See Celotex, 477 U.S. at 322. Such is the case here.

## IV. Argument

### A. Harris's claims for false arrest, malicious prosecution, and First Amendment retaliation fail because there was probable cause for his arrests

A warrantless arrest without probable cause violates the Fourth Amendment and provides the basis for claims of false arrest and malicious prosecution. Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990); Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). Likewise, police officers may not retaliate and arrest a private citizen for lawfully exercising their First Amendment rights. Nunnelee v. Morgan, 550 F. App'x

716, 717 (11th Cir. 2013).  The existence of probable cause, however, is a bar to all three claims.  See Anderson v. City of Naples, 501 F. App'x 910, 916 (11th Cir. 2012); Wood, 323 F.3d at 882.[4]

Probable cause is measured by well-settled standards.  An arrest is supported by probable cause when the facts and circumstances within the police officer's knowledge "warrant a reasonable belief that the suspect had committed or was committing a crime." Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009).  The evidence of criminal activity need not be overwhelming.  "Probable cause requires only a probability . . . of criminal activity, not an actual showing of such activity."  Id.  Establishing probable cause "is not a high bar."  Paez v. Mulvey, 915 F.3d 1276, 1286 (11th Cir. 2019).  An officer must have something more than mere suspicion, but he may have far less than convincing proof.  Judged against this standard, the factual record proves that Deputy Wingo had probable cause to arrest Harris on both occasions.  No reasonable jury could conclude otherwise.

    *i.  iStorage Arrest*

It is undisputed that Deputy Chapman observed Harris leaving the iStorage facility at night after it had closed.  Harris was also carrying a backpack that could have contained burglary tools or items stolen from a storage unit.  The law is well-settled that these facts created reasonable suspicion for Deputy Chapman to stop Harris for further investigation.  See, e.g., State v. Russell, 659 So. 2d 465, 467 (Fla. 3d DCA 1995); State v. Jenkins, 566 So. 2d 926, 927 (Fla. 2d DCA 1990).  Harris was also aware of the basis

---

[4] Harris's state and federal claims for malicious prosecution are analyzed under the same rubric.  See Bembry v. City of Tallahassee, No. 4:05-CV-286-SPM, 2006 WL 1080676, at *6 (N.D. Fla. Apr. 24, 2006).  Accordingly, they are addressed together.

for the intrusion.  Deputy Chapman stated, in no uncertain terms, that he was conducting an investigatory stop.  (Chapman Dash Cam Video 4:25-35.)

Harris claims he was actually detained in retaliation for past complaints he lodged against Deputy Chapman.  (See Doc. 51 ¶¶ 48, 212-216, 223, 225.)  Even if true, the same result follows.  A police officer's subjective intent or motivation for conducting a stop is immaterial to the analysis.  The Eleventh Circuit has "explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists." Rankin v. Evans, 133 F.3d 1425, 1433 (11th Cir. 1998). If the objective facts provided a basis to stop Harris, which they did, the deputies complied with the Fourth Amendment. Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc) (police officer's belief that he did not believe probable cause existed was irrelevant to Fourth Amendment analysis); United States v. Roy, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting the notion that probable cause turns on what law enforcement officers think and explaining that "[c]ourts determine the existence of probable cause").

Once stopped, Harris was uncooperative.  He questioned Deputy Chapman's authority, accused him of harassment, and requested a supervisor.  But most important for present purposes, Harris refused to provide identification.  This constitutes a crime under Florida law.  See Fla. Stat. § 901.151; Burkes v. State, 719 So. 2d 29, 30 (Fla. 2d DCA 1998) (holding that it is a violation of Fla. Stat. § 843.02 for a lawfully detained individual to refuse to identify himself).

The audio recording confirms that Deputy Wingo asked Harris for identification no less than five times without success.  And when Harris finally declared that his wallet was missing, Deputy Wingo switched tactics and requested the spelling of his last name and date of birth.  (Chapman Dash Cam Video 3:05-25, 4:13-25.)  Harris never provided this information.  Instead, he continued to question the legality of the stop.  At that point, Deputy Wingo possessed probable cause to arrest Harris for obstruction without violence.  See, e.g., N.H. v. State, 890 So. 2d 514, 516 (Fla. 3d DCA 2005); K.A.C. v. State, 707 So. 2d 1175, 1177 (Fla. 3d DCA 1998).

Harris makes much of the fact that he was lawfully exiting the iStorage facility and the deputies did not wait for his friend to corroborate this alibi.  (Doc. 51 ¶ 222, 224.)  This argument misses the mark for several reasons.  For starters, the deputies were under no obligation to accept Harris's story.  Marx, 905 F.2d at 1507.  Indeed, they had reason to doubt its veracity.  Deputy Chapman believed Harris's friend was homeless and without the resources to own a storage unit.  (Chapman Dash Cam Video 2:50-3:03.)  But regardless of whether Harris could ultimately explain his presence, he remained obligated to provide identification.  See Fla. Stat. § 901.151 (providing that an officer may detain a suspect "for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence" (emphasis added)).  "As the cases from Terry itself to the present reflect and emphasize, one of the basic reasons for, and necessarily one of the primary functions of the investigatory stop[,] is to ascertain the identity of the suspect."  Harper v. State, 532 So. 2d 1091, 1094 (Fla. 3d DCA 1988).

