**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

ROBERT DALE HARRIS,

        Plaintiff,

vs.                           Case No.  **2:18-CV-00017-JES-MRM**

KEVIN RAMBOSK, in his Official Capacity as Sheriff of Collier County, Florida, KASEY P. WINGO, individually, MICHAEL D. CHAPMAN, individually, and SCOTT PEPIN, individually,

        Defendants.
_____/

**PLAINTIFF'S MOTION IN LIMINE AND MEMORANDUM IN SUPPORT TO EXCLUDE WITNESS AND EVIDENCE INVOLVING BO HARRIS**

    The Plaintiff, Robert Dale Harris, by and through his undersigned counsel, file this Motion in Limine to exclude Bo Allen Harris (the Plaintiff's brother) as a witness in this case and any evidence relating to Bo Allen Harris, and state as follows:

**MEMORANDUM OF LAW**

    **I.**    **Legal Standard**

    A motion in limine presents a pretrial issue of admissibility of evidence that is likely to arise at trial. In re Seroquel Products Liability Litigation, 2009 WL 26099 at *1 (M.D. Fla. 2009). A motion in limine serves the purpose of providing the court with "notice of the movant's position so as to avoid the introduction of damaging evidence which may irretrievably effect the fairness of the trial." Id.

In considering a motion in limine, this Court has broad discretion to determine the admissibility of evidence. United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998), citing United States v. Ross, 131 F.3d 970, 987 (11th Cir. 1997). An appellate court will find an abuse of discretion only when the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment. Tran v. Toyota Motor Corp., 420 F.3d 1310 (11th Cir. 2005).

Federal Rules of Evidence 401 and 402 govern relevance and the admissibility of evidence. "Relevant evidence" is "evidence having a tendency to make the existence of any fact that [*4] is of consequence to the determination of the action more probable or less probable than it would be without the evidence," and "[e]vidence which is not relevant is not admissible." Lane v. McKeithen, 423 Fed. Appx. 903, 905 (11th Cir. 2011)(citing Fed. R. Evid. 401, 402). However, even if evidence is deemed to be relevant, the court may exclude relevant evidence pursuant to Federal Rule of Evidence 403, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403, In re Seroquel Products Liability Litigation, 2009 WL 26099 at *2.

The Plaintiff believes that the matters set forth herein would be inadmissible for any purpose on proper and timely objection because they have no bearing on the issues in this case. Permitting interrogation of witnesses, comments to jurors or prospective jurors, or offers of evidence concerning these matters would prejudice the jury, and sustaining objections to such questions, comments, or offers would not cure such prejudice, but rather reinforce the impact of the prejudicial matters to the jury.

**II.     Bo Harris, the Plaintiff's Brother, Should Be Excluded as a Witness along with Any Evidence Related to Bo Harris and his Past Criminal Record**

Bo Allen Harris ("Bo"), the Plaintiff's brother, did *not* live with the Plaintiff *until* 2015 -- well after the Plaintiff's 2014 claims against the Defendants.  (Harris Dep. 14:6-11; 15:20-22; 85:1-16).  Prior to 2015, the Plaintiff had not seen Bo for about 10 years.  (Id. 84:23-25, 85:1-11).  When Bo arrived at their grandmother's home in 2015, he was suffering from a serious medical condition that occasionally required hospitalization.  (Id. at 84:9-20).  Due to his medical issues, the Plaintiff was attempting to help Bo apply for Social Security Disability.  (Id. 85:17-19).

The Plaintiff's first interaction with Collier County Code Enforcement and Defendant Chapman occurred in 2013, two years *before* Bo came to live with the Plaintiff.  (Id. 15:23-25, 17:4-10).  The Plaintiff's next encounter with Chapman was at the McDonald's in March 2014, when he had reported Chapman's conduct to Sgt. Amengual and Defendant Wingo, followed by two weeks of unlawful ID checks by Collier County deputies.  (Id. at 21:1-11).

The Plaintiff then encountered Defendant Pepin and Deputy Ellis in June 2014 for the Dunkin Donuts' trespass warning, shortly after Defendant Pepin had conducted a TAR search on the Plaintiff in May 2014.  (Doc. 135, p. 10).  In May 2014, the Plaintiff was trespassed from the Shell Station and Waffle House by Deputy Ross Anthony.  (Id. at 68:11-15).  The Plaintiff encountered Deputy Ellis, again, in August 2014, when he was unlawfully removed by him and Deputy Kennedy from the same McDonalds where he had encountered Chapman.  (Id. at 65:10-21).  The above interactions occurred the year before Bo came to live with the Plaintiff.  Furthermore, there is also no evidence that after 2014 Bo was connected to the March 2015 Sew Short trespass warnings or the Kallenberg traffic stop.

