UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERT DALE HARRIS,

       Plaintiff,

v.                                    Case No: 2:18-cv-17-FtM-29MRM

KEVIN RAMBOSK, in his
official capacity as Sheriff
of Collier County, Florida,
KASEY      P.      WINGO,
individually,  MICHAEL   D.
CHAPMAN, individually, SCOTT
PEPIN,  individually,  and
ROSS ANTHONY, individually,

       Defendants.

_____

**OPINION AND ORDER**

    This matter comes before the Court on the defendant Wingo's
Motion for Summary Judgment (Doc. #112) filed on June 10, 2019.
Plaintiff filed a Response (Doc. #129) on June 24, 2019.  For the
reasons set forth below, the motion is granted in part and denied
in part.

**I.**

    Summary judgment is appropriate only when the Court is
satisfied that "there is no genuine issue as to any material fact
and that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if
the record taken as a whole could lead a rational trier of fact to

find for the nonmoving party." <u>Baby Buddies, Inc. v. Toys "R" Us,</u>
<u>Inc.</u>, 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material"
if it may affect the outcome of the suit under governing law.
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "A
court must decide 'whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law.'"
<u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th
Cir. 2004)(citing <u>Anderson</u>, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views
all evidence and draws all reasonable inferences in favor of the
non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Tana</u>
<u>v. Dantanna's</u>, 611 F.3d 767, 772 (11th Cir. 2010). However, "if
reasonable minds might differ on the inferences arising from
undisputed facts, then the court should deny summary judgment."
<u>St. Charles Foods, Inc. v. America's Favorite Chicken Co.</u>, 198
F.3d 815, 819 (11th Cir. 1999)(quoting <u>Warrior Tombigbee Transp.</u>
<u>Co. v. M/V Nan Fung</u>, 695 F.2d 1294, 1296-97 (11th Cir.
1983)(finding summary judgment "may be inappropriate even where
the parties agree on the basic facts, but disagree about the
factual inferences that should be drawn from these facts")). "If
a reasonable fact finder evaluating the evidence could draw more
than one inference from the facts, and if that inference introduces
a genuine issue of material fact, then the court should not grant

summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

Qualified immunity provides "complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quotation omitted). A defendant claiming qualified immunity must show that he acted "within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)). If that showing is made, then plaintiff must establish "(1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." Singletary v. Vargas, 804 F.3d 1174, 1180 (11th Cir. 2015)(citation omitted). It is undisputed that Deputy Wingo was acting within his discretionary authority as a law enforcement officer at all relevant times.

## II.

Plaintiff Robert Dale Harris's (Plaintiff) Amended Complaint (Doc. #51) is the operative pleading. The Amended Complaint

asserts claims against Deputy Kasey P. Wingo, a Collier County Sheriff's Office deputy, for false arrest and excessive force under 42 U.S.C. § 1983 (Counts II, XVI); malicious prosecution under § 1983 (Counts III, VI, XVII); assault and battery under Florida law (Counts XI, XIX); conspiracy to violate Plaintiff's civil rights under § 1983 (Counts XII, XX); and First Amendment retaliation under § 1983 (Count XIII).  Plaintiff's claims against other defendants are discussed in separate orders.

This case centers on two arrests, occurring on April 4, 2014 and December 16, 2016, respectively.  The undisputed facts are as follows:

## A.    The April 4, 2014 Arrest

On April 4, 2014, Plaintiff was repairing his friend Randy Leon Sulwilcowski's (Mr. Sulwilcowski) motorcycle which was warehoused at a storage facility in Naples, Florida.  (Doc. #112-1, pp. 36-37.)  Plaintiff finished working with Mr. Sulwilcowski on the motorcycle at approximately 9:25 P.M.; the storage facility had closed at 9:00 P.M.  (Id. p. 43; Doc. #51, ¶ 28.)  Plaintiff then exited the storage facility through the front gate riding a bicycle while wearing a backpack.  (Doc. #112-1, p. 135.)  As Plaintiff exited the storage facility, Deputy Michael D. Chapman (Deputy Chapman) arrived at the scene in his police cruiser and approached Plaintiff.  (Doc. #112-3, pp. 68-69.)  Deputy Wingo

arrived at the scene in a separate vehicle while Deputy Chapman was approaching Plaintiff. (Doc. #112, p. 4.)

The audio of most of[1] Plaintiff's interactions with Deputies Chapman and Wingo was recorded on Deputy Chapman's dashcam.[2] During the entire interaction, Plaintiff straddled his bicycle with his feet on the ground. (Doc. #112-3, p. 99.) As Deputy Chapman approached Plaintiff, the following exchange ensued:

| | |
|---|---|
| Deputy Chapman: | "Robert, here's the thing, do you work in here?" |
| Plaintiff: | "I am working for Randy, thank you." |
| Deputy Chapman: | "Okay, do you work inside this place?" |
| Plaintiff: | "Yeah, for today." |
| Deputy Chapman: | "Is there anybody than can confirm that? Because you're coming out of a closed place. That's what the problem is." |
| Plaintiff: | "Listen, he just let me out." |
| Deputy Chapman: | "Okay, is he back there?" |
| Plaintiff: | "Yeah, he's still back there with the generator running." |

---

[1] Deputy Chapman did not activate his microphone until some point after initiating contact with Plaintiff, so the audio of Deputy Chapman's initial interactions with Plaintiff was not recorded. (Doc. #112, p. 3.)