To be sure, this incident could have ended differently.  But the same can be said of any encounter where the police officer's suspicions are ultimately unsubstantiated. The Fourth Amendment does not require perfection – it demands a reasonable response under the circumstances presented.  See Illinois v. Gates, 462 U.S. 213, 246 (1983). Harris was given several opportunities to identify himself with sufficient detail so the deputies could confirm his identity as required under Florida law.  It was not unreasonable for Deputy Wingo to take action when, after several minutes, those efforts proved futile.  See K.A.C., 707 So. 2d at 1177.

Harris has also suggested that the deputies knew his name from the inception of the stop, and thus their demands for identification were superfluous.  (Doc. 51 ¶ 45.) This argument fares no better.  The audio recording makes clear that the deputies could not identify Harris.  (Chapman Dash Cam Video 1:45-50, 2:16-21.)  Furthermore, even if they thought they recognized Harris, that would not preclude them from requesting identification.  See, e.g., Harper, 532 So. 2d at 1096.  Robert Harris is a common name.[5] To that end, it was sensible for Deputy Wingo to ask for more information –  like a license or date of birth – to "verify that the person who stated his name was . . . in fact, [the person] named."  Id.; see also Riley v. California, 573 U.S. 373, 381 (2014) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness.").  In essence, Harris is proposing that the deputies were required to forgo investigating his identity because they knew his name from prior encounters.  This cannot "pass the straight-face test."  Kisela v. Hughes, 138 S. Ct. 1148, 1154 (2018).  Law enforcement officers interact with the public

---

[5] The WhitePages list thirty two entries for "Robert Harris" in Naples, Florida.  See https://www. whitepages.com/name/Robert-Harris/Naples-FL (last visited June 7, 2019).

daily.  It is nonsensical to suggest they must rely on memory when identifying a suspect or otherwise let him go unimpeded.  Such a rule would "have a perplexing effect on law enforcement efforts."  Harper, 532 So. 2d at 1095.

Deputy Wingo gave Harris several opportunities to identify himself.  Fueled by a misbelief that the deputies lacked authority to investigate his presence, (Ex. A, Harris Dep. 146:14-147:4), he refused.  This violated Florida law: specifically, Fla. Stat. § 843.02.  Because the objective facts show that Deputy Wingo had probable cause to arrest Harris for this crime, summary judgment is appropriate as to his claims for false arrest (Count II), malicious prosecution (Counts III & VI), and First Amendment retaliation (Count XIII).  See Anderson, 501 F. App'x at 916; Wood, 323 F.3d at 882.[6]

### ii.  2016 Traffic Stop

This aspect of the parties' dispute merits only brief attention.  Harris concedes that the car he was driving during the 2016 traffic stop had an improper tag.  (Ex. A, Harris Dep. 477:16-479:4, 480:24-481:16.)  Regardless of what transpired thereafter, this provided probable cause for Deputy Wingo to conduct a full custodial arrest.  See Fla. Stat. § 320.261; Borsella v. Parker, No. 6:11-CV-1249-ORL-28, 2012 WL 834127, at *3 (M.D. Fla. Mar. 13, 2012) (finding police officer had probable cause to arrest motorist driving with an invalid license plate attached to his vehicle); Kapila v. Jenkins, No. 07-

---

[6] One final point.  Harris focuses on the loitering and prowling charge, maintaining the deputies lacked proof of this crime.  His argument misses the mark.  The pertinent question is whether the officers had facts suggesting *any* criminal activity.  See Elmore v. Fulton Cty. Sch. Dist., 605 F. App'x 906, 914 (11th Cir. 2015).  As discussed, Deputy Wingo had probable cause to arrest Harris for obstruction following a lawful stop.  Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002) ("When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.").

61895-CIV, 2009 WL 1288233, at *8 (S.D. Fla. May 7, 2009) (driving with an invalid license plate "is a misdemeanor under Florida law . . . and thus an arrestable offense under federal law"); <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001) (explaining that an officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that he committed even a minor criminal offense).

Harris, nonetheless, faults Deputy Wingo for "never conduct[ing] a proper and professional investigation into the unassigned tag, which violated [his] civil rights." (Doc. 51 ¶ 420.)  Settled law defeats this argument.  Deputy Wingo was not obligated to conduct an investigation.  He personally observed Harris driving a car with an illegal tag.  Nothing more was required.  <u>See Borsella</u>, 2012 WL 834127, at *3; <u>Smith v. City of Fairburn, Ga.</u>, 679 F. App'x 916, 924 (11th Cir. 2017) ("Once probable cause is established, an officer is under no duty to investigate further or look for additional evidence which may exculpate the accused.").