In October 2016, former Defendant Wiedel performed a traffic stop involving Bo. (Wiedel Dep. 46:9-21). Wiedel began his employment with the Collier County Sheriff's Office in 2006 as a deputy with road patrol. (Id. at 6:17-25). In 2008, Wiedel was promoted to corporal. (Id. at 7:3-8). Five years later he was promoted to the East Naples SET team, which merged with the Aggressive Criminal Enforcement Unit in 2015. (Id. at 7:10-12; 9:2-6). SET investigates drug related crimes. (Id. at 8:3-16). In 2016, Wingo became Wiedel's SET supervisor. (Id. at 8:20-23). Five years later, Wiedel was promoted from corporal to sergeant. (Id. at 9:2-6).

In October 2016, when Wiedel stopped the car that Bo was driving, the tag (a Florida state-issued tag) came back legally registered to the GMC, which was the Plaintiff's car. (Id. at 46:9-21). The Plaintiff testified in deposition that he, *not* Bo, had removed the license plate from his GMC Jimmy and attached it to his Ford Escort about *six days* before his December 2016 arrest by Wingo, and was waiting for his paycheck so he could pay the transfer fee. (Harris Dep. 478:2-14, 481:9-12). Wingo testified in deposition, however, that during the October 2016 stop, he had received "intel" that Bo was the one who had switched tags and had been checking on the switched tags for "[m]aybe one month" before the Plaintiff's arrest. (Wingo Dep. 176:11-15).

Wingo's deposition testimony, however, is not corroborated by Wiedel. Wiedel makes no mention of this alleged "intel" about the switched tag coming from the October 2016 stop and, in fact, testified that he only ran the tag a day or two before the Plaintiff's December 2016 arrest when he first noticed that the GMC tag was on the Ford. (Wiedel Dep. 51:10-22; 52:4-24). Wiedel was also very clear in deposition that Bo's stop was for a traffic infraction and

that there was no indication of any type of narcotics or a smell of narcotics.  (Wiedel Dep. 69:7-19; 71:6-24).  Significantly, Wiedel also testified that at the time of Bo's October 2016 traffic stop, he did *not* "have any Intel of Bo Harris" that he or an associate were running drugs. (Wiedel Dep. 71:22-24).  Wiedel claims that "intel" about Bo came *after* the October 2016, where Wingo was present.  (Id.).

After reviewing the Plaintiff's video of his December 2016 arrest involving Wingo, Wiedel made the following sworn statement to CCSO's Professional Responsibility Bureau about the false information given to him about the arrest by Wingo:

> "I mean that, and I feel I did, when I saw my name on the Booking Sheet I was like, my God I looked at the video, I was like I'm caught up in this because my name's on there."
>
> …
>
> "And I'm upset that [] [Wingo] fabricated some of what happened and got me in the trick bag."
>
> …
>
> "If I had known that, that he was trying to do that I would have made him write his own report."  (Wiedel PRB Statement).

Despite being part of the SET team that investigated drug trafficking and the deputy who performed the traffic stop on Bo in October 2016, Wiedel had no knowledge of Bo prior to October 2016 or information about the Plaintiff selling drugs.  Coincidently, this stop occurred less than a month after the Plaintiff filed his Notice of Intent dated September 28, 2016, which specifically named Wingo as a defendant in a potential civil rights violation lawsuit. Rhetorically, and based on all of the foregoing information, if Wiedel was assigned to the SET team, and he didn't have any information about Bo prior to October 2016, then any argument that Bo and the Plaintiff were under surveillance for three years for selling and delivery drugs

lacks merit. However, the switched tag issue is important because not only was it the reason that Wingo stopped the Plaintiff in December 2016, but it has been used as the argument supporting the fallacy that the tag was switched to conceal drug related activity.

In Summary, the Plaintiff has a clean adult criminal record with no history of arrests or convictions for drug related offenses, to date. (Woods Aff. ¶¶ 4-5). To that end, there is no evidence that either Defendants Pepin or Chapman knew of Bo or had knowledge of him during the time of the Plaintiff's April 2014 arrests and trespasses, or that Bo had any connection to the 2013 Code Enforcement encounters, the 2014 iStorage and trespass warnings, the 2015 Sew Shore trespass warnings or traffic stops.