[2] Because Deputy Chapman's police cruiser was parked facing away from Plaintiff, the dashcam was unable to record video of the interaction.

```
Deputy Chapman:        "Relax, okay? I have a job I have to
                       do.  You understand that?  Okay,
                       there's burglaries in these things
                       all the time.  I see you come out
                       with a bicycle with a backpack,
                       okay, at 9:30 at night."
```

(Chapman Dashcam Video, at 1:03-1:41.)  Deputy Chapman then stated

to Plaintiff, "you're being very abrasive right now, which makes

me think you were back there doing something wrong. Do you

understand that?"  (Id. at 1:48-1:52.)  Plaintiff then requested

the presence of Deputy Chapman's supervisor, and Deputy Chapman

stated, "well, too bad, because that's not going to happen."  (Id.

at 1:54-1:58.)  Deputy Wingo asked Deputy Chapman if he "g[ot] his

ID yet," and Deputy Chapman responded, "it's Robert Price, I

think's his last name.  It's Robert something."  (Id. at 2:17-

2:21.)  In response to Deputy Chapman stating that his last name

is "Price," Plaintiff stated, "no, it's not." (Id.)  Deputy Wingo

then asked Plaintiff for his ID:

```
Deputy Wingo:        "Let me see your ID, man."

Plaintiff:           "Just talk to 2008."

Deputy Wingo:        "I don't give a shit about 2008. Let
                     me see your ID."

Deputy Chapman:      "He  was  coming  out  of  here.
                     Everything's closed."

Plaintiff:           "You know, you guys are harassing
                     me, you know."

Deputy Wingo:        "Let me see your ID, man."

Plaintiff:           "I have no ID."
```

(<u>Id.</u> at 2:22-2:40.)

After Plaintiff stated that he "ha[d] no ID," Deputy Chapman asked Plaintiff which storage unit he was working in:

| | |
|---|---|
| Plaintiff: | "You know Rock 'n' Roll Randy?"[3] |
| Deputy Wingo: | "What about him?" |
| Plaintiff: | "That's who I'm working for, thank you." |
| Deputy Chapman: | "He owns a place back there? Because last time I checked he was homeless." |
| Deputy Wingo: | "What's your name, man?" |
| Plaintiff: | "Robert." |
| Deputy Wingo: | "Robert what? Robert what?" |
| Plaintiff: | "Hold on, I'm on the phone getting my boss out. Thank you." |

(<u>Id.</u> at 2:41-3:22.) Plaintiff called Mr. Sulwilcowski on speaker and stated, "Hey, Randy, come out to the gate and talk to these officers, please." Mr. Sulwilcowski said "okay" and that he was "on [his] way." (<u>Id.</u> at 3:35-3:47.)

After finishing the phone call, Plaintiff continued to interact with Deputies Chapman and Wingo:

| | |
|---|---|
| Deputy Wingo: | "What's your last name, Robert?" |
| Plaintiff: | "Of the family of Harris, and I do not consent to-" |

---

[3] "Rock 'n' Roll Randy" is Mr. Sulwilcowski's nickname. (Doc. #51, ¶ 27.)

| | |
|---|---|
| Deputy Wingo: | "Harris. H-A-R-R-I-S?" |
| Plaintiff: | "If, if you want-"[4] |
| Deputy Chapman: | "Sir, you do realize I have a valid reason to get your ID? You failing to produce your ID will land you in jail. Do you understand that? Or if you fail to identify yourself." |
| Plaintiff: | "I just don't like being harassed, that's all." |
| Deputy Wingo: | "You're not being harassed. I'm trying to get your name and date of birth, man." |
| Plaintiff: | "No, over there you had harassed me." |
| Deputy Wingo: | "Look, what is your name?" |
| Plaintiff: | "Have I committed a crime, sir?" |
| Deputy Chapman: | "I am investigating a loitering and prowling complaint, yes." |
| Plaintiff: | "From who? I have the right to face my accusers, sir." |
| Deputy Chapman: | "Well, you're facing them." |
| Plaintiff: | "Are you taking your wages under false pretenses?" |

(Id. at 3:38-4:38.)

Deputies Chapman and Wingo then forced Plaintiff off his bicycle and onto the ground. During the arrest process, Deputies

---

[4] The remainder of this statement is inaudible, as Deputy Chapman spoke over Plaintiff at this point.

Wingo and Chapman used physical force, a Taser, and pepper spray on Plaintiff.  (Doc. #112, pp. 5-6; Doc. #129, pp. 4-5.)

Plaintiff was ultimately charged with three (3) counts of battery on a police officer; one (1) count of assault on a police officer; one (1) count of resisting an officer without violence; and one (1) count of loitering and prowling.  (Doc. #51, ¶¶ 59-62; Doc. #112, p. 7.)  On April 17, 2014, the State Attorney's Office filed a "Not Filing Charge" on all six counts.  (Id.)

**B.   The December 16, 2016 Arrest**

On December 16, 2016, Deputy Wingo stopped Plaintiff's vehicle after observing it being driven with an invalid license plate.[5]  (Doc. #112, p. 7; Doc. #129, pp. 6-7.)  Deputy Wingo had received information that Plaintiff's vehicle was involved in transporting narcotics.[6]  (Doc. #112, p. 7; Doc. #129, p. 7.)  After initiating the traffic stop, Deputy Wingo approached Plaintiff and the following interaction occurred and was captured on Plaintiff's in-car camera:

| Deputy Wingo: | "Hello, sir." |
|---|---|
| Plaintiff: | "One second, I'm calling my attorney." |

---

[5] Specifically, Plaintiff was driving a Ford vehicle on which a license plate registered to a GMC vehicle was affixed.

[6] Deputy Wingo believed that Plaintiff's brother was using Plaintiff's vehicle to transport narcotics.  (Doc. #112, p. 7; Doc. #129, p. 7.)

| | |
|---|---|
| Deputy Wingo: | "I need your license, registration, [and] insurance." |
| Plaintiff: | "Let me call my attorney." |
| Deputy Wingo: | "No, you need it now." |

(Plaintiff Video, at 3:17-3:24.)  Deputy Wingo then attempted to open the vehicle door, but Plaintiff pulled the door closed. Deputy Wingo next opened the vehicle door and attempted to remove Plaintiff from the vehicle.  (Id. at 3:24-3:26.)  As Deputy Wingo entered the vehicle, Plaintiff lifted his knees, which prevented Deputy Wingo from removing Plaintiff from the vehicle.  (Id.) Deputy Wingo then attempted to deploy his Taser on Plaintiff, but Plaintiff grabbed the Taser and pushed it away.  (Id. at 3:35-3:38.)  Deputy Wingo continued his attempts to subdue Plaintiff with his Taser, but Plaintiff continued to resist Deputy Wingo's efforts.  (Id. at 3:40-6:51.)  Shortly thereafter, other deputies arrived at the scene and assisted Deputy Wingo in removing Plaintiff from the vehicle and placing him under arrest.  (Id. at 6:52-9:47.)