Because Deputy Wingo was authorized to arrest Harris at the inception of the traffic stop, his claims for false arrest (Count XVI) and malicious prosecution (Count XVII) must fail.  <u>See Wood</u>, 323 F.3d at 878-883.

**B. Alternatively, Deputy Wingo is entitled to qualified immunity on Harris's federal claims for false arrest, malicious prosecution, and First Amendment retaliation**

When qualified immunity is raised to claims of false arrest, malicious prosecution, or retaliation, the issue is not whether actual probable cause existed, but instead whether there was "arguable probable cause" for the arrest.  <u>Davis v. Williams</u>, 451 F.3d 759, 762 (11th Cir. 2006); <u>Phillips v. Irvin</u>, 222 F. App'x 928, 929 (11th Cir.

2007).   Arguable probable cause presents a lesser burden.   It exists where, viewed objectively, "reasonable officers in the same circumstances and possessing the same knowledge as the arresting officer *could have* believed that probable cause existed to arrest." Allen v. Gooden, No. 11-61804-CIV, 2012 WL 2375330, at *2 (S.D. Fla. June 22, 2012) (emphasis added).   This standard recognizes that the law does not automatically hold an officer liable for making an arrest that, with the benefit of reflection, turns out to have been wrong.[7]

      *i.  iStorage Arrest*

Deputy Chapman encountered Harris leaving a storage facility after it had closed. He was riding a bicycle and carrying a backpack.  A reasonable officer presented with these facts could conclude that an investigative stop was warranted.  See, e.g., Russell, 659 So. 2d at 467; Jenkins, 566 So. 2d at 927.  For instance, a reasonable officer could believe that Harris was leaving the scene of an attempted burglary.  See Brown v. City of Huntsville, 608 F.3d 724, 735 (11th Cir. 2010) (explaining that the existence of arguable probable cause is not limited to the charging crime).

It is asserted that Deputy Wingo developed probable cause to arrest Harris when he refused to provide identification during the investigative stop.  (See Supra Section IV, A.)  After several minutes (and multiple requests) Harris eventually told the deputies he lost his license and said his name.  But he would neither confirm the spelling nor give his

---

[7] To claim qualified immunity, a public official must first show that he was engaged in a "discretionary duty." Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).  This initial inquiry is not at issue here.  It is beyond dispute that Deputy Wingo was acting within the scope of his discretionary authority as law enforcement officer during the events at issue.  See, e.g., Proescher v. Bell, 966 F. Supp. 2d 1350, 1362 (N.D. Ga. 2013).

date of birth.   At issue, then, is whether Deputy Wingo possessed arguable probable cause to arrest Harris based on his failure to provide this additional information.   The answer is yes.

Harris was admittedly uncooperative and initially refused to provide any identification.  (Ex. A, Harris Dep. 144:21-145:6.)  This is not "usual behavior" for a law-abiding citizen.  See Fla. Stat. § 856.021(2).  Joined with the fact that Robert Harris is a common name, it was sensible for Deputy Wingo to demand further information.  A date of birth would have allowed Deputy Wingo to pinpoint Harris in the computer system without guesswork or delay.   This was far from an arbitrary or unreasonable request. See, e.g., Draper v. Reynolds, 369 F.3d 1270, 1276-77 (11th Cir. 2004) (analyzing similar fact pattern under Georgia law).

If any doubt exists about Deputy Wingo's authority to arrest Harris for obstruction, favoring qualified immunity is the fact that this crime is inherently unclear. A lawfully detained individual must provide "identification" when requested.  See Fla. Stat. § 901.151.  But the statute and case law provide no guidance for what information meets this threshold.  It is thus unclear whether a first and last name is alone sufficient under § 901.151.  One can imagine situations where it would be (a unique name) and situations where it might not (a common name, like John Smith).  Qualified immunity exists to protect police officers where probable cause is present but not necessarily clear. Facing a close call on whether to arrest a suspect is precisely when qualified immunity matters most.  See Hunter v. Bryant, 502 U.S. 224, 229 (1991).  When a statute is unclear

or innately fact specific, as here, qualified immunity is intended to offer the most protection.  See Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997).

Finally, even without arguable probable cause, there has been no showing that Deputy Wingo violated clearly established law.  Qualified immunity offers complete protection for government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, once it is established that a government official violated the Constitution, the court must further consider if the right in question was "clearly established."  Id.

"In determining [if] a right is clearly established, the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1102 (11th Cir. 2014).  To be sure, the Eleventh Circuit has long held that it is a violation of the Fourth Amendment to detain a suspect without probable cause.  But it is not enough for Harris to simply point at this generalized rule.  See Belcher v. City of Foley, Ala., 30 F.3d 1390, 1395 (11th Cir. 1994); White v. Pauly, 137 S. Ct. 548, 551-52 (2017).  The Supreme Court "has repeatedly [instructed] . . . not to define clearly established law at a high level of generality."  Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). Specificity is especially important in the Fourth Amendment context, where it is often difficult for an officer to determine how the relevant legal doctrine (here probable cause) will apply to the factual situation he confronts.  D.C. v. Wesby, 138 S. Ct. 577, 590 (2018).