Moreover, when Bo was stopped in October 2016 and the Plaintiff in December 2016, both vehicles were searched for drugs and **none** were found. The Defendants have failed to put forth any proof that the Plaintiff and Bo were involved in the selling or delivery of drugs or that they were operating a drug house from their grandmother's home. The Defendants' argument that the Plaintiff and his brother were selling and delivering drugs and that evidence of the switch tag is proof, is a thinly-veiled tactic to prejudice the jury and mitigate their damages.

The sad irony here is that on the day Wingo arrested the Plaintiff in December 2016, he was delivering donuts and bagels for Dunkin Donuts – a business that Defendant Pepin had unlawfully trespassed him from in 2014. (Harris Dep. 486:6-25; 487:1-25). Prior to his December 2016 arrest, the Plaintiff was living in his grandmother's home that he worked to bring up to code and was gainfully employed. After he was released from jail in mid-January 2017, the Plaintiff once again found himself homeless and without a job. Wiedel, a law enforcement professional who prided himself on truthfulness and integrity, found himself in suit.

## Conclusion

Bo Harris had no contact with the Plaintiff and had no direct knowledge of any of the claims in this case concerning code enforcement in 2013, the Plaintiff's iStorage arrest in 2014, or the unlawful trespass warnings and removals.   There is no evidence that Bo had contact with Chapman, Pepin or that he is relevant to Sheriff Rambosk's defense.   Bo's traffic stop by Wiedel in October 2016 did not involve the Plaintiff and there is no corroborating evidence that Bo had anything to do with the switch tag.   Moreover, there were no drugs found in the Plaintiff's GMC or proof that Bo was using the vehicle to deliver drugs.

Wiedel makes no reference in either his PRB statement or deposition that during the stop he had received "intel" that it was Bo and not the Plaintiff who switched the tags from the GMC to the Escort and that they did so to conceal their involvement with drugs.   However, once the defense begins questioning witnesses about their "suspicions" that the Harris brothers were engaging in illicit drug activity, and even if the Court sustains Plaintiff's counsel objections concerning this type of inquiry, the bell will have been rung and the jury will be left wondering why those questions were asked in the first place.   Therefore, Bo's testimony here would not only be irrelevant, but have no material or probative value in assisting the jury in its deliberations as to the validity of the Plaintiff's claims or the defenses raised by the Defendants.

**WHEREFORE**, Defendants should be prohibited from alluding to, inferring, seeking testimony, entering into evidence, remarking, etc. anything having to do with Bo Harris's past criminal activity or involvement in this case.   Therefore, the Plaintiff respectfully asks that Bo Harris be excluded as a witness in this case including any evidence related to his criminal record.

## RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Plaintiff ROBERT DALE HARRIS, certifies

that before filing this motion, she conferred with counsel for Defendants SHERIFF KEVIN RAMBOSK, KASEY WINGO, MICHAEL CHAPMAN, and SCOTT PEPIN.  All counsel for Defendants **OPPOSE** this motion.

## CERTIFICATE OF SERVICE

I hereby Certify that I have electronically filed a copy of the forgoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:  **Robert C. Shearman, Esq.**, Henderson, Franklin Starnes & Holt, P.A., Attorneys for Defendant Wingo, 1715 Monroe St., Ft. Myers, Florida   33902-0280, robert.shearman@henlaw.com; **Bruce R. Bogan, Esq.**, Hilyard, Bogan & Palmer, P.A., Attorneys for Defendant Chapman, 105 E. Robinson St, Suite 201, Orlando, Florida   32802, bbogan@hilyardlawfirm.com; **Summer M. Barranco, Esq.**, Purdy, Jolly, Giuffreda & Barranco, P.A., Attorneys for Defendant Sheriff Rambosk, 2455 East Sunrise Boulevard, Suite 1216, Fort Lauderdale, Florida   33304, summer@purdyllaw.com; and **Thomas W. Poulton, Esq.**, DeBevoise & Poulton, P.A., Attorneys for Defendant Wiedel, 1035 S. Semoran Blvd., Suite 1010, Winter Park, Florida   32792-5512, poulton@debevoisepoulton.com this 26th day of August, 2019.

Attorney for the Plaintiff, ROBERT DALE HARRIS

By  s/Dawn L. Drellos-Thompson
DAWN L. DRELLOS-THOMPSON, ESQ.
Florida Bar No. 1026247
Compass Law Firm, P.A.
27499 Riverview Center Blvd., Suite 128
Bonita Springs, Florida   34134
Telephone: 239-444-1727
Email: dawn@compass.legal