Plaintiff was ultimately charged with one (1) count of assault on a law enforcement officer; one (1) count of battery on a law enforcement officer; one (1) count of resisting an officer with violence; and one (1) count of resisting an officer without violence.  (Doc. #129-8, p. 8.)  Plaintiff was held in jail for several days, and the charges were later dismissed on January 17,

2014 when the State Attorney's Office filed a "Not Filing Charge" on all four counts. (Doc. #129, p. 8; Doc. #129-8, p. 8.)

## III.

Deputy Wingo moves for summary judgment on all Counts asserted against him. As to Plaintiff's claims for false arrest, malicious prosecution, and First Amendment retaliation, Deputy Wingo argues he is entitled to summary judgment because he had probable cause to arrest Plaintiff on both April 4, 2014 and December 16, 2016. Deputy Wingo alternatively argues that even if he lacked probable cause to arrest Plaintiff, he had arguable probable cause to arrest Plaintiff and is thus entitled to qualified immunity as to those claims.

As to Plaintiff's claims for excessive force and assault and battery, Deputy Wingo argues he is entitled to summary judgment because his use of force was objectively reasonable. Deputy Wingo alternatively argues that even if his use of force was "objectively unlawful," he is nonetheless entitled to qualified immunity. (Doc. #112, p. 32.) As to Plaintiff's civil conspiracy claims, Deputy Wingo argues Plaintiff's claims are barred by the intra-corporate immunity doctrine. The Court will address each claim in turn below.

**A.  The Claims Relating to the April 4, 2014 Arrest**

**(1)  The False Arrest (Count II), Malicious Prosecution (Counts III, VI), and First Amendment Retaliation (Count XIII) Claims**

Deputy Wingo argues he is entitled to summary judgment on Plaintiff's claims for false arrest, malicious prosecution, and First Amendment retaliation because he had probable cause to arrest Plaintiff for resisting an officer without violence on April 4, 2014. The existence of probable cause, Deputy Wingo correctly asserts, defeats these causes of action.[7]  Deputy Wingo alternatively argues that even if he lacked probable cause to arrest Plaintiff, he had arguable probable cause to arrest Plaintiff and is thus entitled to qualified immunity.

The threshold questions are whether Deputy Wingo lawfully stopped and detained Plaintiff.  The Court concludes that both the stop and the detention were proper.

---

[7] See Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004)("The existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest."); Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008)("Because lack of probable cause is a required element to prove a § 1983 claim for malicious prosecution in violation of the Constitution, the existence of probable cause defeats the claim."); Nieves v. Bartlett, 139 S. Ct. 1715, 1724 (2019)(A "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.")

### (a)   Initial Stop Supported by Reasonable Suspicion

"Under the Fourth Amendment, a police officer generally may lawfully detain an individual without a warrant if (1) there is probable cause to believe that a traffic violation has occurred (a traffic stop), or (2) there is reasonable suspicion to believe the individual has engaged or is about to engage in criminal activity (an investigative or Terry stop)." United States v. Gibbs, 917 F.3d 1289, 1294 (11th Cir. 2019). The Court examines "(1) whether the officer's action was justified at its inception -- that is, whether the officer had probable cause or reasonable suspicion to initiate the stop, and (2) whether the stop was reasonably related in scope to the circumstances that justified it in the first place." Id. Here, only an investigative stop is at issue, since there is no claim of any traffic infraction. "In resisting [without violence] cases involving an investigatory detention, the state must prove that the officer had a reasonable suspicion of criminal activity." A.R. v. State, 127 So. 3d 650, 654 (Fla. 4th DCA 2013). Thus, the Court begins its analysis with whether the initial stop was supported by reasonable suspicion.

"In appropriate circumstances, 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" United States v. Bishop, ___ F.3d ___, 2019 WL 5090019,

at *3 (citations omitted).  Reasonable suspicion exists if a police officer has "a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000).  The officer "must be able to articulate more than an inchoate and unparticularized [] hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000)(citation and quotation omitted).  In determining whether reasonable suspicion exists, a court considers "the totality of the circumstances from the perspective of a reasonable officer." United States v. McCoy, 259 F. App'x 264, 268 (11th Cir. 2007); see also Bishop, ___ F.3d ___, 2019 WL 5090019, at *11, *12.

Here, the totality of the circumstances established reasonable suspicion for the deputy to stop Plaintiff on his bicycle as he attempted to exit the closed storage facility at night after hours.  Deputy Chapman witnessed Plaintiff exiting the storage facility at approximately 9:30 p.m. after the facility had already closed.  Plaintiff was riding a bicycle and wearing a backpack.  Deputy Chapman was aware that thefts occur at such storage facilities.  A reasonable officer could reasonably believe Plaintiff was "engaged in, or [was] about to engage in, criminal activity" inside the closed business.  Powell, 222 F.3d at 917.  Therefore, neither Deputy Chapman nor Wingo violated Plaintiff's

Fourth Amendment rights by stopping Plaintiff as he left the storage facility.

**(b)    Scope and Duration of Stop**

While the stop of Plaintiff on his bicycle was lawful, the scope and duration of the resulting detention must also be reasonable to comply with the Fourth Amendment.  "Even if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely. The detention is 'limited in scope and duration.'"  United States v. Campbell, 912 F.3d 1340, 1350 (11th Cir. 2019)(citation omitted.) "[I]t is well established that an officer may ask a suspect to identify himself in the course of a Terry stop . . . ."  Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County, 542 U.S. 117, 186-87 (2004).  The record clearly establishes that the scope of the stop was reasonably related to the legitimate concerns which prompted it, and that the resulting detention was reasonably short in duration before escalating to an arrest.  Thus, the Court finds the scope and duration of Plaintiff's stop was reasonable, and therefore lawful.