Harris has not (and cannot) prove that Deputy Wingo violated settled law.  As noted above, there is a dearth of authority interpreting § 901.151.  What constitutes sufficient "identification" during an investigatory stop is unclear in Florida.  Id.  Deputy Wingo is thus entitled to qualified immunity for his decision to arrest Harris for failing to provide the information requested.  See Caldwell, 748 F.3d at 1102 ("[T]he salient question is whether the state of the law gave the [defendants] fair warning that their alleged conduct was unconstitutional.").

*ii.  2016 Traffic Stop*

Again, this incident requires only brief attention.  The case law is unwavering that an officer who personally observes a vehicle with an improper tag has, at minimum, arguable probable cause to arrest the driver.  See Pierre v. Gruler, No. 3:06-CV-45-J-32JRK, 2009 WL 383352, at *6 (M.D. Fla. Feb. 16, 2009); Cuyler v. Peebles, No. 4:13CV472-MW/CAS, 2015 WL 5559883, at *5 (N.D. Fla. Aug. 14, 2015), report and recommendation adopted, No. 4:13CV472-MW/CAS, 2015 WL 5559869 (N.D. Fla. Sept. 18, 2015).  Having witnessed Harris driving the station wagon with a swapped-out license plate, Deputy Wingo was well within his authority to stop and detain him.  Qualified immunity thus preempts Harris's claims of false arrest and malicious prosecution.

**C. Harris's claims for excessive force and battery against Deputy Wingo fail because the force used was objectively reasonable in light of the resistance encountered**

The Fourth Amendment's prohibition against unreasonable searches and seizures includes the right to be free from the use of excessive force.  Graham v. Connor, 490 U.S.

21

386, 394-95 (1989).  This rule, however, does not prohibit all force during an arrest.  "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Id. at 396.  To determine whether a police officer's use of was proper, a court must ask if "a reasonable officer would believe that [the conduct was] necessary in the situation at hand."  Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001).

Florida law follows the same rubric for a battery claim stemming from arrest.  "[P]olice officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest."  Davis, 451 F.3d at 768.  "[O]fficers are only liable for damage where the force used is 'clearly excessive.'"  Id. "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery."  City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).  "A battery claim . . . is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances."  Id.; see Cordoves v. Miami-Dade Cty., 92 F. Supp. 3d 1221, 1238 (S.D. Fla. 2015) (state law battery is "governed by same analysis" as the Fourth Amendment).

The Supreme Court has emphasized that there is no precise test or "magical on/off switch" to determine when an officer is justified in using force.  Scott, 550 U.S. at 382.  Rather, the particular facts of each case must be analyzed under the totality of the circumstances.  See Graham, 490 U.S. at 396.  Further, the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.  Id.  The

underlying events and circumstances are often "tense, uncertain and rapidly evolving," thereby requiring "split-second judgments" as to how much force is necessary.  Id. at 397.  Because an officer's perspective in the field differs from that of a judge sitting in chambers, courts must resist the temptation to review an officer's actions "with the 20/20 vision of hindsight."  Id. at 396.  Against this backdrop, the two incidents involving Deputy Wingo are addressed below.

### i.   iStorage Arrest

The encounter outside the iStorage facility lasted several minutes before the deputies made physical contact.  Deputy Wingo first went "hands on" with Harris when he was ordered to step away from his bike.  (Ex. A, Harris Dep. 148:14-149:11.)  Harris believes the force that followed, being "pummeled to the ground," was excessive.  (Id.)  He is incorrect.

"No matter the severity of the underlying crime[,] every officer may use some force in carrying out a custodial arrest."  Mladek v. Day, 320 F. Supp. 2d 1373, 1376-77 (M.D. Ga. 2004); see also Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994) ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives[.]").  This rule springs from common sense.  The immediate and unannounced use of force can prevent flight and avoid a more dangerous physical confrontation.  Further, the Eleventh Circuit has concluded that forcibly bringing a suspect to the ground for even a minor offense is not improper.  See Woodruff v. City of Trussville, 434 F. App'x 852, 854-55 (11th Cir. 2011) (removing suspect from his car and slamming him onto the pavement following a traffic stop was not excessive force);

Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003) (finding that even if the force applied in arresting the suspect – grabbing him from behind, pushing him to the ground, and placing him in handcuffs – was unnecessary, it was not unlawful).