**(c)  Existence of Probable Cause**

While both the initial stop and the resulting detention were lawful, probable cause must nonetheless have existed for the arrest to have been lawful.  "Probable cause to arrest exists . . . when an arrest is objectively reasonable based on the totality of the

circumstances." <u>Coffin v. Brandau</u>, 642 F.3d 999, 1006 (11th Cir. 2011)(citation and quotation omitted). This standard is satisfied where "the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, 734 (11th Cir. 2010). The Eleventh Circuit has recently stated:

> "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." <u>District of Columbia v. Wesby</u>, ––– U.S. –––, 138 S. Ct. 577, 586, 199 L.Ed.2d 453 (2018) (quotation marks omitted). It "requires more than mere suspicion, but does not require convincing proof." <u>Bailey v. Bd. of Cty. Comm'rs</u>, 956 F.2d 1112, 1120 (11th Cir. 1992); <u>see</u> <u>Wesby</u>, 138 S. Ct. at 586 ("It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.") (quotation marks omitted). All in all, it's "not a high bar." <u>Wesby</u>, 138 S. Ct. at 586.

<u>Gill, as Next Friend of K.C.R. v. Judd</u>, No. 17-14525, 2019 WL 5304078, at *6 (11th Cir. Oct. 21, 2019).

Plaintiff argues Deputy Wingo lacked probable cause to arrest him for loitering and prowling, the offenses Deputies Wingo and Chapman were initially investigating. But Deputy Wingo does not assert probable cause for such offenses. Rather, Deputy Wingo asserts probable cause for the offense of resisting an officer

without violence, a first-degree misdemeanor under Florida law. See Fla. Stat. § 843.02. An arrest comports with the Fourth Amendment if it is supported by probable cause for *any* offense. See Elmore v. Fulton Cty. Sch. Dist., 605 F. App'x 906, 914 (11th Cir. 2015)("So long as the circumstances known to the officers, viewed objectively, give probable cause to arrest for any crime, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges."). The arrest was therefore lawful if there was probable cause that Plaintiff was resisting arrest without violence within the meaning of Fla. Stat. § 843.02.[8]

The Florida statute provides that an individual commits the offense of resisting an officer without violence when he "resist[s], obstruct[s], or oppose[s] any [law enforcement] officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Fla. Stat. § 843.02. "[T]o support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the

---

[8] Deputy Wingo also asserts there was probable cause to arrest Plaintiff for the Florida crime of refusing to provide identification, citing Fla. Stat. § 901.151. (Doc. #112, p. 13.) But this statute does not create a state criminal offense for refusing to identify oneself to an officer when requested. Additionally, the Florida loitering and prowling statute does not criminalize such a refusal. Fla. Stat. § 856.021(2). In the absence of another crime, the probable cause determination is limited to the resisting without violence offense.

lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." C.E.L. v. State, 24 So. 3d 1181, 1185-86 (Fla. 2009). Deputy Wingo asserts that both elements were satisfied in this case.

The first element of the resisting statute is clearly satisfied. Deputies Wingo and Chapman were investigating Plaintiff's presence at a closed storage facility. Fla. Stat. § 901.151 provides that, when an officer has reasonable suspicion to believe an individual is engaged in criminal activity, the officer "may temporarily detain such person for the purpose of ascertaining the identity of the person [] and the circumstances surrounding the person's presence abroad which led" to the officer's reasonable suspicion. As the Court has found, the officers had sufficient reasonable suspicion to justify the stop, and its scope and duration were reasonable. "Knowing defiance of a lawful Terry stop constitutes unlawful resistance without violence." C.E.L. v. State, 995 So.2d 558, 561 (Fla. 2d DCA 2008) (en banc), approved, 24 So.3d 1181 (Fla. 2009); B.M. v. State, 212 So. 3d 526, 528 (Fla. 2d DCA 2017).

Deputy Wingo contends that the second element is also satisfied. Deputy Wingo asserts Plaintiff was resisting an officer without violence because Plaintiff "questioned Deputy Chapman's authority, accused him of harassment, [] requested a supervisor,"

and "most important[ly] . . . refused to provide identification."
(Doc. #112, p. 13.)  Deputy Wingo asserts that the audio recording
of his interaction with Plaintiff confirms that Deputy Wingo asked
Plaintiff "for identification no less than five times without
success," and that Plaintiff "never provided" his date of birth or
his last name's spelling.  (Id. p. 14.)

Some of the facts relied upon by Deputy Wingo are legally
insufficient to support a resisting without violence charge.
Plaintiff's questioning of Deputy Chapman's authority, accusation
of harassment, and request for the presence of a supervisor do not
constitute a violation of the Florida statute.  See Davis v.
Williams, 451 F.3d 759, 767 (11th Cir. 2006)("[A]sking to speak to
an officer's superior or [] asking for an officer's badge number
. . . do[es] not constitute obstruction of justice" under Florida
law.); DeRosa v. Sheriff of Collier Cty., Fla., 416 F. App'x 839,
840 (11th Cir. 2011)("Florida courts have long held that criticism
cannot support a conviction for obstruction, even if the criticism
is insulting or defiant.").

Deputy Wingo's primary basis for probable cause – that
Plaintiff refused his request for identification - is unsupported
in the record.  The audio recording from Deputy Chapman's dashcam
does not support Deputy Wingo's assertion that Plaintiff
repeatedly refused to identify himself.  The audio recording begins
with Deputy Chapman stating, "Robert, here's the thing, do you

work in here?"  (Chapman Dashcam Video, at 1:03-1:07.)  Later, Deputy Chapman incorrectly recalled the last name given by Plaintiff.  Thus, in the non-recorded portion Plaintiff must have identified himself when Deputy Chapman first encountered Plaintiff.  When Deputy Wingo arrived at the scene and asked Plaintiff for his ID, Plaintiff informed Deputy Wingo that he "ha[d] no ID."  (Id. at 2:22-2:40.)