The audio makes clear that tensions were high outside the iStorage.  Harris ignored verbal commands and questioned the deputies' authority.  (See, e.g., Chapman Dash Cam Video 3:48-4:00.)  Because Harris also had a means of escape (the bicycle) it was not unreasonable for Deputy Wingo to immediately take him to the ground.  See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding use of a taser during traffic stop reasonable where plaintiff was uncooperative and repeatedly refused to comply with officer's commands); Ainsworth v. City of Tampa, No. 8:10-CV-293-T-23TGW, 2010 WL 2220247, at *6 (M.D. Fla. June 2, 2010) ("[N]either physical resistance nor a verbal threat is a prerequisite to an officer's applying force in the course of an arrest.").  Indeed, the initial force used by Deputy Wingo was no more severe than what the Eleventh Circuit has previously described as de minimis.  See, e.g., Myers v. Bowman, 713 F.3d 1319, 1328 (11th Cir. 2013) (rejecting excessive force claim where the defendant "grabbed [the plaintiff] by the arm, forced him to the ground, [and] placed him in handcuffs"); Croom v. Balkwill, 645 F.3d 1240 (11th Cir. 2011) (finding no excessive force where officer forced the plaintiff to the ground from a squatting position and held her there with a foot (or knee) in the back for up to ten minutes).  Consistent with this case law, simply taking Harris to the ground cannot support a finding of excessive force.

Harris did not submit to arrest once he was on the ground.  He curled into a fetal position and "tr[ied] to defend himself."  (Ex. A, Harris Dep. 151:1-3, 154:2-7.)  Harris tucked his hands into his body, and despite repeated commands, the deputies could not handcuff him.  (Id. at 157:8-10.)  It is important to note here that Deputy Wingo did not use a taser, baton, or pepper spray during this encounter.  His actions were limited to physical strikes with his fists and knees.  (See id. at 155:8-15.)  Accordingly, the pertinent question is whether Deputy Wingo was allowed to use this force to overcome Harris's resistance and secure his hands.  The answer, yet again, is yes. See Alcocer v. Mills, 906 F.3d 944, 952 (11th Cir. 2018) (reversing summary judgment where the district court did not "individually evaluate each defendant's specific actions and omissions").

This is not a case in which force was applied after a suspect was securely in custody.  See, e.g., Reese v. Herbert, 527 F.3d 1253, 1273-74 (11th Cir. 2008) (concluding that the officers used excessive force when they beat and pepper-sprayed a misdemeanor suspect who did not pose a threat and was not actively resisting or evading arrest).  Harris was anything but compliant – he fought every effort to secure his hands. Increased and significant force has been allowed in response to such resistance.  For example, in Lewis v. City of West Palm Beach, 561 F.3d 1288, 1290 (11th Cir. 2009), the court found that it was reasonable to "hogtie" a suspect who subsequently died in custody.  The suspect was not wanted on a serious crime.  He merely appeared disoriented and was stumbling in the road trying to flag down vehicles.  But, once confronted by the officers, he "continued to struggle" against efforts to restrain him.  Id.

at 1292.  Similarly, in <u>Escarcega v. Jordan</u>, 701 F. App'x 338, 342 (5th Cir. 2017), officers used kicks and punches to bring the suspect into compliance when he refused to surrender his hands.  Noting that no force was used after the suspect was finally handcuffed, the court held, "using force, such as punches, to gain control of a non-complaint suspect is not clearly excessive." <u>Id.</u> at 342.

Here, although Harris was not suspected of serious crimes, he fought attempts to restrain him.  His physical resistance is proven by the undisputable fact that it took a three-minute struggle to apply handcuffs.  (<u>See</u> Ex. A, Harris Dep. 183:18-184:13.) Fourth Amendment reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1267-68 (11th Cir. 2003). Deputy Wingo's actions were thus reasonable under the circumstances.  <u>See, e.g.</u>, <u>Black v. Miller</u>, No. 1:05-CV-0348-WBH, 2006 WL 8432337, at *10 (N.D. Ga. Aug. 16, 2006) (finding no excessive force where officer used physical strikes to secure suspect's hands).

Harris claims he was unable to comply with the deputies' commands to roll over because he was on his back and held down.  (<u>See, e.g.</u>, Ex. A, Harris Dep. 154-19-24.) Even if true, this would not have prevented Harris from surrendering his hands as also requested.  It is important to note that the facts must be viewed from the standpoint of the deputies on scene.  What Harris thought or believed is of no moment – his actions, as viewed by the deputies, is determinative.  <u>Robinson v. Arrugueta</u>, 415 F.3d 1252, 1255 (11th Cir. 2005).  Harris tucked his hands to his chest, went into a fetal position, and was

acting in "self-defense."  (Ex. A, Harris Dep. 151:1-3, 157:6-12, 163:5-9.)  Given these

facts, a reasonable officer could believe Harris was continuing to resist despite any

declarations to the contrary.  See Cordoves, 92 F. Supp. 3d at 1237 (rejecting plaintiff's

claim that police officers used excessive force while she was unconscious because, based

on the objective facts, the officers could have concluded "not that [plaintiff] fell

unconscious, but rather that she was feigning a fall to avoid being handcuffed").

Likewise, because the court must view the facts through Deputy Wingo's eyes, Harris's

claim that he was resisting in self-defense is irrelevant.  In fact, Harris did not have such

a right.  Fernandez v. City of Cooper City, 207 F. Supp. 2d 1371, 1378 (S.D. Fla. 2002)

("A person is not justified in the use of force to resist an arrest by a law enforcement

officer who is known, or reasonably appears, to be a law enforcement officer.").