Moreover, when Deputy Wingo asked Plaintiff for his last name, Plaintiff provided that information.  And when Deputy Wingo spelled Plaintiff's last name aloud, Deputy Chapman did not allow Plaintiff to complete a response, but spoke over Plaintiff, stating:

> Sir, you do realize I have a valid reason to get your ID? You failing to produce your ID will land you in jail. Do you understand that? Or if you fail to identify yourself.[9]

(Id. at 4:00-4:12.)

---

[9] Deputy Wingo asserts that Plaintiff "d[id] not confirm the spelling [of his last name], telling Deputy Wingo 'he does not consent.'" (Doc. #112, p. 4.)  Deputy Wingo mis-reads the record. Plaintiff clearly did not state he "does not consent" to confirming the spelling of his last name.  Rather, in response to Deputy Wingo asking Plaintiff for his last name, Plaintiff stated, "Of the family of Harris, and I do not consent to-". (Chapman Dashcam Video, 3:47-3:57.)  Before Plaintiff completed that statement, Deputy Wingo spoke over Plaintiff and stated, "Harris. H-A-R-R-I-S?" (Id.)  Thus, Plaintiff made the statement that he "do[es] not consent" before Deputy Wingo made any reference to the spelling of Plaintiff's last name.

Plaintiff then stated he felt he was being harassed by Deputies Wingo and Chapman, and Deputy Wingo stated, "You're not being harassed. I'm trying to get your name and date of birth, man." (Id. at 4:12-4:16.) The audio recording confirms that Deputy Wingo had never asked Plaintiff for his date of birth, and Plaintiff had already provided his first and last name to Deputy Wingo. The audio recording further reflects that, although Plaintiff already provided his first and last name to Deputies Wingo and Chapman, Deputy Wingo again stated to Plaintiff, "Look, what is your name?" (Id. at 4:19-4:21.) After Plaintiff responded by asking if he had committed a crime and whether the Deputies were "taking [their] wages under false pretenses," Deputies Wingo and Chapman forcibly removed Plaintiff from his bicycle. (Id. at 4:23-4:38.)

While Deputy Wingo was authorized to temporarily detain Plaintiff and ascertain his identity and "the circumstances surrounding [his] presence" at the storage facility under Fla. Stat. § 901.151, Plaintiff has established facts showing an absence of probable cause. Contrary to Deputy Wingo's characterization, the audio recording does not reflect that Plaintiff refused to identify himself. Rather, the audio recording confirms that Plaintiff identified himself to Deputy Chapman, corrected Deputy Chapman when he stated Plaintiff's last name was "Price," informed Deputy Wingo he "had no ID," and provided his first and last name

to Deputy Wingo. Moreover, the record does not show Plaintiff was requested to provide his date of birth and refused. The audio recording confirms that neither Deputy Chapman nor Deputy Wingo asked Plaintiff for his date of birth. After Plaintiff stated he felt he was being harassed, the following interaction ensued:

| | |
|---|---|
| Deputy Wingo: | "You're not being harassed. I'm trying to get your name and date of birth, man."[10] |
| Plaintiff: | "No, over there you had harassed me." |

(Chapman Dashcam Video, at 4:12-4:16.) As discussed above, Deputy Wingo had never asked Plaintiff for his date of birth, and Deputy Wingo's assertion that he "g[ave Plaintiff] numerous chances to provide his . . . date of birth without success" is refuted by the recording. (Doc. #112, p. 5.) Further, consistent with § 901.151, Plaintiff informed Deputy Wingo he was working at the facility for Mr. Sulwilcowski, and called Mr. Sulwilcowski so Mr. Sulwilcowski could speak to Deputies Wingo and Chapman and confirm that Plaintiff was indeed working at the storage facility.

Viewing the facts in the light most favorable to Plaintiff, the Court finds Plaintiff has shown a lack of probable cause to arrest Plaintiff for resisting an officer without violence.

---

[10] At this point, Plaintiff had already provided Deputy Wingo with his first and last name.

Therefore, Deputy Wingo's request for summary judgment on the basis of the existence of probable cause is denied.

### (d) Whether Deputy Wingo is Entitled to Qualified Immunity

Deputy Wingo alternatively argues that, even if he lacked probable cause to arrest Plaintiff for resisting an officer without violence, he had arguable probable cause to arrest Plaintiff and is thus entitled to qualified immunity. The Court disagrees.

Although an arrest without probable cause "violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." Skop v. City of Atlanta, GA, 485 F.3d 1130, 1137 (11th Cir. 2007). Indeed, an officer who "make[s] an arrest without probable cause [is] entitled to qualified immunity if there was arguable probable cause for the arrest." Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)(citation omitted). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)(citation and quotation omitted).

The arguable probable cause standard "is an objective one and does not include an inquiry [into] the officer's subjective intent or beliefs." Brown v. City of Huntsville, Ala., 608 F.3d 724, 735 (11th Cir. 2010)(citation omitted). Whether an officer possessed

arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern." Id. (citation omitted).

Deputy Wingo asserts he had arguable probable cause to arrest Plaintiff for resisting an officer without violence because Plaintiff refused to "confirm the spelling [of his last name]" and "give his date of birth." (Doc. #112, pp. 8-9.) This is so, Deputy Wingo argues, because it "is inherently unclear" what identifying information a legally detained individual must provide to a police officer under Fla. Stat. § 901.151. (Id. p. 19.) Thus, Deputy Wingo asserts, "[i]t is [] unclear whether a first and last name is alone sufficient under § 901.151." (Id.)