When viewed objectively from the perspective of a reasonable officer, Harris's

actions justified the force Deputy Wingo utilized to restrain him.  Summary judgment is

thus appropriate as to Harris's claims of excessive force (Count II) and battery (Count

XI).

### ii.   2016 Traffic Stop

The first use of force occurred when Deputy Wingo opened the car door.  Despite

Harris's assertion otherwise, this was not improper.  (Doc. 51 ¶ 421.)  As already

explained, Deputy Wingo had probable cause to arrest Harris from the inception of the

stop.  This provided him authority to open the car door.  See, e.g., Guilford v. Frost, 269

F. Supp. 3d 816, 829 (W.D. Mich. 2017) (attempting to pull suspect from car constitutes

no more than *de minimis* force); Brown v. City of Huntsville, Ala., 608 F.3d 724, 740

(11th Cir. 2010) ("For even minor offenses, permissible force includes *physical restraint*, use of handcuffs, and pushing into walls." (emphasis added)).

Further, by the time Deputy Wingo grabbed the car door Harris had already refused a verbal command to produce his license.  (Harris Video 0:33-44.)  There was no requirement for Deputy Wingo to wait any longer.  Indeed, his quick reaction was understandable under the circumstances.  Deputy Wingo was alone and he had stopped a vehicle thought to be involved with smuggling narcotics.  The driver (who was unknown at that point) then attempted to make a call on his cellphone.  For all Deputy Wingo knew, Harris was contacting a coconspirator to warn him of the stop.  Deputy Wingo was not obligated to wait until Harris posed more of a threat before resorting to physical force.  See Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001) ("Government officials are not required to err on the side of caution.").  The Fourth Amendment imposes a standard of reasonableness, not superhuman courage.  See, e.g., Mannor v. Pearce, No. 4:15-CV-01413-SGC, 2018 WL 1456638, at *5 (N.D. Ala. Mar. 23, 2018) (explaining that police are permitted to use force to secure a suspect they reasonably perceive as threatening).

Deputy Wingo instructed Harris to exit the car as he opened the door.  Harris did the opposite – he grabbed the door and pulled it shut.  (Harris Video 0:45-47.)  Harris also turned his body and used his knees to block Deputy Wingo.  (Id. at 0:50-55.)  Facing active resistance in response to a lawful command, Deputy Wingo pulled his taser and pointed it towards Harris.  This force also complied with the Fourth Amendment.  See Hall v. McGhee, 762 F. App'x 837, 845 (11th Cir. 2019) (displaying a taser, without

using it, is *de minimis* force); <u>Williams v. Sirmons</u>, 307 F. App'x 354, 360-61 (11th Cir.

2009) ("It is well established in this circuit that where an arrest is supported by probable

cause, the application of *de minimis* force as needed to effect the arrest, without more,

will not support a claim for excessive force in violation of the Fourth Amendment.").

It was Harris who then escalated the encounter by *grabbing the taser* and

removing the firing cap.  (Ex. D, Kroll Report 17-19.)  Harris also physically resisted

Deputy Wingo's efforts to remove him from the car.  Confronting a combative suspect,

Deputy Wingo then attempted to drive-stun Harris.  (Harris Video 0:59-1:30.)  The

Eleventh Circuit has repeatedly held that use of a taser is not excessive force when the

plaintiff, like here, is physically resisting arrest.  <u>See</u> <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d

1291, 1306 (11th Cir. 2009) (concluding that the tasing of a woman three times, which

led to her eventual death, did not amount to excessive force where the plaintiff actively

resisted the deputies' efforts at a lawful arrest); <u>Barfield v. Rambosk</u>, 641 F. App'x. 845,

848 (11th Cir. 2015) (holding that "noncompliance or continued physical resistance to

arrest justifies use of force" in taser cases); <u>Floyd v. Corder</u>, 426 F. App'x 790, 792 (11th

Cir. 2011) (use of taser found not excessive).

There can be no genuine dispute that Harris physically resisted Deputy Wingo's

attempt to complete the arrest.  Their altercation continued for several minutes as Deputy

Wingo yelled for Harris to exit the vehicle.  Harris, in turn, can be seen grabbing Deputy

Wingo's arms.  (Harris Video 1:30-4:00.)  Harris's resistance is conclusively established

by the fact that he eventually restrained Deputy Wingo by pinning him to the car ceiling.

(Ex. A, Harris Dep. 532:1-17.)  Any force used during this time (even if unsuccessful)

was plainly justified.  (See Ex. D, Kroll Report 14, 26 (explaining that the taser was largely ineffective); Buckley v. Haddock, 292 F. App'x 791, 796 (11th Cir. 2008) ("In most circumstances where an arrestee is resisting, a single officer can constitutionally effectuate an otherwise lawful arrest by resorting to the use of moderate, nonlethal force.").