The Court is unpersuaded by Deputy Wingo's assertion that he had arguable probable cause to arrest Plaintiff. The audio recording does not support Deputy Wingo's claim that Plaintiff refused to spell his last name or to provide his date of birth after being asked. As discussed *supra*, when Deputy Wingo spelled Plaintiff's last name aloud, Deputy Chapman spoke over Plaintiff and did not allow him to respond. Additionally, the audio recording confirms that Deputy Wingo never asked Plaintiff for his date of birth; instead, after Plaintiff already provided his first and last name and claimed harassment, Deputy Wingo declared, "You're not being harassed. I'm trying to get your name and date of birth, man." (Chapman Dashcam Video, at 4:12-4:16.) But Deputy Wingo never asked for Plaintiff's date of birth, but rather again

asked Plaintiff for his name, even though Plaintiff had already provided that information to Deputy Wingo.

The Court concludes no reasonable officer "in the same circumstances and possessing the same knowledge as [Deputy Wingo] could have believed that probable cause existed to arrest" Plaintiff for resisting an officer without violence. Ferraro, 284 F.3d at 1195. Indeed, the record establishes that Plaintiff identified himself at least twice, explained his presence at the storage facility, corrected Deputy Chapman when he stated his last name was "Price," and called Mr. Sulwilcowski to come to the storage facility's front gate to speak with Deputies Chapman and Wingo. These facts do not support even arguable probable cause.

Deputy Wingo nonetheless argues that, "even without arguable probable cause, there has been no showing that Deputy Wingo violated clearly established law." (Doc. #112, p. 20.) Deputy Wingo reasons that "[w]hat constitutes sufficient 'identification' during an investigatory stop is unclear in Florida" and Deputy Wingo is "thus entitled to qualified immunity for his decision to arrest [Plaintiff] for failing to provide the information requested." (Id. p. 21.)

The law was clearly established that a police officer needs probable cause for a warrantless arrest. The record simply does not support Deputy Wingo's assertion that Plaintiff "fail[ed] to provide the information requested" or that Plaintiff refused

"numerous chances to provide his name and date of birth . . . ." (Id. pp. 5, 21.)  A court must "define the 'clearly established' right at issue on the basis of the specific context of the case." Tolan v. Cotton, 572 U.S. 650, 657 (2014)(citations and quotations omitted).  And at the time of Plaintiff's arrest on April 4, 2014, it was clearly established that an individual must actually "disobey[] a command by members of law enforcement" in order to be arrested for resisting an officer without violence.  Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008).  The Court thus concludes Deputy Wingo is not entitled to qualified immunity "for his decision to arrest [Plaintiff] for failing to provide the information requested," given that the record, viewed in the light most favorable to Plaintiff, does not support this characterization of events.  (Doc. #112, p. 21.)

On this record, the Court finds sufficient evidence that Deputy Wingo lacked probable cause or arguable probable cause to arrest Plaintiff on April 4, 2014.  Deputy Wingo's motion is therefore denied as to Plaintiff's claims for false arrest (Count II), malicious prosecution (Counts III, VI), and First Amendment retaliation (Count XIII) relating to the April 4, 2014 arrest.

**(2)  The Excessive Force (Count II) and Assault and Battery (Count XI) Claims**

Deputy Wingo also moves for summary judgment on Plaintiff's claims for excessive force and assault and battery, arguing the

force he used to arrest Plaintiff was objectively reasonable in light of Plaintiff's resistance. Deputy Wingo alternatively argues that, "even if the force [he] applied was objectively unlawful," he is nonetheless entitled to qualified immunity. (Doc. #112, p. 32.)

A claim that a law enforcement officer used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989); Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir. 1993).[11] "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002)(citation omitted). In determining whether an officer used excessive force in effectuating an arrest, the Court considers such factors as "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade

---

[11] Plaintiff's claim for excessive force and his state-law claim for assault and battery are analyzed under the same standard. See Christie ex rel. estate of Christie v. Scott, 923 F. Supp. 2d 1308, 1328 (M.D. Fla. 2013)("[T]he crux of a state-law assault and battery claim against [] officers is whether a reasonable officer would believe that this level of force is necessary in the situation at hand." (citation and quotation omitted)).

arrest by flight." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)(citation omitted).

**(a) Deputy Wingo's Use of Force**

The manner in which Plaintiff was subdued and arrested by Deputies Wingo and Chapman is disputed, and Deputy Chapman's dashcam did not record the approximately five minute physical altercation that ensued during Plaintiff's arrest.[12] Deputy Wingo asserts his use of force was objectively reasonable because his actions "were limited to physical strikes with his fists and knees" in order to "overcome [Plaintiff's] resistance and secure his hands" and place him under arrest. (Doc. #112, p. 25.) Plaintiff, however, testified at deposition that Deputy Chapman "pummeled [him] to the ground" and Deputy Wingo straddled Plaintiff, held him down, and punched and kneed Plaintiff in the head, while Deputy Chapman tasered him and sprayed him with pepper spray. (Doc. #112-1, pp. 148, 155.)

Viewing the facts in the light most favorable to Plaintiff, a jury may reasonably determine that Deputy Wingo used excessive force in arresting Plaintiff. Plaintiff testified he had his hands around his head to protect himself after Deputy Wingo was "on top

---

[12] Sergeant Amengual of the Collier County Sheriff's Office arrived at the scene after Plaintiff had already been subdued, and his dashcam only captured video of the latter part of Plaintiff's arrest. Sergeant Amengual's dashcam, however, did not capture video of the portion of Plaintiff's arrest that is in dispute.

of [him] beating [him]" – which Deputy Wingo asserts is an indication that Plaintiff resisted his efforts to place Plaintiff in handcuffs. (Id.) Under Plaintiff's version of events, Deputy Wingo mounted Plaintiff, held him down, and punched and kneed him even though Plaintiff had not resisted arrest and posed no threat to Deputies Wingo and Chapman. If true, such "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008)(citation omitted). Given the lack of a video recording of this altercation (Deputy Chapman's dashcam only recorded the audio of Plaintiff's arrest) and the inconclusive audio, these conflicting accounts create an issue of material fact as to whether Deputy Wingo's use of force was objectively reasonable under the circumstances.