Harris suggests that he posed no actual threat and would have complied but for Deputy Wingo springing into action.  However accurate this argument may be in retrospect, it disregards the correct viewpoint for assessing Fourth Amendment claims. Yet again, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396; Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir.2009) ("Our task is not to evaluate what the officers could or should have done in hindsight.").   While Deputy Wingo may have been safe in prolonging the traffic stop and allowing Harris to use his phone, he had no way of knowing that at the time. Likewise, although Harris claims he would have complied had Deputy Wingo stopped using force (Doc. 51 ¶ 401), his actions, such as grabbing the taser and fighting, showed otherwise.  For obvious reasons, the Constitution does not require a police officer to accept a suspect's pleas of compliance when their objective actions demonstrate otherwise.  See Cordoves, 92 F. Supp. 3d at 1237.

The pertinent question now is whether Deputy Wingo acted reasonably under the circumstances presented.  And he did.  Accordingly, summary judgment is appropriate as

to Harris's claims of excessive force (Count XVI) and battery (Count XIX) related to the 2016 traffic stop.[8]

### D. Deputy Wingo is otherwise entitled to qualified immunity from Harris's claims of excessive force

Qualified immunity is intended to "give ample room for mistaken judgments." Malley v. Briggs, 475 U.S. 335, 343 (1986).  This standard represents a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation.  See Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

Against this backdrop, trial courts have been cautioned to "think long and hard before stripping defendants of immunity."  Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999).  Indeed, the Eleventh Circuit has made clear that qualified immunity is the usual rule, and "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities."  Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996).  If reasonable public officials could differ on the lawfulness of the actions at issue, qualified immunity must be applied.  Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).

"The Supreme Court has emphasized that there is no precise test or magical on/off switch to determine when an officer is justified in using . . .  force."  Garczynski, 573

---

[8] The complaint also suggests that Deputy Wingo's use of force was motivated by some personal animus. To the extent this argument is asserted, it has no bearing on the analysis required here.  Graham, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

F.3d at 1166 (11th Cir. 2009).  "Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Post, 7 F.3d at 1559.  Put differently, only when an officer's conduct is "clearly excessive" does the door to qualified immunity slam shut.  Kirkland v. Mosaic Fertilizer, LLC, No. 8:14-CV-1715-T-24TGW, 2015 WL 4042100, at *6 (M.D. Fla. July 1, 2015).

The Eleventh Circuit has consistently granted qualified immunity to officers using similar force when dealing with a resisting arrestee.  See, e.g., Draper, 369 F.3d at 1278; Mann, 588 F.3d at 1306; Benton v. Hopkins, 190 F. App'x 856, 859-60 (11th Cir. 1006). Particularly illustrative is Hoyt v. Cooks, 672 F.3d 972 (11th Cir. 2012).  In Hoyt, the court held that qualified immunity attached where officers could not handcuff a suspect who resisted by stretching his arms. The police officers repeatedly tased the suspect despite only minor resistance.  Id. at 977-78.  The force used in Hoyt was far more egregious in response to roughly the same level of resistance offered by Harris.  Against this backdrop, not "every reasonable officer would conclude that the . . . force used [here] was plainly unlawful."  Lewis, 561 F.3d at 1292 (emphasis added).

For argument's sake, even if the force applied was objectively unlawful, this result was not "clearly established" at the time.  Although it is not Deputy Wingo's burden to demonstrate that the law was clearly established in his favor, a review of Eleventh Circuit case law does not show a bright line barring his conduct.  See Buckley v. Haddock, 292 F. App'x 791, 797 (11th Cir. 2008) ("Plaintiff must demonstrate that, from the preexisting law, the deputy had 'fair and clear notice' that the [his] conduct

would break federal law."). To the contrary, police officers are offered wide discretion in reacting with force when the officer believes that a suspect is resisting arrest. "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." Wilson v. Layne, 526 U.S. 603, 618 (1999). At the very least, therefore, Deputy Wingo is entitled to qualified immunity.

### E. Harris's civil conspiracy claims are factually insufficient and otherwise barred by the intra-corporate immunity doctrine

We turn finally to Harris's conspiracy claims under 42 U.S.C. § 1983 (Counts XII & XX). He alleges that Deputy Wingo conspired with several other deputies to violate his constitutional rights during the incidents discussed above. The first glaring problem for Harris is the lack of evidence that Deputy Wingo reached an agreement to violate his constitutional rights. See Grider v. City of Auburn, Ala., 618 F.3d 1240, 1260 (11th Cir. 2010) ("A plaintiff claiming a § 1983 conspiracy must prove the defendants 'reached an understanding[.]'"). "[T]he linchpin for conspiracy is agreement." Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1122 (11th Cir. 1992). A civil conspiracy claim requires more than labels and conclusions. "Plaintiff cannot rely on subjective suspicions and unsupported speculation but must provide sufficient facts to show that an agreement was made." Oden v. Thomas, No. 2:13CV388-TMH, 2013 WL 5502963, at *2 (M.D. Ala. Sept. 30, 2013).