### (b)     Clearly Established Law

Deputy Wingo argues that, "even if the force applied was objectively unlawful," it was not clearly established at the time of Plaintiff's April 4, 2014 arrest that the use of such force was excessive. (Doc. #112, p. 32.) As set forth above, Plaintiff alleges that although he had not resisted arrest, Deputy Wingo mounted Plaintiff, held him down, and punched and kneed Plaintiff in the head. At the time of Plaintiff's arrest, it was clearly established that such "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."

Hadley, 526 F.3d at 1330 (citation omitted). It was similarly clearly established at the time of Plaintiff's arrest that an officer uses excessive force by "kicking and beating" an arrestee laying on the ground who "[a]t no point was [] fighting back or attempting to escape." Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008). Accordingly, on this record, the Court cannot conclude that Deputy Wingo is entitled to qualified immunity on Plaintiff's claims for excessive force (Count II) and assault and battery (Count XI) relating to the April 4, 2014 arrest.

**(3) The Civil Conspiracy Claim (Count XII)**

Count XII is a civil conspiracy claim under Section 1983 which alleges that Deputy Wingo conspired with other deputies to violate Plaintiff's constitutional rights on April 4, 2014. Deputy Wingo argues he is entitled to summary judgment on Count XII because Plaintiff's claim is barred by the intra-corporate immunity doctrine. The Court agrees.

As the Eleventh Circuit recently stated:

> "A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1260 (11th Cir. 2010). A plaintiff attempting to state such a claim must allege that "the defendants 'reached an understanding' to violate the plaintiff's constitutional rights," id. (quoting Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1122 (11th Cir. 1992)), and that "an actionable wrong"

> occurred, id. (quoting Bendiburg v. Dempsey,
> 909 F.2d 463, 468 (11th Cir. 1990)).

Worthy v. City of Phenix City , Alabama, 930 F.3d 1206, 1224 (11th Cir. 2019). At the summary judgment stage, plaintiff must establish the understanding and the actionable wrong.

Under the intra-corporate immunity doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000). The intra-corporate immunity doctrine specifically provides "that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1261 (11th Cir. 2010)(citation and quotation omitted). The doctrine is not limited to corporations, but also "applies to public entities such as [a] [c]ity and its personnel." Denney v. City of Albany, 247 F.3d 1172, 1190 (11th Cir. 2001)(citations omitted). The Eleventh Circuit has recognized an exception to the doctrine when the alleged conduct of the conspirators violates the federal criminal code. Id. at 1263.

Here, all the conspirators alleged by Plaintiff are deputies employed by the Collier County Sheriff's Office.[13]  Further, the subject of the alleged conspiracy involves functions within the scope of the deputies' employment as law enforcement officers. See Grider, 618 F.3d at 1261 ("The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (i.e., job-related duties).").  Thus, absent an exception, the intra-corporate immunity doctrine applies in this case and bars Plaintiff's conspiracy claim.

The Court disagrees with Plaintiff that the criminal conspiracy exception applies in this case.  Plaintiff has not alleged or otherwise established that the deputies engaged in conduct that violated the federal criminal code.  Grider, 618 F.3d at 1263; Swanson v. Scott, No. 2:17-CV-67-FTM-99MRM, 2017 WL 1134998, at *2 (M.D. Fla. Mar. 27, 2017)(finding the criminal conspiracy exception inapplicable because there were no "allegations of federal criminal code violations"); Prof'l LED

_____

    [13] Plaintiff argues the deputies involved in the alleged conspiracy "brought in a third-party who is not employed by the Sheriffs Office, Ms. Wolin." (Doc. #129, p. 20.)  Plaintiff, however, fails to establish any facts substantiating this assertion and otherwise fails to describe Ms. Wolin's role in the alleged conspiracy or that she entered into an unlawful agreement with the deputies.  It is undisputed that Ms. Wolin had no involvement in the events at the storage facility.

Lighting, Ltd. v. AAdyn Tech., LLC, 88 F. Supp. 3d 1356, 1372 (S.D. Fla. 2015)(finding the criminal conspiracy exception inapplicable where the conduct in the alleged conspiracy "d[id] not amount to criminal activity in violation of a federal criminal statute."). Accordingly, the Court finds Plaintiff's civil conspiracy claim in Count XII is barred by the intra-corporate immunity doctrine.

**B.   The Claims Relating to the December 16, 2016 Arrest**

**(1)   The False Arrest (Count XVI) and Malicious Prosecution (Count XVII) Claims**

Plaintiff also asserts claims against Deputy Wingo for false arrest and malicious prosecution based on Deputy Wingo's December 16, 2016 arrest of Plaintiff.  Deputy Wingo argues he is entitled to summary judgment on these counts because his arrest was supported by probable cause of a violation of Fla. Stat. § 316.605(1), or at least arguable probable cause.

As discussed above, on December 16, 2016, Deputy Wingo observed Plaintiff driving a vehicle with an invalid license plate attached.  While Plaintiff does not dispute that Deputy Wingo observed Plaintiff driving his vehicle with an invalid license plate, Plaintiff contends that Deputy Wingo lacked probable cause to arrest Plaintiff for violating Fla. Stat. § 320.161 because Deputy Wingo did not witness Plaintiff *attach* the invalid license plate to the vehicle.  Plaintiff is correct.

Fla. Stat. § 320.261 provides that an individual commits the offense of driving with an invalid license plate when that person "knowingly attaches to any motor vehicle or mobile home any registration license plate, or who knowingly attaches any validation sticker or mobile home sticker to a registration license plate, which plate or sticker was not issued and assigned or lawfully transferred to such vehicle . . . ." Deputy Wingo's observation of Plaintiff driving a vehicle with the wrong license plate did not establish probable cause or arguable probable cause to arrest Plaintiff for this second-degree misdemeanor. See Weaver v. State, 233 So. 3d 501, 503 (Fla. 2d DCA 2017)(citing cases).