There is nothing to suggest that Deputy Wingo reached an agreement or understanding with his coworkers. At best, the record displays that he participated in Harris's arrest and prosecution. But merely showing that Deputy Wingo was involved with these criminal cases, which is part of his duty as law enforcement officer, is a far cry

from proving he was engaged in a conspiracy.  See Carter v. City of Melbourne, No. 611CV824ORL22DAB, 2012 WL 12895873, at *4 (M.D. Fla. Jan. 24, 2012) (explaining that "[m]erely alleging that defendants had a common goal to violate [p]laintiff's rights" is not enough).  Although an agreement can be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct," Harris has failed to bring forward credible evidence from which a reasonable fact-finder could make such an inference.  United States v. Schwartz, 541 F.3d 1331, 1361 (11th Cir. 2008).  Harris, in effect, is trying to create a conspiracy out of innuendo and conclusory allegations that the deputies all worked together.  This will not do.  See, e.g., Lochin v. Verizon Florida LLC, No. 8:09-CV-1535-T-23TBM, 2010 WL 4056034, at *6 (M.D. Fla. Oct. 15, 2010).

Harris's conspiracy claim also fails because the alleged conspirators are members of the same organization: the Collier County Sheriff's Office.  No outsiders were allegedly involved.  (See Doc. 51 Counts XII & XX.)  The intracorporate conspiracy doctrine bars conspiracy claims against corporate or government actors accused of colluding together within an organization.  See Detris v. Coats, 523 F. App'x 612, 615 (11th Cir. 2013) (stating that "the intracorporate conspiracy doctrine prohibits a § 1983 claim against law enforcement officers in their individual capacities"); see also Swanson v. Scott,, No. 2:17-CV-67-FTM-99MRM, 2017 WL 1134998, at *2 (M.D. Fla. Mar. 27, 2017) (same).  The Eleventh Circuit recognizes an exception to the intracorporate conspiracy doctrine when the plaintiff show an underlying *criminal* conspiracy.  See Foster v. Pall Aeropower Corp., 111 F. Supp. 2d 1320, 1324 (M.D. Fla. 2000).  That

34

exception has not been alleged here.  "[T]his case involves an alleged *civil conspiracy* among [law enforcement officers] and does not involve . . . a criminal conspiracy in violation of the federal criminal code." Grider, 618 F.3d at 1263.

Finally, because Harris cannot prove a constitutional violation by Deputy Wingo (see Supra Section IV, A-D.), there can be no conspiracy claim based on these alleged acts.  "To sustain a conspiracy action under § 1983[,] a plaintiff must show an underlying actual denial of his constitutional rights."  Hadley v. Gutierrez, 526 F.3d 1324, 1332 (11th Cir. 2008) (citation omitted).  For all these reasons, summary judgment is proper as to Harris's conspiracy claims (Counts XIII & XX).

## V. Conclusion

There is little doubt that Harris feels aggrieved by the actions of Deputy Wingo. But the Constitution does not offer redress for every perceived wrong that occurs during an arrest or investigatory stop.  The law instead embodies an allowance for the fact that police officers are often forced to make split-second decisions under intense pressure.  On both occasions at issue Harris was lawfully approached by Deputy Wingo and he resisted arrest.  Given these circumstances and in the context of all other facts, Deputy Wingo's conduct did not violate the Constitution or state law.   Accordingly, Deputy Wingo respectfully requests that the Court enter summary judgment in his favor and dismiss this case.

Respectfully submitted,

/s/ Robert C. Shearman
Robert C. Shearman
Kyle C. Dudek

I HEREBY CERTIFY that on June 10, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

DAWN L. DRELLOS-THOMPSON, ESQ.
Compass Law Firm, P.A.
27499 Riverview Center Blvd., Suite 210
Bonita Springs, FL 34134
Attorney for Plaintiff
dawn@compass.legal

BRUCE R. BOGAN, ESQUIRE
MELISSA J. SYDOW, ESQUIRE
Hilyard, Bogan & Palmer, P.A.
P.O. Box 4973
Orlando, FL 32802-4973
Counsel for Def. Chapman
bbogan@hilyardlawfirm.com
msydow@hilyardlawfirm.com
lduclos@hilyardlawfirm.com

SUMMER M. BARRANCO, ESQUIRE
Purdy, Jolly, Giuffreda, Barranco & Jisa,
P.A.
2455 East Sunrise Boulevard
Suite 1216
Fort Lauderdale, Florida 33304
Counsel for Defendant Sheriff
summer@purdylaw.com
melissa@purdylaw.com

THOMAS W. POULTON, ESQUIRE
DeBevoise & Poulton, P.A.
Suite 1010
1035 South Semoran Blvd.
Winter Park, FL 32792
Counsel for Def. Pepin
Poulton@debevoisepoulton.com
cook@debevoispoulton.com

HENDERSON, FRANKLIN, STARNES
  & HOLT
Attorneys for Defendant KASEY WINGO
Post Office Box 280
Fort Myers, Florida 33902-0280
Telephone: 239.344.1346
Facsimile: 239.344.1501
Primary: robert.shearman@henlaw.com
Secondary: Courtney.ward@henlaw.com


By:/s/ Robert C. Shearman
    Robert C. Shearman
    Florida Bar No. 614025
    Kyle C. Dudek
    Florida Bar No. 122752