This observation, however, provided Deputy Wingo with probable cause to initiate a lawful traffic stop of Plaintiff's vehicle for violation of Florida law. Florida law requires that "[e]very vehicle, at all times while driven, stopped, or parked upon any highways, roads, or streets of this state, shall be licensed in the name of the owner thereof in accordance with the laws of this state . . . and shall . . . display the license plate or both of the license plates assigned to it by the state . . . ." Fla. Stat. § 316.605(1)(emphasis added). "A violation of this subsection is a noncriminal traffic infraction, punishable as a nonmoving violation as provided in chapter 318." Id. A noncriminal traffic infraction can provide a basis to perform a lawful traffic stop. State v. Arevalo, 112 So. 3d 529, 531 (Fla. 4th DCA

2013); <u>State v. Y.Q.R.</u>, 50 So. 3d 751, 753 (Fla. 2d DCA 2010); <u>Baker v. State</u>, 164 So. 3d 151 (Fla. 1st DCA 2015). Therefore, Deputy Wingo properly stopped the vehicle driven by Plaintiff.

Given the proper traffic stop, Deputy Wingo was permitted to compel Plaintiff to exit the vehicle. The Supreme Court has held that an officer making a traffic stop may order both a driver and passengers to get out of the car pending completion of the traffic stop. <u>Maryland v. Wilson</u>, 519 U.S. 408, 415 (1997); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977).

> Following <u>Wilson</u>, this Court has consistently held that "[d]uring a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety ... including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009) (emphasis added) (citation omitted) (quoting <u>Wilson</u>, 519 U.S. at 410, 117 S.Ct. at 884); <u>see also, e.g.,</u> <u>Terrell v. Smith</u>, 668 F.3d 1244, 1252 (11th Cir. 2012).

<u>Gibbs</u>, 917 F.3d at 1294-95. It is undisputed that Plaintiff refused to comply with this lawful direction, and physically resisted the officer. Deputy Wingo had ample probable cause to arrest Plaintiff for the refusal and resistance. Accordingly, because Deputy Wingo's December 16, 2016 arrest was supported by probable cause, Deputy Wingo's motion is granted as to the claims for false arrest (Count XVI) and malicious prosecution (Count XVII). <u>Kingsland</u>, 382 F.3d at 1226; <u>Kjellsen</u>, 517 F.3d at 1237.

**(2)  The Excessive Force (Count XVI) and Assault and Battery (Count XIX) Claims[14]**

Plaintiff also asserts claims for excessive force and assault and battery for Deputy Wingo's use of force in effectuating the December 16, 2016 arrest.  Plaintiff contends that Deputy Wingo used excessive force on December 16, 2016 because it was not objectively reasonable for Deputy Wingo to enter Plaintiff's vehicle and ultimately forcibly remove him from the vehicle. Deputy Wingo, however, argues his use of force was reasonable because (1) Plaintiff's vehicle was "thought to be involved with smuggling narcotics"; and (2) Plaintiff ignored Deputy Wingo's request for his identification and "then attempted to make a call on his cellphone."  (Doc. #128, p. 28.)

The Court agrees that Deputy Wingo's use of force was objectively reasonable under the circumstances of the proper vehicle stop and Plaintiff's resistance to following a lawful direction from the officer.  First, as discussed *supra*, Deputy Wingo had probable cause to stop Plaintiff for driving with an invalid license plate and probable cause to arrest for resisting, and "the law permits some use of force in any arrest for even minor offenses."  Brown v. City of Huntsville, Ala., 608 F.3d 724, 739–40 (11th Cir. 2010).

---

[14] As noted *supra*, Plaintiff's claims for excessive force and assault and battery are analyzed under the same standard.

Second, Plaintiff's actions would lead a reasonable officer to believe Plaintiff "pose[d] an immediate threat." Graham, 490 U.S. at 396. As noted earlier, Deputy Wingo had received information that Plaintiff's vehicle was involved in transporting narcotics, and when Deputy Wingo approached Plaintiff's vehicle, Plaintiff ignored Deputy Wingo's request for his license and vehicle registration information but instead attempted to make a phone call. Under these circumstances, the Court finds it was objectively reasonable for Deputy Wingo to attempt to enter Plaintiff's vehicle by opening the vehicle's door.

After Deputy Wingo attempted to enter the vehicle to remove Plaintiff from the vehicle, Plaintiff resisted Deputy Wingo by pulling the door closed and lifting his knees, which prevented Deputy Wingo from entering the vehicle. Deputy Wingo then attempted to subdue Plaintiff with his Taser, but Plaintiff continued to resist Deputy Wingo's efforts by trying to grab the Taser and pushing it away. The Court finds this continued use of force was also objectively reasonable under the circumstances because a reasonable officer under such circumstances would believe Plaintiff posed an immediate threat to their safety, given the facts surrounding the initial traffic stop and Plaintiff's escalating physical resistance. See e.g. Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)(The "use of [a] taser gun to effectuate [an] arrest . . . was reasonably proportionate to the

difficult, tense and uncertain situation [the officer] faced in [a] traffic stop" where the suspect "repeatedly refused to comply with [the officer's] verbal commands.").

Accordingly, under the totality of the circumstances, the Court finds Deputy Wingo's use of force was objectively reasonable. Deputy Wingo is thus entitled to summary judgment on Counts XVI and XIX.

**(3)   The Civil Conspiracy Claim (Count XX)**

Plaintiff also alleges a civil conspiracy claim as to the December 16, 2016 arrest, asserting that Deputy Wingo conspired with other deputies to violate Plaintiff's constitutional rights on December 16, 2016.  For the same reasons discussed *supra*, the Court finds Plaintiff's civil conspiracy claim is barred by the intra-corporate immunity doctrine.

Accordingly, it is now

**ORDERED:**

1.   Defendant's Motion for Summary Judgment (Doc. #112) is **GRANTED IN PART AND DENIED IN PART.**

2.    The motion is **GRANTED** as to Counts XII, XVI, XVII, XIX, and XX.

3.    The motion is **DENIED** as to Counts II, III, VI, XI, and XIII.

4.    The Clerk shall withhold the entry of judgment until the conclusion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this ___5th___ day of November, 2019.

<br>

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

<br>

Copies: Counsel of record